# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HU CHUN LIANG,

                        Plaintiff,

vs.

DANIEL BARA, HEPHAESTUS
FOUNDATION AG, OLYMPUS DAO, AND
JOHN DOE DEFENDANTS 1-5,

                        Defendants.

No. 22-cv-00541


April 14, 2022

## COMPLAINT

Plaintiff Hu Chun (Jayson) Liang ("Plaintiff"), by and through his undersigned counsel, McDermott, Will & Emery LLP, files this complaint (the "Complaint") against defendants Daniel Bara, Hephaestus Foundation AG, Olympus DAO, and potential John Doe entities and individuals (referred to collectively as "Olympus" or "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      This case concerns a notoriously secretive cryptocurrency enterprise involving "smart contracts" and tens of millions of dollars of various cryptocurrencies. Apparently hoping to avoid liability, the founders of this enterprise (known as "Olympus") were cryptically known only by the screen names "Zeus" and "Apollo." We have finally identified Apollo – Daniel Bara from Weston, Connecticut.

2.      Although this case may appear technologically complex, the scheme here is relatively simple. Mr. Liang, a seed investor, took a chance by providing much-needed start-up

capital to Olympus.  When Olympus became wildly successful, Olympus refused to honor its deal with Mr. Liang.

3.     On March 11, 2021, Mr. Liang provided Olympus seed capital to launch a cryptocurrency company pursuant to a "Token Purchase Agreement" (the "TPA").  Liang also agreed to provide consulting services pursuant to an informal consulting agreement (the "Consulting Agreement").  Olympus promised Liang 4,000,000 of a cryptocurrency called "pOHM" – 2,000,000 pOHM under the TPA and 2,000,000 under the Consulting Agreement. Olympus promised that these pOHM tokens would be eligible to exchange for Olympus's now highly popular cryptocurrency, OHM.[1]  pOHM is only valuable if it can be exchanged for OHM because there is a market to trade OHM for more popular cryptocurrencies, such as Bitcoin (BTC), Ethereum (ETH), and many others.  By contrast, no such market exists for pOHM.

4.     Under the TPA, Olympus deployed a series of "smart contracts"[2] which allowed Mr. Liang to exchange pOHM for an equal number of OHM (the "pOHM Smart Contracts").  To use the pOHM Smart Contracts, Mr. Liang was required to post pOHM and an equal number of stablecoin (i.e., a cryptocurrency pegged to a "stable" asset such as the U.S. dollar or gold) worth 1 U.S. dollar, called DAI.  The pOHM Smart Contracts were designed to exchange one OHM for each posted pOHM and DAI.  Mr. Liang would be able to sell the OHM he received from the pOHM Smart Contracts for BTC, ETH, and other cryptocurrencies.  Mr. Liang would then be able to convert those cryptocurrencies for fiat currency, such as U.S. dollars.

---

[1]  The initial TPA and discussions with Olympus referenced prior names for Olympus's cryptocurrencies, which Olympus publicly changed.  OHM was previously called OLY.  pOHM was previously called pOLY.  For purposes of this Complaint, we refer only to pOHM and OHM.

[2]  The pOHM Smart Contracts were a series of three smart contracts.

5.       Under the Consulting Agreement, Mr. Liang was required to share updates about Olympus with his relatively large social media following and otherwise market Olympus. Mr. Liang performed under the Consulting Agreement by issuing multiple social media posts on various mediums concerning Olympus and coordinating interviews with Zeus.

6.       After receiving Mr. Liang's seed investment, Olympus rapidly gained market traction and the price of OHM skyrocketed.  Rather than share the success with its seed investor as promised, Olympus reneged.  Olympus was apparently upset that Mr. Liang had sold some of the OHM he received and decided to deprive Mr. Liang of any future profits.  Olympus secretly and unilaterally withdrew the pOHM Smart Contracts.  By doing so, Olympus eliminated Mr. Liang's ability to generate any value from his investment.  Mr. Liang is now stuck with worthless pOHM that is no longer convertible into the valuable OHM.

7.       When Mr. Liang realized that he could not redeem his pOHM, he assumed it was a mistake.  He reached out to Olympus to resolve the issue.  After a couple of messages, it became clear something was wrong.  Olympus then stopped responding.  To date, Mr. Liang has been unable to convert 3,999,170.07 of the pOHM he received under the TPA and Consulting Agreement.

8.       Since inception, Olympus has been shrouded in secrecy.  Its attempts to retain anonymity are well-known.  Per the New York Times: "Olympus is largely controlled by its pseudonymous founder, Zeus, whose statements about the business model have baffled industry insiders.  The result has been to leave even crypto enthusiasts musing publicly that the operation

is probably a Ponzi scheme entirely reliant on participants' continual faith and inflows of crypto to stay afloat."[3]

9.      Olympus apparently believed it could avoid liability by hiding behind screen name aliases and fictitious corporate entities.  However, we uncovered the identity of Olympus's founder and key principal, "Apollo."  His name is Daniel E. Bara and he resides at 28 Hillcrest Lane, Weston, Connecticut 06883-1105.  Bara signed the TPA and spoke with Mr. Liang on the phone. We are continuing to investigate the identity of "Zeus."

10.      Mr. Liang is seeking to recover of the value of the 3,999,170.07 OHM still owed to him pursuant to the TPA and the Consulting Agreement.  Olympus unilaterally withdrew the pOHM Smart Contracts and converted Mr. Liang's ability to obtain any value for his investment and consulting services.  Mr. Liang is entitled to the highest possible value of the approximately 707,733.7 OHM that were vested from the date he should have been able to convert to the date of the judgment.

11.      Mr. Liang is also entitled to the right to convert the remaining 3,292,266.3 pOHM to OHM or damages in an amount to be determined at trial, but no less than the current market value of that remaining OHM.  In terms of U.S. dollars, Mr. Liang is owed in a range between $20,333,189 and $2,271,435,988 based on the significant price fluctuation between today's prices ($28.73 USD) and the highest price of OHM since the date Mr. Liang should have been able to convert ($3,209.43 USD), plus statutory interest and costs.

12.      Accordingly, Olympus is liable for: (1) breach of the TPA; (2) breach of the Consulting Agreements; (3) conversion; (4) common law fraud; and (5) civil conspiracy.  In

---

[3] *Reality Intrudes on a Utopian Crypto Vision*, Eric Lipton and Ephrat Livni, New York Times, (March 8, 2022) https://www.nytimes.com/2022/03/08/us/politics/cryptocurrency-dao.html

addition to monetary compensation, we also request that the Court direct Olympus to reactivate the pOHM Smart Contracts so that Mr. Liang can continue to mint OHM as his pOHM continue to vest.

## PARTIES

13.     Plaintiff Hu Chun (Jayson) Liang is a resident of Paddington, Queensland, Australia.

14.     Defendant Daniel Bara ("Bara") is a resident of Weston, Connecticut.  Bara (who goes by the alias "Apollo") is the key promoter of Olympus.

15.     Hephaestus Foundation AG ("Hephaestus") is a fictitious unformed entity used by Bara and John Doe Defendants to execute the TPA with Mr. Liang.  Our review of publicly-available information reveals that no such entity has ever been organized.

16.     Olympus DAO is an organization controlled and operated by Bara, Zeus, and the John Doe Defendants that controls the website (https://www.olympusdao.finance/), the various social media accounts, and has launched the cryptocurrency OHM.

17.     John Doe Defendants are the entities, founders, promoters, executives, and others responsible for the management of Olympus.  The John Doe Defendants include, but are not limited to, the natural person or persons controlling the screen name "Zeus," including those who conducted the various interviews and "Ask Me Anything" (commonly referred to as "AMAs"), purportedly being performed by Zeus.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Mr. Liang and the Defendants are completely diverse in citizenship and the amount in controversy exceeds $75,000.

19.     Unincorporated entities have no independent citizenship and instead take on the citizenship of each of their members.  *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990). Because Bara is a citizen of Connecticut, the unincorporated entities Olympus DAO and Hephaestus AG are citizens of Connecticut and are subject to this court's personal jurisdiction.[4]

20.     Venue in this judicial district is proper under 28 U.S.C. § 1391 because Bara resides in Weston, Connecticut and the sale giving rise to Mr. Liang's claim occurred in Connecticut.

**GENERAL CRYPTOCURRENCY BACKGROUND AND KEY DEFINITIONS**

21.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens."  Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Most customers purchase cryptocurrency speculating that the price of that particular cryptocurrency will increase.  Some cryptocurrencies are also used to buy goods and services.  Bitcoin (BTC) and Ethereum (ETH) are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

22.     All cryptocurrencies exist on a "blockchain."  A blockchain is an open-sourced string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are

---

[4] The TPA includes a non-exclusive arbitration clause stating "to the extent permissible under applicable law, the Purchaser hereby irrevocably agrees that any suit, action or proceeding ("Action") with respect to this Agreement may, but need not, be resolved, whether by arbitration or otherwise, within ZUG, SWITZERLAND."  Because the arbitration clause is non-exclusive, the parties have the right to bring an action in any venue that has jurisdiction and are not restricted to Swiss arbitration.

publicly available.[5]  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain" – a "block"-"chain."

23.     There are a number of different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency Ethereum.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.  The OHM cryptocurrency that is the subject of this lawsuit is one of the thousands of ERC-20 tokens that exist on the Ethereum blockchain.

24.     Smart contracts are open-sourced code that exist on the blockchain and dictate to the market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer cryptocurrency.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  However, the designer of the smart contract can retain the ability to "withdraw" the smart contract, which effectively cancels it.

25.     Users generally hold tokens in digital wallets.  On the Ethereum blockchain, tokens, wallets, and smart contract are all identifiable public by unique public keys.  These public keys are

---

[5] There is one exception not relevant here.  Certain blockchains are "private" blockchains.  In those blockchains, the transactions are not public.

40 digit alphanumeric strings, such as "0x36994486c6e97c170065899d8659a28d7371c800." Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time tokens are traded, or any time a smart contract is used.

26.     There are number of cryptocurrencies called "stablecoins." Stablecoins are "stable" because their value is pegged to a "stable" asset such as the U.S. dollar or gold. The purpose of stablecoins is to allow users to transact without the volatility of other cryptocurrencies like ETH. In one well known example, MakerDAO uses algorithms to peg the value of its stablecoin, DAI, to one U.S. dollar.

27.     In addition to being traded as assets, ERC-20 tokens can also convey voting rights. A common governance structure would require individuals controlling 51% of tokens to vote to allow a change to a smart contract. Many protocols advertise that they are "decentralized," meaning that the governance of their protocol is designed to distribute control through a community by using a democratic voting structure. However, because creators of protocols design these governance provisions themselves, many protocols have governance structures that allow small groups of individuals to retain control.

28.     Such claims of being "decentralized" have become popular among those in the cryptocurrency space as users seek to skirt regulation by the United States Securities and Exchange Commission ("SEC"). These claims gained popularity following the SEC's public statement that Bitcoin and ETH have become sufficiently decentralized that they are not "securities."[6]

---

[6] *See Remarks at the Yahoo Finance All Markets Summit: Crypto*, William Hinman (June 14, 2018) ("And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise…[and] based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions.")

29.     The theory behind these enterprises is that investments into a "DAO" in the form of purchasing tokens or other investments do not constitute "securities" because the project is "decentralized" and thus the investor is not making its investment "in a common enterprise" with the expectation of "profits to be derived solely from the efforts of others." *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

30.     Seizing on the importance of "decentralization" to avoid securities regulation, some groups of individuals call themselves "decentralized autonomous organizations" or, more commonly, "DAOs." These DAOs sometimes have some governance structure embedded as smart contracts on the blockchain, commonly with the goal of taking some collective action through a decentralized decision-making process. They may or may not have affiliated corporate entities through which they transact business. DAOs may also create protocols and/or issue tokens on the blockchain itself to generate interest or raise funds.

31.     In recent years, the term "decentralized finance" or "DeFi" has become popular. This term has been widely applied to traditional lending, yield earning, and banking services that are not being performed by a centralized bank or financial institution. Instead, these services are being provided solely by "decentralized" organizations and governed by self-executing smart contracts. In reality, many products that claim to be "DeFi" and completely "decentralized" are actually being controlled by a group of natural person insiders who are making decisions, marketing the product, running the websites, and generally control nearly everything related to the so-called "DeFi" project.

32.     An important element of many DeFi protocols is "staking." Staking is, on a basic level, lending tokens to a protocol in exchange for the promise of a return. "Stakers" can place

their cryptocurrency into the protocol and in exchange the users gain interest on their investment, called "yield."

33.     Olympus created two ERC-20 tokens relevant to this case, pOHM and OHM. Olympus also marketed itself as "decentralized" and as a DAO.  Finally, Olympus is also part of a so-called DeFi protocol in which it urges owners of OHM to "stake" it with Olympus in order to earn a yield.

## FACTUAL BACKGROUND

### I.     Olympus

34.     Olympus was introduced to the public in a February 1, 2021 blog post titled "Introducing OlympusDAO, An Algorithmic Currency Protocol."[7]  The post outlined the Olympus platform and technologies (the "Protocol").  According to Olympus, it would hold the stablecoin DAI to stabilize the value of OHM, arguing "the fact that the protocol holds DAI for each token allows us to say with certainty that OHM will not trade below its intrinsic value in the long term."

35.     According to the blog, Olympus profited when OHMs were created or destroyed because "the fact that the protocol holds DAI for each token allows us to say with certainty that OHM will not trade below its intrinsic value in the long term."  Olympus would also share profits with its "stakers."

36.     Olympus further indicated that it would attempt to earn profits on the DAI it was holding by "plug[ing] those assets into yield aggregators."  A "yield aggregator" is a product that purports to generate optimal interest rates by lending or staking cryptocurrency assets to a number of different entities or protocols.

---

[7] *See Introducing OlympusDAO, An Algorithmic Currency Protocol,* OlympusDAO (Feb. 1, 2021),        https://olympusdao.medium.com/introducing-olympusdao-a-true-digital-currency-protocol-648c00c572d2

37.     Olympus noted that its explanation was "intentionally vague on implementation details to avoid front-running."   Olympus stated it would "share more of the 'how' closer to launch."

38.     Olympus marketed itself as a marketplace that could "achieve stability while still maintaining a floating market-driven price."  Olympus encouraged purchasers to use OHM "as an alternative to holding USD."

39.     Concurrent to its public facing launch, Olympus also privately raised start-up capital to build out the Protocol through a "presale" of pOHM (pre-OHMs).  Olympus stated that the presale was necessary to "build[] a solid protocol" by bringing in "funds and individuals [they] believe[d] [could] be pivotal to the success of the protocol."[8]  Mr. Liang was one such early-stage investor.

40.     Through contractual relationships like the TPA, Olympus accepted start-up capital in exchange for the future delivery of pOHM, which were convertible to OHM.  Because pOHM are not traded on any exchange and hold no independent value, the consideration for the investors was the valuable OHM it would receive following the conversion.  pOHM are not traded anywhere and are worth nothing if they cannot be converted to OHM.

41.     Olympus created the pOHM Smart Contracts, which were supposed to track the terms of the TPA.  These pOHM Smart Contracts provided the ability to exchange one pOHM plus one DAI in exchange for one OHM.  Since April 2021, OHM tokens are widely traded on both decentralized and centralized exchanges and have been valued at a low of $27.29 and high of

---

[8] *See* OlympusDAO, *What is pOHM?* (Mar. 13, 2021) https://olympusdao.medium.com/what-is-poh-16b2c38a6cd6.

$3,209.43 per token.[9]  The pOHM Smart Contracts are unilaterally controlled by Olympus, Bara, and John Doe defendants.

42.     While marketing itself as a DAO, Olympus is run by an internal circle of promoters, including Bara and Zeus, who can unilaterally withdraw smart contracts.[10]  These individuals maintained secret back-end control of the pOHM Smart Contract and used it to damage Mr. Liang while enriching themselves.

**I.     The Token Purchase Agreement**

43.     In or around February 2021, Mr. Liang and Olympus discussed an early-stage investment to fund the creation of Olympus and its Protocol.

44.     After several conversations with Olympus, specifically Bara and Zeus, Mr. Liang was convinced to enter into the TPA and to invest 50,000 DAI.

45.     Olympus and its consultant, Ryon Nixon of Horizon Law and Consulting, drafted the TPA and provided Mr. Liang a copy.

46.     On March 11, 2021, Mr. Liang and Bara executed the TPA.

47.     Under the TPA, Mr. Liang invested 50,000 DAI in exchange for 2,000,000 pOHM that would be convertible to an equal amount of OHM.

48.     Concurrent to executing the TPA, Olympus and Mr. Liang also entered into a verbal Consulting Agreement for an additional 2,000,000 pOHM that would be convertible to an equal amount of OHM.  Mr. Liang agreed to provide Olympus marketing services, including promoting OHM to his substantial social media following in China.  As is commonplace for early-stage

---

[9] *See* CoinMarketCap Olypmus V2, https://coinmarketcap.com/currencies/olympus/.
[10] *See Reality Intrudes on a Utopian Crypto Vision*, Eric Lipton and Ephrat Livni, New York Times, (March 8, 2022) https://www.nytimes.com/2022/03/08/us/politics/cryptocurrency-dao.html ("But Olympus is largely controlled by its pseudonymous founder, Zeus. . . .").

cryptocurrency companies, Mr. Liang and Olympus agreed that the Consulting Agreement did not need to be reduced to a formal contract.

49.     On March 14, 2021, Mr. Liang transferred 50,000 DAI to the digital address provided by Olympus.  Olympus transferred the 4,000,000 pOHM to Mr. Liang's digital wallet.

50.     Under the TPA, Olympus promised to deliver "a number of [pOHM] tokens" which were "being designed to give the Purchaser the right to mint [OHM]…."

51.     The TPA states that "[pOHM] acquired during the first Tranche (Tranche I) will vest" (meaning become exchangeable for OHM) "at a rate of 2% of the Token supply."  Elsewhere the TPA states that the vesting period was to be "linearly calculated, as a maximum at all times of 3.5% of the total Protocol."

52.     Olympus's marketing materials described the purpose of pOHM as "[bringing on] funds and individuals we believe can be pivotal to the success of the protocol."[11]  Olympus described the initial investments as "a private funding round."  Olympus stated "pOHM is a precursor derivative of OHM; it gives the holder the option to mint OHM by burning pOHM."  Pursuant to the TPA and the pOHM Smart Contract, a holder of pOHM had the ability to exchange one pOHM and one DAI in exchange for one OHM.[12]  As described by Olympus, "the value of pOHM is worth the price of OHM minus [one DAI]."[13]

---

[11] *What is pOHM?*, OlympusDAO (March 13, 2021) https://olympusdao.medium.com/what-is-poh-16b2c38a6cd6.

[12] *See* Exhibit A (TPA) at 1 ("[Hephaestus] hereby issues to the Purchaser the right, to receive a number of pOLY (the'Tokens') being designed to give the Purchaser the right to mint OLY by providing the protocol (the 'Protocol') DAI for a total equal to the amount listed above under the 'Token Amount.' Minting will be restricted to a vesting period linearly calculated, as a maximum at all times of 3.5% of the total Protocol.").

[13] *Id.*

53.     The TPA created a "right to mint [OHM]" by providing that Olympus would implement a protocol to exchange one DAI and one pOHM for one OHM.

54.     pOHM is worthless unless it can be exchanged for OHM.  As explained in the TPA, "[n]o exchange is currently listing [pOHM] in the United States, or elsewhere."

55.     On the other hand, OHM is tradable for other cryptocurrency and fiat on a variety of cryptocurrency exchanges and can also be staked on the Olympus protocol to earn more OHM. OHM has been sold at prices ranging from $27.29 to $3,209.45 from March 28, 2021, to present.

56.     Because pOHM is worthless absent the right to exchange and OHM is valuable, the "right to mint" in the TPA is the entire consideration being paid by Olympus to Mr. Liang.

57.     The TPA states that "[changes to the protocol that affect OHM] distributions [] require a *majority support from Token holders*."  (Emphasis added.)  "In the Protocol's case, while unlikely, the DAO (*at the control of a majority of Token-holders*) may take the Protocol in a different direction than is currently planned."[14]   (Emphasis added.)  As described below, Olympus actually maintained secret back-end control to withdraw smart contracts.

58.     What Mr. Liang never expected was that that value of his pOHM would go to zero when Olympus used its secret back-end control of the pOHM Smart Contracts to prevent Mr. Liang from exchanging pOHM for OHM.

## II.     Mr. Liang Performs on the Consulting Agreement

59.     After Mr. Liang executed the TPA and Consulting Agreement, he began marketing Olympus to his social media and messaging application followers.

---

[14] *See also* Exhibit A (TPA) at 38 ("In the event the existing technology of the Tokens proves inadequate to the demands of its Token holder/user base, *solutions may be difficult to implement as they may require the majority consent of existing users*, for example, if they are implemented via a fork.") (emphasis added).

60.     For example, Mr. Liang created a WeChat group with hundreds of potential Chinese investors advertising Olympus.  Mr. Liang advertised Olympus to this investor group. Mr. Liang also maintains an active Twitter account under the handle @jaysonhu2018.  Mr. Liang has over 21,000 Twitter followers.

61.     Mr. Liang regularly discusses early-stage cryptocurrency projects through his @jaysonhu2018 Twitter handle.

62.     Mr. Liang is well known for identifying and discussing successful cryptocurrency projects.

63.     For this reason, Olympus agreed to pay Mr. Liang to promote Olympus through his Twitter handle.  Mr. Liang began performing in March 2021.[15]



64.     After that, as Mr. Liang promised, he continued to promote OHM through a series of public Tweets promoting Olympus.[16]

---

[15] @jaysonhu2018, Twitter (Mar. 26, 2021)
https://twitter.com/jaysonhu2018/status/1452779484239712256
[16] @jaysonhu2018, Twitter (Oct. 25, 2021)
https://twitter.com/jaysonhu2018/status/1452779484239712256



65.     In April of 2021, Mr. Liang assisted Zeus create a WeChat profile.  WeChat is a popular messaging platform.  WeChat is particularly popular in Asian countries and is regularly used to discuss early-stage cryptocurrency investment opportunities.  Mr. Liang then attempted to set up "Ask Me Anything" (AMA) sessions at which Zeus, Apollo (Defendant Bara) and others at Olympus would speak directly with potential investors.  According to Zeus, he was unable to create a WeChat account and for this reason the AMA session never occurred.

66.     Through these actions, Mr. Liang met his obligations under the Consulting Agreement.

**III.    Mr. Liang Sells His OHM**

67.     According to Olympus' blog, on April 15, 2021, the supply of OHM was "~230k."[17]  As of April 13, 2022, according to Olympus, the total supply of OHM is 17,693,343.[18]

---

[17]*Dai Bonds: A More Effective Sales Mechanism*, OlympusDAO (April 15, 2021) https://olympusdao.medium.com/dai-bonds-a-more-effective-sales-mechanism-c9a57586f1f7

[18] *Dashboard*, OlympusDAO (April 13, 2022) https://app.olympusdao.finance/#/dashboard

68.     Separate and apart from the TPA and Consulting Agreement, on March 23, 2021, Mr. Liang purchased 141.34 OHM for a price of $4 per OHM in connection with a pre-sale on the social media platform Discord (the "Discord Sale").

69.     Mr. Liang also "staked" his OHM.  Mr. Liang earned additional OHM from staking.

70.     In the first quarter of 2021, Mr. Liang's pOHM tokens began to vest.  On March 25, 2021, Mr. Liang was able to begin using the original smart contract 0xEEC0deeac0ac7E9c8B50e2153afa5aE9f3a13e17 (the "Original pOHM Smart Contract") to exchange pOHM to OHM.  That day, he posted 82.42 pOHM and 82.42 DAI and received 82.42 OHM from the Original pOHM Smart Contract.[19]  Mr. Liang was able to continue to use the Original pOHM Smart Contract several additional times on April 4, 8, 11 and 12, to convert pOHM to OHM.

71.     Mr. Liang accumulated several hundred OHM this way, and staked them all, along with the OHM he received in the Discord Sale, to earn even more and hold a total of over 700 OHM by May.

## IV.     Olympus Restricts Mr. Liang from using the pOHM Smart Contract

72.     On May 12, 2021, Mr. Liang sold 702.925 OHM on the decentralized cryptocurrency exchange "Sushiswap" and received 363,076 DAI (the "May 12 Transaction").[20] The OHM he sold were a combination of OHM from the Original pOHM Smart Contract, the Discord Sale, and OHM he had earned from staking the OHM he received in the Discord Sale.

---

[19]The pOHM Smart Contract is identified by the following digital address: 0xEEC0deeac0ac7E9c8B50e2153afa5aE9f3a13e17.

[20]See Etherscan, *Transaction Details* (April 13, 2022), https://etherscan.io/tx/0x352e13f8c82e2b5373a5c4ee452f685b03e849ba5c0a93b7df8447a61f7dd0f2

73.     Immediately after the May 12 Transaction, Bara on behalf of Olympus called Mr. Liang.  Bara was irate and told Mr. Liang not to sell OHM.

74.     Bara told Mr. Liang to use immediately the DAI proceeds of the May 12 Transaction to buy OHM, even though it would be at a loss.  Bara refused to hang up the phone until Mr. Liang used the DAI he received by selling OHM to purchase OHM.  Just half an hour after he sold his 702.925 OHM Mr. Liang relented and, at Bara's direction, Mr. Liang used the 363,076 DAI to buy 691.53 OHM.  This trade was at a loss to Mr. Liang of 11.395 OHM.[21]

75.     Even though Mr. Liang had acceded to Bara's demands, Olympus was apparently still unhappy with Mr. Liang.  On May 16, 2021, after Mr. Liang transferred 741.97 OHM to a different digital wallet, Bara contacted Mr. Liang again.  In a chat on May 19, 2021, Bara accused Mr. Liang of "dumping the market."[22]



**Apollo_(3,3)** 05/19/2021
Hi Jayson
https://etherscan.io/token/0x383518188c0c6d7730d91b2c03a03c837814a899?a=0xe1e45bd3589fa8b61347645e46de791d2a9d4f21



Ethereum (ETH) Blockchain Explorer

**Olympus (OHM) Token Tracker | Etherscan**

Olympus (OHM) Token Tracker on Etherscan shows the price of the Token $481.62, total supply 4,029,104.807567036, number of holders 703 and updated information of the token. The token tracker page also shows the analytics and historical data.

Ω

So you transfered to another wallet and you are dumping the market ?
Can you talk for a minnute ?

76.     It became clear that Bara did not want any large sales of OHM so that the price of OHM would continue to increase.  Early-stage cryptocurrency companies refer to early sales of new tokens as "dumping", which could cause the price of a token to decrease.

---

[21] *See* Etherscan, Transaction Details (last visited April 13, 2022).
https://etherscan.io/tx/0xb17b293e64bc8a8d389471a686f947a554aa4df542b2a3cc9517b05b6284de25

[22] *See* Exhibit B (May 19, 2021 Chat Log)

77.     Bara's pressure tactics were an obvious attempt to inflate artificially the price of OHM.  Bara and Olympus were attempting to manipulate the market by indicating that investors were holding and not selling OHM.  By pressuring Mr. Liang to not sell and to use the proceeds of prior sales to buy more OHM, Bara ensured that the price of OHM would not be negatively affected by Mr. Liang's sales.

78.     Despite acceding to Olympus's demands, on or around June 2021, without warning, Olympus withdrew the Original pOHM Smart Contract, which made it impossible for Mr. Liang to redeem pOHM for OHM.

79.     Mr. Liang became aware that he could no longer use the Original pOHM Smart Contract on or around June 16, 2021, when he attempted to exchange his pOHM for OHM but was unable to do so.

80.     That day, Mr. Liang reached out to Bara, who suggested Mr. Liang was using the Original pOHM Smart Contract incorrectly.

81.     Publicly available blockchain records show that the Original pOHM Smart Contract has not been used by anyone to mint OHM since April 13, 2021.[23]

82.     Mr. Liang soon realized the Original pOHM Smart Contract had been withdrawn and a new one was created 0x053449023313a67B0Ea179Ae2c4ACd65afDAA729 (the "Second pOHM Smart Contract").

83.     On June 17, Mr. Liang raised this issue with Apollo.  By reviewing publicly available records on Etherscan, a website that compiles records from the Ethereum blockchain,

---

[23]*See    0xEEC0deeac0ac7E9c8B50e2153afa5aE9f3a13e17,*   Etherscan   (April   13,   2022) https://etherscan.io/address/0xeec0deeac0ac7e9c8b50e2153afa5ae9f3a13e17#tokentxns

Mr. Liang could see that other seed investors were using the Second pOHM Smart Contract to exchange pOHM for OHM.  But Mr. Liang was unable to use the Second pOHM Smart Contract.

84.     On or around July 4, 2021, Mr. Liang was permitted to use the Second pOHM Smart Contract.

85.     That day, Mr. Liang exchanged 284.3 pOHM and 284.3 DAI for 284.3 OHM. He then sold 69 OHM.  Predictably, on July 5, 2021, Olympus sent Mr. Liang another angry message stating that Mr. Liang was "the only investor that has sold."  "[D]ude are you serious?" said "Zeus," "you make up 75% of the investor sales almost."



Not Zeus 07/05/2021
dude are you serious?
why are you selling
you are the only investor that has sold
you make up 75% of the investor sales almost

86.     Mr. Liang replied, "I thought the issue was 'dumping the market' and now it seems your expectation is 'not selling.'"

Jayson 07/06/2021
Hey Zeus, I am sorry if this act upsets you. (edited)
I won't be selling newly vested OHM then.
I was under the impression that I am free to sell the vested part.
Shall we have a call to talk about this issue, and understand more about your position in terms of vesting and selling? (edited)

Jayson 07/06/2021
I thought the issue was "dumping the market", and now it seems your expectation is "not selling". I think everything can be talked about, and let's try to find common ground before any other misunderstanding. Also, I was not checking what other investors are doing.

87.     Zeus apologized and explained he was "actively trying to fix how they work" presumably in an attempt to prevent users from selling OHM.  Zeus admitted he was "upset with the situation in general" and "acutely aware of the fact that it [was] a miscommunication on [Zeus'] end."[24]

---

[24] *See* Exhibit C (July 5th, 2021 Chat Log)

 **Not Zeus** 07/06/2021
yes im sorry
im actively trying to fix how they work
i am sorry i lashed out at you, im upset with the situation in general and that set me off a bit (edited)

 **Jayson** 07/06/2021
No problem man. We can talk about this.
We should have talked about this last time.

 **Not Zeus** 07/06/2021
i'm acutely aware of the fact that it is miscommunication on my end that results in countering behaviors
yes

88.   Mr. Liang was able to use the Second pOHM Smart Contract again on July 12, 2021, and July 20, 2021 to mint another 101.3 and 101.6 OHM respectively, bringing the total number of OHM he had minted to 829.93.  Mr. Liang has never since been able to mint OHM.

89.   Publicly available blockchain records show that the Second pOHM Smart Contract has not been used by anyone to mint OHM since July 20, 2021.[25]

90.   On August 3, 2021, Mr. Liang realized that he had lost the ability to use the Second pOHM Smart Contract.[26]  That day, Mr. Liang raised the issue with Zeus:  "Hi Zeus, [the Second pOHM Smart Contract] 0x053449023313a67B0Ea179Ae2c4ACd65afDAA729 is not working again . . . Could you please kindly look into this?  Thanks!"[27]

91.   The next day, in response, Zeus told Mr. Liang that Olympus had changed contracts again, and directed Mr. Liang to use a smart contract called "0x5328e11B0ff87EADC9387E2CF6e458647e1f49e8" (the "Third pOHM Smart Contract").

---

[25]*See 0x053449023313a67B0Ea179Ae2c4ACd65afDAA729,* Etherscan (April 13, 2022) https://etherscan.io/address/0x053449023313a67b0ea179ae2c4acd65afdaa729

[26] Inputting Mr. Liang's digital address in the "claimableFor" field results in the following error: "[ claimableFor (address) method Response ] uint256: Error: Returned error: execution reverted: SafeMath: subtraction overflow."

[27] *See* Exhibit D (August 3rd, 2021 Chat Log)

The issue, according to Zeus, was "because we changed contracts" and it "just happened two days ago."[28]

92.     The Third pOHM Smart Contract did not and still does not permit Mr. Liang to redeem pOHM for OHM as he is entitled to do under the TPA.

93.     By either revoking Mr. Liang's permission to the pOHM Smart Contracts or withdrawing pOHM Smart Contracts, Olympus divested Mr. Liang of his ability to convert pOHM to OHM.  Mr. Liang's right to convert pOHM to OHM was stated in the TPA.[29]

94.     Despite the TPAs representation that changes that affect OHM distribution would require a majority vote of OHM token holders,[30] none of these changes to the pOHM Smart Contracts was put to a vote.

95.     In so doing, Olympus effectively stole Mr. Liang's right to the OHM he is owed under the TPA and Consulting Agreement.

96.     Mr. Liang continued to press the issue with Zeus and Apollo.  On October 20, 2021, Mr. Liang reached out to Zeus: "Hi Zeus, not trying to bother you too much given that you must be super busy.  But there is something wrong with the vesting contract.  The new vesting contract

---

[28] *Id.*

[29] *See* Exhibit A (TPA) at 1, 8 ("[Olympus] hereby issues to the Purchaser the right, to receive a number of pOLY (the 'Tokens') being designed to give the Purchaser the right to mint OLY by providing the protocol (the 'Protocol') DAI for a total equal to the amount listed above under the 'Token Amount.'"; "except as expressly provided herein purchaser understand that pOLY is a utility token to control the rate at which Purchaser's OLY is minted.").

[30] *See id* at 10, 12 ("[changes to the protocol that affect OHM] distributions [] require a majority support from Token holders."; "In the Protocol's case, while unlikely, the DAO (at the control of a majority of Token-holders) may take the Protocol in a different direction than is currently planned[.]").

you gave me is not working either.  I waited for a few months and it is still not working.  The last time I vest was 92 days ago.  Please kindly get back to me.  Thank you."[31]

97.    Mr. Liang sent repeated messages to Olympus and received no response.   For example, on November 9, 2021, Mr. Liang sent the following message:

> Hey Zeus, it seems that you are avoiding me, I don't know why.  I thought our misunderstanding [we]re solved [a] long time ago over the phone, and since then, the vesting contract was changed, and none of my messages are [being] responded [to].  I tried to contact you via Discord, Twitter DM, and Email.  I also contact Apollo, he said he will talk to you.  I am hoping to get a respon[se] from you.  I don't think there is a big issue between us, and hopefully we could work this out.  This will be the last message that I am sending before involving 3rd parties.[32]

98.    Olympus did not respond until November 24, 2021.

99.    On November 24, 2021, Zeus sent the Third pOHM Smart Contract's web address

https://etherscan.io/address/0xaCCC8306455BaA01593Fa6267809fEA72F684169#readContract

to Mr. Liang again, telling him that "it has and has had your terms."[33]



100.    The Third pOHM Smart Contract did not work either.   Not only did the Third pOHM Smart Contract not work for Mr. Liang, but publicly available blockchain records show that the Third pOHM Smart Contract has never been used to mint OHM by anyone.

101.    Mr. Liang continued to reach out to Olympus.  Olympus did not respond.

---

[31] *See* Exhibit D (August 03, 2021 Chat Log)

[32] *See* Exhibit E ( November 11, 2021 Chat Log)

[33] *Id.*

102.    In total, Mr. Liang has only been able to obtain 829.93 of the 4,000,000 OHM he was due under the TPA and Consulting Agreement.

103.    During a public "Ask-Me-Anything" session on the platform Twitch on January 27, 2022, Zeus confirmed Mr. Liang's worst fears, stating "I don't think we ever made large scale comms on this, there was an issue, so [pOHM the token] doesn't exist.  It exists on chain, [but] it hasn't been used for six months."[34]  This statement made clear that, unless he took action, Mr. Liang would never recover the balance of his promised OHM.

104.    Since November 2021, through counsel, Mr. Liang has made repeatedly good faith attempts to settle this matter with Olympus consultant Ryon Nixon of Horizon Consulting and outside counsel Dan Ravicher of Zeisler PLLC.  Representatives for Olympus have repeatedly insisted that Mr. Liang is owed nothing and "has no claim against [Olympus]."  Mr. Liang has thus been left with no choice but to bring this action.

## IV.    Misrepresentations by Olympus

105.    Olympus made several relevant misrepresentations to induce Mr. Liang to invest. Most notably, Olympus continually misrepresented to Mr. Liang that it was a "decentralized autonomous organization" and that crucial decision making regarding his rights would be made by a vote of OHM holders.

106.    On March 11, 2021, Olympus issued a blog post exhaustively explaining its governance structure.

---

[34] *See* Exhibit F (January 27, 2022 Twitch AMA)

107.    In this article, Olympus made several representations about decentralization, including that "[a]ll decisions will be made via snapshot, using OHM as voting power."[35]

108.    Olympus stated that "we are not making decisions, we are merely executing them."[36] Olympus went on that "[a]ll decisions are subject to a 30% quorum, 70% consensus, and 2 day voting period."[37]

109.    Specifically, while Olympus stated that it retained "a few non-critical powers," it made clear "***we cannot move funds or change contracts***" (emphasis added).[38]

110.    Despite that representation, Zeus admitted in his August 4, 2021, communication with Mr. Liang that "we [Olympus] changed contracts." [39]



111.    There were no votes conducted concerning the changes to the pOHM Smart Contracts described above.

---

[35]  OlympusDAO, *The Genesis DAO* (Mar. 11, 2021) https://olympusdao.medium.com/the-genesis-dao-70f0ee6b5b8

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] See Exhibit D (August 03, 2021 Chat Log)

112.    A review of Olympus' "Snapshot" page – a website they used to collect community votes – shows no votes conducted concerning the structure of pOHM or the related smart contracts during the relevant period while the pOHM Smart Contracts were being changed in 2021.[40]

113.    Despite Olympus's representations, in fact, there was no "quorum," "consensus," or "2 day voting period" concerning any of the changes to the pOHM Smart Contracts.

114.    In a March 13, 2021, blog post discussing pOHMs – released just two days after Mr. Liang executed the TPA – Olympus stated, "we can't promise anything because we do not control the DAO."

115.    This statement is a material misrepresentation because Olympus is controlled by a group of promoters including Bara and "Zeus."

116.    The TPA states that the pOHM Smart Contract could only be changed by a majority of participants.[41]

117.    But Olympus unilaterally "changed" the smart contract which eliminated Mr. Liang's ability to exchange his pOHM for OHM.[42]

118.    The Original pOHM Smart Contract was not withdrawn due to any community vote or other decentralized decision-making.

119.    Following Mr. Liang's May 12 sale, Olympus was apparently angry with Mr. Liang and felt he had profited enough, so they unilaterally decided to cut him off.

---

[40] OlympusDAO Snapshot Page (last visited April 13, 2022)
https://snapshot.org/#/olympusdao.eth

[41] *See* Exhibit A (TPA) at 29 ("hard forks that change [OHM] distributions are rare and require a majority support from Token holders"); 28 ("solutions may be difficult to implement as they may require the majority consent of existing users").

[42] *See* Exhibit D (Aug. 03, 2021 Chat Log) ("we changed contracts").

120.    The claim of "decentralization" was important to Mr. Liang.

121.    It is clear from Olympus' actions and communications is not and was at no time functioning as a DAO.   Instead, Bara, Zeus, and other promoters maintained the ability to manipulate the pOHM Smart Contracts.

122.    The "decentralization" claim was also important to Mr. Liang because it assured him that no one promoter or team of promoters could alter the smart contract and divest Mr. Liang of his right to the OHM tokens.

123.    In short, decentralization was a core reasons why Mr. Liang felt comfortable investing in this early-stage company on the other side of the world.

124.    By presenting itself as a "DAO," Olympus was also representing to Mr. Liang that pOHM and OHM were not securities.

125.    In reality, these were false statements because OHM is a security that should have been registered with the SEC.

126.    Had OHM been registered with the SEC, it would have been required to disclose material information, including the identify of its senior management.

127.    A "security" within the meaning of the Securities Act includes a wide range of investment vehicles, including "investment contracts."  As the United States Supreme Court noted in *SEC v. W.J. Howey* Co., Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," 328 U.S. 293, 299 (1946), such that "investment contracts" are instruments, schemes, or transactions through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  SEC guidance has described the

*Howey* test as having three prongs, (1) investment of money in a (2) common enterprise with a (3) reasonable expectation of profits to be derived from the efforts of others.[43]

128.    The first prong, investment of money, is clearly satisfied by Mr. Liang and others exchange of value in the form of DAI for pOHM and OHM.  Independent of the TPA, as part of the Discord Sale, Mr. Liang and others were able to purchase 141 OHM for a price of $4 per OHM on March 23, 2021.  OHM is widely traded on a number of cryptocurrency exchanges where investors purchase OHM with fiat currency and various forms of cryptocurrency.

129.    The common enterprise prong is also established here.  Common enterprise is established by either horizontal commonality, "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" or vertical commonality, which focuses "on the relationship between the promoter and the body of investors."[44]

130.    In this case, OHM purchasers pooled DAI in a common treasury and their initial investment is used to fund Olympus' operations.  The ability of each investor to profit was linked to the ability of Olympus to successful launch the Protocol.  The investors' success in their investment depends on the success of Olympus as a whole.  If Olympus had failed and the pooled funds in the treasury dissipated, investors would have been left with nothing.  Therefore, both horizontal and vertical commonality are established here.

131.    According to the SEC, the third prong – reasonable expectation of profits to be derived from the efforts of others – is usually "the main issue in analyzing a digital asset under the

---

[43]*See* SEC, *Framework for "Investment Contract" Analysis of Digital Assets,* (April 3, 2019) https://www.sec.gov/files/dlt-framework.pdf

[44] *See Revak v. SEC Realty Corp.,* 18 F.3d. 81, 87-88 (2d Cir. 1994)

Howey test."[45]  Olympus regularly released blog posts and promotional materials that indicated that, in fact, Olympus was the product of a "core team" speaking to investors in the first person.[46] These blog posts demonstrate that Olympus' investors could reasonably expect to profit from the efforts of that "core team."

132.    The SEC guidance suggests that the third *Howey* prong is met when "a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise and investors reasonably expect to derive profit from those efforts. . . ." Olympus' "core team" – made up of Zeus, Bara, and John Doe 1-5 – are "APs."

133.    Olympus made clear that the core team's role was to promote and strengthen the protocol, noting of itself that "it's our job to [continuously make] Olympus stronger, more capable, and ever more appealing to new members."[47]  This statement is consistent with the SEC's guidance that "efforts of others" is likely present where "[a]n AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network."[48]

---

[45]*See* SEC, *Framework for "Investment Contract" Analysis of Digital Asssets,* (April 3, 2019) https://www.sec.gov/files/dlt-framework.pdf

[46] *See* OlympusDAO, *OlympusDAO Fundamentals: The Foundations of Web3's Decentralized Reserve Currency* (March 10, 2022) ("You have no doubt heard the ancient tales of Mount Olympus. The mythological heavens where deities reigned supreme as they commanded over the realms of Earth below. This magnificence is what inspired Zeus, the founder of Olympus, along with other core team members to create OlympusDAO — a mighty DeFi protocol that would empower protocols and mechanisms of web3.").

[47] *Introducing OlympusDAO, An Algorithmic Currency Protocol,* OlympusDAO (Feb. 1, 2021), https://olympusdao.medium.com/introducing-olympus-give-9a1cac06a235

[48] *See* SEC, *Framework for "Investment Contract" Analysis of Digital Asssets,* (April 3, 2019) https://www.sec.gov/files/dlt-framework.pdf

134.    The SEC has further suggested that where "[a]n AP has a lead or central role in the direction of the ongoing development of the network or the digital asset" the "efforts of others" prong may be satisfied. [49]   The "core team" stated their managerial purpose most clearly on June 7, 2021 - "The sole purpose of Olympus is to accrue value to the network and OHM token."[50]

135.    Any investor in OHM who read the Olympus blog would expect to be investing in the efforts of the "core team."

136.    In addition to the three prongs, the SEC has stated that, in order to meet *Howey,* investors must have "reasonable expectation of profits."   All public facing communications by Olympus make clear than any investor in OHM would have this expectation.   Olympus has admitted that part of the value of OHM has always been that it would "become worth more"[51]  The purpose of buying OHM is as a speculative asset which can increase in value.

137.    Application of several key SEC factors demonstrate that this reasonable expectation of profits was present.   The SEC has said that it is informative when "[a] digital asset is transferable or traded on or through a secondary market or platform."[52]   OHM is tradeable and traded on

---

[49] *See* SEC, *Framework for "Investment Contract" Analysis of Digital Assets,* (April 3, 2019).

[50]   OlympusDAO,   *June   Review   –   It's   in   the   Fundamentals*   (Jul.   7,   2021) https://olympusdao.medium.com/june-review-its-in-the-fundamentals-e6af64497d28

[51] *See Introducing OlympusDAO, An Algorithmic Currency Protocol,* OlympusDAO (Feb. 1, 2021), ("This system maintains a stable intrinsic value and reduces the incentive role of appreciation in favor of accumulation, like with real currency: you try to get more dollars, you don't hope your dollars become worth more **(though we do have both)**.").

[52] *See* SEC, *Framework for "Investment Contract" Analysis of Digital Assets,* (April 3, 2019).

secondary markets including, notably, major swap protocol Sushiswap and exchanges Korbit and XT.com.[53]

138.    The SEC has also highlighted is that "the AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public."  Olympus made clear *this March* that its "core team" had incentives aligned with investors, stating the following: "They aligned their own incentives to the long term success of Olympus by structuring their 'shares' called pOHM.   The core team is only awarded these tokens when Olympus is succeeding."[54]   As discussed above, the only value of pOHM is to mint OHM.

139.    Olympus has used the sale of OHM to fund its operations, saying "new supply is created via direct sales into the market and burned via direct purchases from the market.  This way, OHM remains backed by real assets in the treasury."[55]   Purchasers of OHM thus understood that they were purchasing shares in a common enterprise.

140.    Had Olympus registered OHM as a security with the SEC, Olympus would have had to file a registration statement which would have disclosed material facts to its investors.

141.    Instead, Olympus promoted that it was "decentralized" and outside of the purview of the SEC.  But Olympus was always run by Defendants.  Because of Olympus's false claim to

---

[53]*See* Sushiswap Eth for OHM Trade (last visited April 13, 2022) https://app.sushi.com/swap?inputCurrency=&outputCurrency=0x6B3595068778DD592e39A122f4f5a5cF09C90fE2

[54] *See* OlympusDAO, *Olympus Fundamentals: The Foundations of Web3's Decentralized Reserve Currency* (March 10, 2022) https://olympusdao.medium.com/olympusdao-fundamentals-the-foundations-of-web3s-decentralized-reserve-currency-ce892008fba

[55]*Introducing OlympusDAO, An Algorithmic Currency Protocol,* OlympusDAO (Feb. 1, 2021), https://olympusdao.medium.com/introducing-olympusdao-a-true-digital-currency-protocol-648c00c572d2

decentralization, it sold pOHM and OHM without disclosing material information to the investing public, such as Mr. Liang.

## V.     While Olympus and Hephaestus are Fictitious Entities and the Founders Were Never Publicly Revealed, Bara is "Apollo"

142.     Another parallel misrepresentation perpetrated by Olympus involved its corporate existence.

143.     The TPA states that the Hephaestus is "duly organized, validly existing and in good standing under the laws of the jurisdiction and of its incorporation, and has the power and authority to own, lease and operate . . . and carry on its business as now conducted."[56]  Elsewhere, the TPA states that Hephaestus is "in formation."[57]

144.     The TPA goes on to state that Hephaestus address is Alpanstrasse 11 6302 Zug Switzerland.

145.     Hephaestus is a fictitious entity that has never been established or organized. The stated address does not exist.

146.     Searches of corporate entities in the United States, Switzerland, and elsewhere reveal no record of "Hephaestus Foundation AG," "Hephaestus Foundation," "Olympus DAO," or "OlympusDAO" being duly organized under the laws of any jurisdiction.

147.     The founders of Olympus are not listed publicly, other than by the screen names "Apollo" and "Zeus."

148.     As discussed above, on May 19, 2021 "Apollo" called Mr. Liang's cell phone to pressure him to use the proceeds of the May 12 Transaction to buy OHM.

---

[56] *See* Exhibit A (TPA) at 6.

[57] *See id.* at 1.

149.    Apollo used the cell phone number +1(203)722-7236 to call Mr. Liang.  The call record on Mr. Liang's cell phone identified the location of the caller in "Connecticut." [58]  Below is a snapshot of the call record:



150.    Using the service Intellius, Mr. Liang conducted a public records search of that cell phone number, which revealed that it may belong to Daniel Bara of Weston, Connecticut.

151.    Westlaw's "PeopleMap Report," which collates publicly available records, also linked the number to Daniel Bara living in Weston, Connecticut.

152.    A Linkedin associated with "Daniel Bara" reveals a man living in Weston, Connecticut, with apparent coding experience.

153.    Daniel Bara is also the person who signed the TPA, both in print and signature.

154.    All this information strongly suggested that Bara was Apollo.

---

[58] *See* Exhibit G (Liang Phone Log)

155.    On February 25, 2022, Mr. Liang's counsel sent a letter to counsel for Olympus asking him if he represented Bara.  Counsel for Olympus did not respond as to whether he represented Bara.

156.    On March 3, 2022, Mr. Liang's counsel Yossy Haezrachy of Haezrachy Law Firm in Tel Aviv called the number +1(203) 722-7236.  Mr. Haezrachy identified himself as counsel for Mr. Liang and asked Bara if he was Apollo from Olympus.  Bara immediately hung up.

157.    Within hours, counsel for Olympus emailed counsel for Mr. Liang confirming Bara was an officer of Olympus.

158.    Olympus's counsel stated that, when Mr. Haezrachy called Bara earlier the day of March 3, 2022, he had attempted to "initiate contact with the Foundation directly."  Olympus's counsel also stated the following:  "Do not attempt to contact the Foundation, its ***officers, directors, employees, or representatives,*** without my consent."

159.    Based on the cell phone records, the trusted third-party database reports, and the confirmation from Olympus's counsel, it is clear that Bara is "Apollo" from Olympus.

## VI.    Mr. Liang's Damages are Extensive

160.    Mr. Liang is seeking to recover of the value of the 3,999,170.07 OHM owed to him pursuant to the TPA and the Consulting Agreement.

161.    Olympus unilaterally withdrew the pOHM Smart Contracts and converted Mr. Liang's ability to obtain any value for his investment and consulting services.

162.    Mr. Liang is entitled to pOHM tokens vesting at a rate of 2% of total OHM supply from the TPA, and 2% vesting from the Consulting Agreement, meaning his tokens should vest at a combined rate of 4% of token supply. As of April 13, 2022, the total supply of OHM is 17,693,343.  4% of 17,693,343 is 707,733.7 OHM, the number Mr. Liang is entitled to as of filing. This number will continue to increase alongside the supply of OHM and until judgment.

163.    Mr. Liang is entitled to the highest possible value of the at a minimum, 707,733.7 OHM that were vested from the date he should have been able to convert to the date of the judgment.

164.    Mr. Liang is also entitled to the right to convert the remaining 3,292,266.3 pOHM to OHM or damages in an amount to be determined at trial, but no less than the current market value of that remaining OHM.

165.    In terms of U.S. dollars, Mr. Liang is entitled to recover the highest intermediate value of the OHM tokens that he did not receive on schedule.  The value of these tokens in U.S. Dollars is an amount in a range between $20,333,189 and $2,271,435,988.  OHM has experienced significant fluctuation in price during this period, and so the estimated range of damages is between today's prices ($28.73 USD) and the highest price of OHM since the date Mr. Liang should have been able to convert ($3,209.43 USD).

166.    If Mr. Liang had received the OHM when it was due to him, he would have been able to sell it at its highest value.  Olympus's actions prevented him from recouping that highest value, damaging him.

167.    The remaining pOHM that have not yet vested should continue to vest according to the schedule set forth in the TPA, allowing Mr. Liang to convert pOHM to OHM until the remainder of his 4 million pOHM are converted.

168.    Mr. Liang is also entitled to statutory interest and costs.

**VII.    Bara and John Does are Liable**

169.    Bara and the John Doe's are all jointly and severally liable for all of Mr. Liang's damages.

170.    Bara personally signed the TPA.  While this was purportedly on behalf of Hephaestus, Hephaestus is not an entity formed under the laws of any jurisdiction.  Bara is thus

personally liable because it is axiomatic law that "[i]f the parties assent that the contract shall be binding, the individual purporting to act on behalf of the unformed entity will be held personally liable under the contract." *See, e.g., BRJM, LLC v. Output Sys.*, Inc., 100 Conn. App. 143, 153, 917 A.2d 605, 612 (2007).

171.    In the absence of any legitimate corporate structure among Bara, Zeus, and John Does, Olympus is considered a general partnership because it is "the association of two or more persons to carry on as co-owners a business for profit forms a partnership."[59]  This is true "whether or not the persons intend to form a partnership."[60]

172.    Olympus is liable for Mr. Liang's injuries because "A partnership is liable for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with authority of the partnership."[61]

173.    Furthermore, "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."[62]

---

[59] Conn. Gen. Stat. Sec. 34-31 4 (a)

[60] *Id.*

[61] Conn. Gen. Stat. Sec. 34-326 (a)

[62] Conn. Gen. Stat. Sec. 34-327 (a)

## CLAIMS FOR RELIEF

## COUNT I
### (Breach of Contract - TPA)

174.   Mr. Liang repeats and re-alleges each and every allegation above as if set forth herein.

175.   Pursuant to Defendants' offer to sell pOHM tokens, Mr. Liang and Defendants entered into an agreement under the TPA whereby Plaintiff purchased 2,000,000 pOHM tokens from Defendants in exchange for 50,000 DAI.

176.   Mr. Liang executed the TPA and upheld substantially all material portions of the TPA.

177.   The TPA was enforceable and supported by valid consideration.

178.   After Mr. Liang attempted to convert the pOHM he purchased from Defendants, Defendants unilaterally altered the smart contracts and eliminated Plaintiff's ability to convert his pOHM to OHM.

179.   In order to receive the benefit of his bargain in the TPA, Mr. Liang had to use the pOHM Smart Contracts.

180.   Defendants intentionally made changes to the pOHM Smart Contracts which prevented Mr. Liang for exercising his rights under the TPA, and thus failed to perform its obligation to provide Mr. Liang with OHM.

181.   By failing to deliver Mr. Liang OHM at a rate of 2% of token supply, Defendants failed to perform on the TPA and materially breached.  Further, by using its unilateral back-end control of the pOHM Smart Contracts to prevent Mr. Liang from receiving the benefit of his bargain, Defendants breached the implied covenant of good faith and fair dealing.

182.    In the TPA, Olympus represented that it was a "decentralized autonomous organization."  In public facing statements, Olympus emphasized a voting structure that defined its decision making, stating that "All decisions are subject to a 30% quorum, 70% consensus, and 2 day voting period."

183.    Olympus was not decentralized.

184.    Contrary to its representations that a "majority of Token-holders" would have to "elect[] to remov[e] the Token redemption smart contracts," Olympus unilaterally "changed" the smart contract which eliminated Mr. Liang's ability to obtain the OHM he is entitled to under the TPA.

185.    As a result of the centralized nature of Olympus, Defendants were able unilaterally to alter the smart contracts and eliminate Plaintiff's ability to convert his pOHM to OHM.

186.    Furthermore, Olympus represented that Plaintiff was signing an agreement with an existing legal entity, Hephaestus.

187.    The TPA states that Hephaestus is "duly organized, validly existing and in good standing under the laws of the jurisdiction and of its incorporation, and has the power and authority to own, lease and operate . . . and carry on its business as now conducted."

188.    Further, the TPA states that Hephaestus "owns or possesses . . . sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes, and other intellectual property rights," of which it clearly does not and cannot.

189.    Hephaestus is a fictitious entity that has never been established or organized. Olympus's statements concerning Hephaestus are all false.

190.    In making materially false statements and falsely representing itself as a valid entity to which Mr. Liang could do business with, Olympus again breached the TPA.

191.    Defendants' breaches of contract were a substantial factor in causing Plaintiffs damages.

192.    As a result of Defendants' breach, Mr. Liang was damaged in an amount to be determined at trial, but within a range, as of April 13, 2022, of $10,166,594 and $1,135,717,994. Mr. Liang is also entitled to an order that his remaining pOHM shall continue to vest and be convertible to OHM.

193.    Mr. Liang is also entitled to an order that his remaining pOHM shall continue to vest and be convertible to OHM at a rate of 2% of token supply.

## COUNT II
### (Breach of Contract – Consulting Agreement)

194.    Mr. Liang repeats and re-alleges each and every allegation above as if set forth herein.

195.    Pursuant to Defendants' offer to sell pOHM tokens, Plaintiff and Defendants entered into the Consulting Agreement whereby Mr. Liang purchased 2,000,000 pOHM tokens from Defendants in exchange for providing certain marketing services.

196.    The Consulting Agreement was enforceable and supported by valid consideration.

197.    Mr. Liang performed under the Consulting Agreement.

198.    After Mr. Liang attempted to convert the pOHM he purchased from Defendants, Defendants unilaterally altered the smart contracts and eliminated Plaintiff's ability to convert his pOHM to OHM.

199.    In order to receive the benefit of his bargain in the TPA, Mr. Liang had to use the pOHM Smart Contracts.

200. Defendants intentionally made changes to the pOHM Smart Contracts, which prevented Mr. Liang for exercising his rights under the TPA, and thus failed to perform its obligation to provide Mr. Liang with OHM.

201. By failing to deliver Mr. Liang OHM at a rate of 2% of token supply, Defendants failed to perform on the Consulting Agreement and materially breached. Further, by using its unilateral back-end control of the pOHM Smart Contracts to prevent Mr. Liang from receiving the benefit of his bargain, Defendants breached their implied covenant of good faith and fair dealing.

202. Olympus, in marketing materials and in the TPA, represented that the Olympus was a "decentralized autonomous organization." In public facing statements, Olympus emphasized a voting structure that defined its decision making, stating that "All decisions are subject to a 30% quorum, 70% consensus, and 2 day voting period."

203. Olympus was not decentralized.

204. Contrary to its representations that a "majority of Token-holders" would have to "elect[] to remov[e] the Token redemption smart contracts," Olympus unilaterally "changed" the smart contract which eliminated Mr. Liang's ability to obtain the OHM he is entitled to under the Consulting Agreement.

205. Mr. Liang entered into the Consulting Agreement under false pretenses that Olympus was decentralized.

206. As a result of the centralized nature of Olympus, Defendants were able unilaterally to alter the smart contracts and eliminate Plaintiff's ability to convert his pOHM to OHM.

207. Defendants' breaches of contract were a substantial factor in causing Mr. Liang's damages.

208.    As a result of Defendants' breach, Mr. Liang was damaged in an amount to be determined at trial, but within a range, as of April 13, 2022, of $10,166,594 and $1,135,717,994.

209.    Mr. Liang is also entitled to an order that his remaining pOHM shall continue to vest and be convertible to OHM at a rate of 2% of token supply.

### COUNT III
**(Conversion)**

210.    Mr. Liang repeats and re-alleges each and every allegation above as if set forth herein.

211.    The pOHM and the right to convert the pOHM to OHM is property of Plaintiff.

212.    Defendants are exercising dominion over the pOHM and the smart contract required to convert the pOHM to OHM.

213.    Defendants' dominion is wrongful, because they have no rightful claim to the pOHM or the smart contract.

214.    Mr. Liang has demanded on multiple occasions that Defendants give back access to the pOHM and unlock the smart contract required to convert the pOHM to OHM, but they have not done so.

215.    Defendants' continued dominion over the pOHM and the smart contract is inconsistent with and in derogation of Plaintiff's right to these assets.

216.    Defendants' conversion of the pOHM and the smart contract was a substantial factor in causing Plaintiffs damages.

217.    Plaintiff is entitled to the immediate return of the pOHM and the unlocking of the smart contract, and any other relief this Court deems just and proper.

218.    As a result of Defendants' breach, Plaintiff was damaged in an amount to be determined at trial, but within a range, as of April 13, 2022, of between $20,333,189 and $2,271,435,988.

**COUNT IV**
**(Common Law Fraud)**

219.    Mr. Liang repeats and re-alleges each and every allegation above as if set forth herein.

220.    Defendants authorized and/or made representations concerning the investment opportunity with Olympus.

221.    Defendants made false and fraudulent statements regarding the decentralization of Olympus.

222.    Defendants falsely and fraudulently represented that Mr. Liang would be receiving 4,000,000 pOHM that he would be able to convert into OHM.

223.    Defendants falsely and fraudulently represented that Mr. Liang, as an investor in OHM, would receive vested pOHMs based on the supply of OHM in the market, and reneging these statements by altering Plaintiff's smart contract to prevent Plaintiff from redeeming his pOHM for OHM notwithstanding the supply of OHM in the market.

224.    Defendants falsely and fraudulently represented the value and stability of OHM.

225.    Defendants falsely and fraudulently represented that the Hephaestus Foundation AG was "in formation."

226.    Defendants falsely and fraudulently stated that Hephaestus Foundation AG had the address Alpanstrasse 11, 6302 Zug Switzerland.

227.    Hephaestus Foundation AG was never formed and does not exist at Alpanstrasse 11, 6302 Zug, Switzerland.

228.    Defendants falsely and fraudulently represented that "All decisions are subject to a 30% quorum, 70% consensus, and 2 day voting period" and that "we cannot move funds or change contracts."

229.    In fact, Defendants did not follow of these procedures, retained secret back-end control of the pOHM Smart Contracts, and "changed contracts" to prevent Mr. Liang from using them.

230.    Defendants conspired to induce Mr. Liang into purchasing OHM and executing the TPA.

231.    Had the Defendants sold Mr. Liang the OHM legally, they would have been required to provide him with certain disclosures, including a registration statement.   That registration statement would have identified material information about Olympus, including the identity of its senior management.

232.    By representing to Mr. Liang that the sale was not subject to United States security law, the conspirators fraudulently induced Mr. Liang into purchasing unregistered securities.

233.    Defendants' representations and omissions were materially false and misleading when made.

234.    Defendants knew that these statements were false, and these representations and omission were made intentionally or with reckless disregard for the truth.

235.    Defendants made these misrepresentations and omissions to Plaintiff directly with knowledge that Plaintiff would rely on them.

236.    Based up on their incomplete and misleading disclosures and in light of the fact that Plaintiffs did not have access to material facts that were uniquely within Defendants' knowledge,

Defendants had an affirmative duty to provide full, complete, and accurate disclosure of these material facts.

237.    Mr. Liang reasonably and justifiably relied to his detriment on Defendants' misrepresentations and omissions and on Defendants' affirmative duty to provide full, complete, and accurate disclosures to them.

238.    Defendants' misrepresentations and omissions induced Plaintiff to invest with Olympus, which they would not have done had Defendants been truthful.

239.    As a direct and proximate result of Defendants' misrepresentations and omissions, Mr. Liang has suffered damages.

240.    As a result of Defendants' breach, Mr. Liang was damaged in an amount to be determined at trial, but within a range, as of April 13, 2022, of between $20,333,189 and $2,271,435,988.

## COUNT IV
**(Civil Conspiracy)**

241.    Plaintiff repeats and re-alleges each and every allegation above as if set forth herein.

242.    Defendants conspired together to intentionally defraud Mr. Liang in all the manners described above, by falsely and fraudulently representing to Mr. Liang that he would be able to convert pOHM to OHM, by falsely and fraudulently representing that Hephaestus was an extant counterparty with an address in Switzerland, and by falsely and fraudulently representing that OHM was not a security subject to United States securities law to sell them to him unregistered securities.

243.    Defendants' acted on this conspiracy by making the above representations to Mr. Liang.

244.    Plaintiff relied on these representations and so was injured by Defendant's fraudulent misrepresentations.

245.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has suffered damages.

246.    As a result of Defendants' breach, Plaintiff was damaged in an amount to be determined at trial, but within a range, as of April 13, 2022, of between $20,333,189 and $2,271,435,988.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief against Defendant:

(1)    Grant Mr. Liang compensatory relief in an amount to be determined at trial, but within a range of between $$20,333,189 and $2,271,435,988 as of the date of this filing, plus statutory interest and fees.

(2)    Order that Mr. Liang's remaining pOHM shall continue to vest and be convertible to OHM at a rate of 2% of token supply for the TPA and 2% of token supply for the Consulting Agreement.

(3)    Grant Mr. Liang attorneys' fees, interest, and costs.

(4)    Grant such other relief as the Court may deem just and proper.

Dated:   New Haven, Connecticut
         April 14, 2022

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFF**

By:  */s/ Ethan Levin-Epstein*
     Ethan Levin-Epstein *(ct01566)*
     **GARRISON, LEVIN-EPSTEIN,**
     **FITZGERALD & PIRROTTI, P.C.**
     405 Orange Street
     New Haven, Connecticut  06511
     Tel.: (203) 777-4425
     Fax: (203) 776-3965
     elevin-epstein@garrisonlaw.com

           -and-

     Joseph B. Evans *(phv forthcoming)*
     Aaron J. Brogan *(phv forthcoming)*
     Jennifer Levengood *(phv forthcoming)*
     **MCDERMOTT WILL & EMERY LLP**
     1 Vanderbilt Avenue
     New York, New York  10017
     Tel.: (212) 547-5400
     jbevans@mwe.com
     abrogan@mwe.com
     jlevengood@mwe.com

     *Attorneys for the Plaintiff Hu Chun*
     *Liang*