# EXHIBIT A

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

## HEPHAESTUS FOUNDATION, AG
(in formation)

## TOKEN PURCHASE AGREEMENT

### (Series 1)

| | |
|---|---|
| **Purchase Amount (Value in DAI):** | **50,000** |
| **Payment Method:** | **DAI** |
| **Amount of Original Currency (if not U.S. Dollars):** | **50,000** |
| **Exchange Rate to U.S. Dollars (if applicable):** | |
| **Purchase Price:** | **DAI 0.025** |
| **Token Amount:** | **2,000,000** |
| **Address, Email and Phone Number of Purchaser or Ultimate Owner (each, as defined below):** | 231 GIVEN TCE PADDINGTON QLD 4064, AUSTRALIA jayson.hu@qq.com |

**THIS TOKEN PURCHASE AGREEMENT** (the "**Agreement**") certifies that in exchange for the payment by  Jayson HU (the "**Purchaser**") of (fifty thousand DAI) DAI 50,000   (the "**Purchase Amount**") on or about 3/11/2021_____     (the "**Effective Date**"), HEPHAESTUS FOUNDATION AG., a Zug , Switzerland foundation (the "**Foundation**"), hereby issues to the Purchaser the right, to receive a number of **pOLY** (the "**Tokens**") being designed to give the Purchaser the right to mint OLY by providing the protocol (the "**Protocol**") DAI for a total equal to the amount listed above under the "**Token Amount**." Minting will be restricted to a vesting period linearly calculated, as a maximum at all times of 3.5% of the total Protocol. Tokens will be received as a swap at the same time DAI are transferred. Risk factors attached hereto as Exhibit A (the "**Risk Factors**"), and, the description of the preliminary token economics attached hereto as Exhibit B (the "**Token Economics**"). *Definitions.*

"**Affiliate**" means: (i) with respect to the Foundation, any entity that, directly or indirectly, controls, is controlled by, or is under common control with the Foundation; or (ii) any other person (including any successor organization including but not limited to a company formed by or with the cooperation of the Foundation) that receives a license or assignment of any material intellectual property from the Foundation (including, without limitation, any trademarks owned by the Foundation) and uses such intellectual property to effect a launch of the Tokens.

"**Business Days**" means any day except Saturday, Sunday or any other day on which banks located in Zug, Switzerland are authorized or required by law to be closed for business.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

"**Decentralization Milestone**" shall mean the moment in time that the Foundation determines that at least thirty three percent (33%) of the staked Tokens are not owned or controlled by the Foundation or any of its Affiliates or their directors, officers, employees or consultants.

"**Disqualified Jurisdiction**" means the United States of America, Algeria, Bolivia, Bangladesh, Macedonia, Saudi Arabia, Qatar, Vanuatu, Vietnam, Pakistan and Afghanistan.

"**Dissolution Event**" means (a) a voluntary termination of operations of the Foundation; (b) a general assignment for the benefit of the Foundation's creditors; or (c) any other liquidation, dissolution, or winding up of the Foundation, whether voluntary or involuntary. A change of control or any public offering will not constitute a Dissolution Event.

"**Dissolving Purchasers**" means the Purchaser and all holders of all other Token Purchase Agreements, or other similar instruments, as of a Dissolution Event, as determined in good faith by the Foundation's board of directors.

"**Governmental Authority**" means any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"**Initial Token Supply**" means the total number of Tokens to be outstanding at Protocol Launch which shall be 1,000,000,000.

"**Law**" means any federal, state, local, municipal, provincial, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement delivered, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"**Protocol Launch**" means the *bona fide* public launch of a fully functioning main Protocol that conforms to the Token protocol as ratified by the Foundation in its sole discretion.

"**Token Purchase Agreement**" means an agreement containing a future right to delivery of Tokens, similar in form and content to this Agreement.

"**Tokens**" shall have the meaning provided in the opening paragraph of this document. For the avoidance of doubt, the meaning shall be inclusive of the singular form, "**Token**."

"**Token Distribution Event**" means a *bona fide* transaction or series of transactions, pursuant to which, after the occurrence of the Protocol Launch, the Foundation distributes Tokens to the Purchasers of Token Purchase Agreements, including this Agreement.

"**Use Restriction**" means the general prohibition on the Purchaser's ability to sell, transfer, spend, exchange, offer, pledge, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, the Tokens as more specifically described in Section 2(f).

"**Use Restriction Period**" means the period commencing on the Effective Date and ending on the later of: (a) one-year plus one day anniversary of the Effective Date; or (b) the achievement of the Decentralization Milestone.

1.    *Events.*

(a)    **Token Distribution Event**.  A Token Distribution Event occurs **with the** execution of this Agreement, the Foundation will, deliver to the Purchaser, according to the procedures specified separately by the Foundation, a number of Tokens equal to the Purchaser's Token Amount.  In connection with, and **as a condition to**, the delivery of Tokens pursuant to this Section 2(a), the Purchaser will: (a) provide to the Foundation a digital wallet address to which the Foundation delivers the Token Amount as more specifically described below; and (b) execute and deliver to the Foundation any and all reasonable transaction documents as the Foundation may determine are related to the distribution of Tokens under this Agreement (the "**Token Distribution Documents**").  The Token Distribution Documents include, but aren't limited to this Agreement and the Risk Factors attached to this Agreement. Such Token Distribution Documents will supersede any and all disclosures, terms and conditions previously provided, made available to or discussed with the Purchaser, if any, except that the economic and other material terms applicable to the Tokens (including the Purchase Price and the Token Amount) shall be as set forth herein and the procedures for delivery of the Tokens to, the Purchaser shall be determined by the Foundation in its reasonable discretion on or about the time of the Token Distribution Event. The Purchaser acknowledges that the Token Distribution Documents are subject to change on an ongoing basis in the sole and absolute discretion of the Foundation as and to the extent the Foundation deems necessary or advisable in connection with the use of the Tokens in the Protocol.  In addition, this Section 2(a) shall not apply if the representations and warranties of the purchasers of Tokens set forth in the Token Distribution Documents are not true with respect to the Purchaser at the time of the Token Distribution Event or if the Purchaser is otherwise not eligible to receive Tokens at the time of the Token Distribution Event under the Token Distribution Documents.  In the event the Purchaser is not eligible to participate in the Token Distribution Event under the Token Distribution Documents, or otherwise under applicable law existing at the time such Tokens are ready for delivery to the Purchaser, the Foundation will, in lieu of delivery of the Tokens to the Purchaser, make commercially reasonable efforts to promptly pay to the Purchaser (as a general unsecured creditor) following the consummation of the Token Distribution Event an amount equal to the Purchase Amount.

For the avoidance of doubt, in connection with the obligation of the Purchaser to provide to the Foundation a digital wallet address to which the Foundation may deliver the Token Amount pursuant to Section 2(a)(ii), it is hereby clarified that such public wallet address must be under the direct control of the Purchaser and shall not be under the direct or indirect control of a third-party with the sole exception being Foundation-approved custody providers.  Further, the Purchaser shall provide the Foundation with its digital wallet address at least 1 day before the Token Distribution Event.  The Foundation will provide the Purchaser with notice of the need to do so when announcing the Token Distribution Event at least 5 days prior to the Token Distribution Event.

(b)    **Termination**.  This Agreement will terminate and expire upon the earliest to occur of the following:

(i)    the delivery of Tokens to the Purchaser following the Token Distribution Event;

(ii)    the payment or setting aside for payment of amounts due to the Purchaser, or the determination that no payments will be made to the Purchaser, as a result of a Dissolution Event; or

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

(iii)    at the discretion of the Foundation, any breach of the representations and warranties of the Purchaser in this Agreement, or any other breach of the provisions of this Agreement by the Purchaser.

Sections 2(b)(iii) (Full Satisfaction), 2(e) (Lockup), 2(f) (Use Restriction), 3 (Tax Treatment and Withholding), 7 (Purchaser Representations) and 12 (Miscellaneous) shall survive any termination or expiration of this Agreement.

(c)    **Lockup**.  All pOLY purchased by the Purchaser pursuant to this Agreement shall be subject to the Use Restriction for a period defined by a maximum vested quantity of 2% of the total OLY supply, after the Token Distribution Event and subject to the achievement of the Decentralization Milestone. For purposes of clarity, all tokens, whether provisionally released or subject to the vesting provisions herein shall remain subject to the Use Restriction until the achievement of the Decentralization Milestone. Notwithstanding the foregoing, all Tokens shall remain subject to any additional restrictions that may be imposed in the future pursuant to Section 7 of this Agreement.

(d)    **Use Restriction**.

(i)    All Tokens delivered upon the conversion of this Agreement shall be subject to the Use Restriction for the Use Restriction Period.

(ii)    During the Use Restriction Period, the Purchaser will not be able to (i) offer, pledge, sell, transfer, spend, exchange, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, the Tokens, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Tokens.

(e)    **Staked Tokens**.

All OLY may be staked (the "**Staked Tokens**"), and the Staked Tokens shall receive additional Tokens for the duration that the Staked Tokens are staked in an amount and at a frequency to be determined by the Protocol (the "**Staking Income Tokens**"). Staking Income Tokens shall be immediately available and not subject to the Use Restriction, and only OLY may be a Staked Token.

(f)    For federal, state and local income tax purposes only, each of the Foundation and the Purchaser agree to treat this Agreement as a forward contract, and to not take any position on any tax return, report, statement or other tax document that is inconsistent with such treatment, unless otherwise required by a change in law occurring after the date hereof, a closing agreement with an applicable tax authority or a final non-appealable judgment of a court of competent jurisdiction.

(g)    In the event of a repayment of a Purchase Amount to a Purchaser, the Foundation will withhold from the payment an amount equal to any income taxes owed by the Foundation on its receipt of the Purchase Amount.  Purchaser will be responsible for the payment of its own taxes with respect to any repayment of a Purchase Amount.

(h)    The Purchaser certifies that the Purchaser has completed and submitted any required waiver of local privacy laws that could otherwise prevent disclosure of information to the Foundation and its respective officers, directors, principals, members, employees, agents and other affiliates (collectively, the "**Sponsoring Parties**" and each a "**Sponsoring Party**"), the IRS or any other Governmental Authority for purposes of Chapter 3, Chapter 4 or Chapter 61 of the Code (including without limitation in connection with FATCA, as

defined below) or any intergovernmental agreement entered into in connection with the implementation of the FATCA (an "**IGA**"), and any other documentation required to establish an exemption from, or reduction in, withholding tax or to permit the Foundation to comply with information reporting requirements pursuant to Chapter 3, Chapter 4 or Chapter 61 of the Code (including, without limitation, in connection with FATCA or any IGA).

(i)     The Purchaser further certifies that the Purchaser will, within 30 days of the Purchaser's receipt of notice that the Purchaser has been entered into this Agreement, provide to the Foundation an IRS Form W-9, as attached hereto as <u>Exhibit C</u> ("**IRS Form W-9**") or other applicable IRS Forms and any additional documentation required by the Foundation for purposes of satisfying the Foundation's obligations under the Code.

(j)     The Purchaser will (a) provide, upon request, prompt written notice to the Foundation, and in any event within 30 days of such request, of any change in the Purchaser's tax or withholding status, and (b) execute properly and provide to the Foundation, within 30 days of written request by the Foundation (or any other Sponsoring Party), any other tax documentation or information that may be reasonably required by the Foundation (or another Sponsoring Party) in connection with the operation of the Foundation or Protocol to comply with applicable laws and regulations (including, but not limited to, the name, address and taxpayer identification number of any "substantial owner" (as defined in the Code) of the Purchaser or any other document or information requested by the Foundation (or another Sponsoring Party) in connection with the Foundation complying with FATCA and/or any IGA or as required to reduce or eliminate any withholding tax directly or indirectly imposed on or collected by or with respect to the Foundation), and (c) execute and properly provide to the Foundation, within 30 days of written request by the Foundation (or another Sponsoring Party), any tax documentation or information that may be requested by the Foundation (or any Sponsoring Party).

(k)     The Purchaser further consents to the reporting of the information provided pursuant to this Section 4, in addition to certain other information, including, but not limited to, the value of the Purchaser's purchase of a Token Purchase Agreement to the IRS or any other Governmental Authority if the Foundation is required to do so under FATCA.

(l)     FATCA.  As used in this Agreement, "FATCA" means one or more of the following, as the context requires: (i) Sections 1471 through 1474 of the Code and any associated legislation, regulations or guidance, or similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement equivalent tax reporting, financial or tax information sharing, and/or withholding tax regimes, (ii) any intergovernmental agreement, treaty or any other arrangement between the United States and an applicable foreign country, entered into to facilitate, implement, comply with or supplement the legislation, regulations or guidance described in the foregoing clause (i), and (iii) any legislation, regulations or guidance implemented in a jurisdiction to give effect to the foregoing clauses (i) or (ii)

## 2.     *Alternative Terms.*

(a)     The Foundation may offer and sell Token Purchase Agreements and similar instruments in multiple rounds and on different terms.  The Foundation is under no obligation to amend and restate any Token Purchase Agreements based on subsequent or any other agreements executed with the Foundation on different terms or to notify the Purchaser of any alternative terms, including any that may be more favorable for certain Purchasers.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

3. ***Foundation Representations and Covenants.***

(a)     The Foundation is a Foundation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)     The execution, delivery and performance by the Foundation of this Agreement is within the power of the Foundation and, other than with respect to the actions to be taken when the Token Amount is to be delivered to the Purchaser, has been duly authorized by all necessary actions on the part of the Foundation. This instrument constitutes a legal, valid and binding obligation of the Foundation, enforceable against the Foundation in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To the knowledge of the Foundation, it is not in violation of (i) its current notice of articles or articles;, (ii) any material statute, rule or regulation applicable to the Foundation; or (iii) any material indenture or contract to which the Foundation is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Foundation.

(c)     To its knowledge, the performance and consummation of the transactions contemplated by this Agreement do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Foundation; (ii) result in the acceleration of any material indenture or contract to which the Foundation is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Foundation or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Foundation, its business or operations.

(d)     No consents or approvals are required in connection with the performance of this Agreement, other than: (i) the Foundation's corporate approvals; and (ii) if deemed applicable by the Foundation's legal counsel any qualifications or filings under applicable securities laws.

(e)     To its knowledge, the Foundation owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights (collectively, "**IP Rights**") necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others. To the extent that the Foundation develops additional intellectual property in the future, it will make reasonable efforts to secure IP Rights for that intellectual property. The name of the Token is not necessarily a proprietary trade name of the Foundation.

(f)     [*Reserved*].

(g)     [*Reserved*]

(h)     Except as and to the extent waived or consented to by the Purchaser, or as required by applicable laws, the Foundation (including any of its Affiliates) shall not avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Agreement by the Foundation. The Foundation covenants and agrees that to the extent the administration and operation of the Protocol is transferred or delegated to any third party, the Foundation will, as a condition to such transfer or delegation and subject to applicable laws, ensure that such third party shall substantially comply with the terms of this Agreement.

4. ***Purchaser Representations and Covenants.***

(a)    The Purchaser is entering into this Agreement as principal and not for any other person and has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement constitutes a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)    If the Subscriber, or any Ultimate Owner (as defined below) for whom the Purchaser is contracting hereunder, is:

(i)    a corporation, the Purchaser is duly incorporated and is validly existing under the laws of its jurisdiction of incorporation and has all requisite legal and corporate power and authority to execute and deliver this Agreement, to take delivery of the Tokens as contemplated herein and to carry out and perform its obligations under the terms of this Agreement; or

(ii)    a partnership, syndicate or other form of unincorporated organization, the Purchaser has the necessary legal capacity and authority to execute and deliver this Agreement and to observe and perform its covenants and obligations hereunder and has obtained all necessary approvals in respect thereof.

(c)    The Purchaser resides or is domiciled and has its principal place of business outside the United States; and is located outside the United States at the time of purchaser and execution of this Agreement. Further, the Purchaser is not a U.S. person or purchasing Tokens for the account or benefit of a U.S. person or a person who is not otherwise a Non-U.S. person. For purposes of this Agreement, **"United States"** and **"U.S. person"** are as defined in Rule 902 of Regulation S of the Securities Act, and the term **"Non-U.S. person"** means any person who is not a U.S. person under Regulation S, or is a Non-United States person under the U.S. Commodity Futures Trading Commission (**"CFTC"**) Regulation 4.7(a)(iv), except for any person under CFTC Regulation 4.7(a)(iv)(D) not otherwise qualified as a Non-United States person. In addition, the Purchaser has been advised that this Agreement is a security that has not been registered under the Securities Act, or any state securities laws and, therefore, cannot be transferred unless registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.  The Purchaser is purchasing this security instrument for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.  If the Purchaser is acting as trustee, agent, representative or nominee for the ultimate owner of this Agreement (the "**Ultimate Owner**"), the Purchaser understands and acknowledges that the representations, warranties and agreements made in this Agreement are made by the Purchaser both (i) with respect to the Purchaser; and (ii) with respect to the Ultimate Owner.  The Purchaser further represents and warrants that it has all requisite power and authority from the Ultimate Owner to execute and perform the obligations under this Agreement. Further, the Purchaser acknowledges and understands that the Foundation or its Affiliates are not registered or licensed with any federal or state regulator as an investment adviser, broker-dealer, money services business, money transmitter, or virtual currency business.  As a result, the Purchaser will not be afforded the full set of protections provided to the clients and customers of such entities under the Securities Act, the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), and any similar or applicable state laws.

(d)    The Purchaser acknowledges and understands that due to the existing regulatory uncertainty with respect to the proper treatment of staking rewards, the Foundation or its Affiliates, as applicable, may

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

choose to restrict the use and transferability of the Staking Income Tokens in its sole and absolute discretion if required by securities laws or regulatory compliance.

(e)     The Purchaser acknowledges and is aware that in order to comply with Regulation S as promulgated under the Securities Act of 1933, as amended, and other regulations, transfer of Tokens to U.S. Persons and persons of other jurisdictions are limited. Purchaser's Tokens may not be used, assigned, sold, traded, exchanged or otherwise transferred to any person in a restricted jurisdiction until such jurisdiction is no longer restricted. Additional transfer restrictions may continue to apply to Purchaser's Tokens based on certain regulatory treatment in certain jurisdictions.

(f)     The Purchaser acknowledges and understands that due to the existing regulatory uncertainty with respect to the proper treatment of staking rewards, the Foundation or its Affiliates as applicable, may choose to restrict the use and transferability of the Staking Income Tokens in its sole and absolute discretion if required by securities laws or regulatory compliance.

(g)     Purchaser understands and expressly accepts that the Tokens are "UNDER DEVELOPMENT" and will be created and delivered to you on an "AS IS" basis and without any express or implied representation or warranty, except as expressly provided herein purchaser understand that pOLY is a utility token to control the rate at which Purchaser's OLY is minted. The Foundation expressly disclaims all implied warranties as to the Tokens, including implied warranties of merchantability, fitness for a particular purpose, title and non-infringement. The Foundation does not represent or warrant that the Tokens will be reliable, current or error-free, or will meet Purchaser's requirements, or that defects in the Tokens will be corrected. The Foundation cannot and does not represent or warrant that the delivery mechanism for the Tokens will be free of viruses or other harmful components. THE RISK OF LOSS IN BUYING, HOLDING AND TRADING DIGITAL ASSETS AND RIGHTS THEREIN, INCLUDING THE TOKENS, CAN BE IMMEDIATE AND SUBSTANTIAL.  THERE IS NO GUARANTEE AGAINST LOSSES FROM PARTICIPATING IN THE SALE. YOU SHOULD THEREFORE CAREFULLY CONSIDER WHETHER TRADING OR HOLDING CRYPTOCURRENCIES IS SUITABLE FOR YOU IN LIGHT OF YOUR FINANCIAL CONDITION.

(h)     THE AGGREGATE LIABILITY OF FOUNDATION AND ITS AFFILIATES AND ITS AND THEIR RESPECTIVE MANAGERS, SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS, LEGAL COUNSEL, CONTROL PERSONS AND REPRESENTATIVES, ARISING OUT OF, OR RELATED TO THE TOKENS WHETHER FOR BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED YOUR PURCHASE AMOUNT ACTUALLY RECEIVED BY THE FOUNDATION. NONE OF THE FOUNDATION, ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE MANAGERS, SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS, LEGAL COUNSEL, CONTROL PERSONS AND REPRESENTATIVES, SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF BEING ADVISED OF THE POSSIBILITY OF THE SAME OR ANY SPECIAL CIRCUMSTANCES.  The foregoing limitations of liability only apply to the extent that they comply with any law applicable to the Purchaser and any court or arbitrator shall be authorized to reform these limitations (including to add exceptions for fraud or willful misconduct) to the minimum extent necessary to have such limitations comply with the maximum limitations of liability allowed under applicable laws and effectuate the intent of the parties to limit Foundation's liability.  The Purchaser's sole and exclusive rights and remedies, and our sole and exclusive obligations to Purchaser are as set forth herein and, to the maximum extent permitted by law, Purchaser hereby waives all other rights and remedies.

(i)     The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of: (i) evaluating the merits and risks of entering into this Agreement and of purchasing Tokens,  including, without limitation, an acknowledgement and assumption of the risk that if issued, the Tokens may and may not be broadly adopted, and the Tokens may decrease in value over time and/or lose all their monetary value; (ii) incurring a complete loss of such investment without impairing the Purchaser's financial condition; and (iii) bearing the economic risk of such investment for an indefinite period of time.  The Purchaser further represents that it has been provided the opportunity to ask the Foundation questions, and where applicable, has received answers from the Foundation, regarding the sale and this Agreement.

(j)     The Purchaser is not a resident of, or (if applicable) is not domiciled in, any Disqualified Jurisdiction or purchasing the Tokens from a location in any Disqualified Jurisdiction.

(k)     The Purchaser is over the age of 18 as of the execution of this Agreement.

(l)     The Purchaser has been advised that this Agreement has not been approved for trading by the CFTC.  The Purchaser represents that it is not purchasing this Agreement on the basis that it is a contract of sale of a commodity for future delivery (or option on such a contract), a swap or any other instrument subject to the CEA.

(m)     The Purchaser acknowledges that it has sought independent legal, financial and tax advice regarding the Purchaser's individual circumstances and objectives in determining whether to purchase the Tokens through this Agreement.

(n)     The Purchaser understands that there is no guarantee that Tokens will ultimately be converted to OLY, or at all.

(o)     The Purchaser understands that the Sponsoring Parties are relying on the information, representations, warranties and covenants made by the Purchaser for purposes of entering into this Agreement.

(p)     The Purchaser understands and acknowledges that the lockup schedule set forth pursuant to Section 2 (e), may be subject to change to comply with applicable legal requirements as determined by the Foundation.

(q)     The Purchaser has read and understands the Risk Factors attached hereto as Exhibit A.

(r)     The Purchaser further acknowledges and understands that the Risk Factors and the White Paper are subject to further revisions prior to being finalized in connection with the Token Distribution Event.

(s)     The Purchaser understands that the Token design remains under development, and that ongoing development efforts may result in material changes to the current design of the Token as outlined in the White Paper and other materials.  Further, the Purchaser understands that the timing, the Token Economics and other ongoing development plans of the Token Distribution Event may be subject to change in the sole and absolute discretion of the Foundation.

(t)     The Purchaser understands that in an abundance of caution and without admitting or acknowledging that this Agreement or the Tokens may qualify as a "security" under any applicable Laws, the Foundation is intending to comply with the requirements of certain exemptions under the U.S. Securities Act of 1933 and the U.S. Securities Exchange Act of 1934 (*collectively*, the **"U.S. Securities Laws"**) with respect to the sale of the Tokens or this Agreement and the delivery of the Tokens in accordance with this Agreement.  Accordingly, this sale of the Agreements and Tokens is being made only to certain qualified buyers inside or

outside the U.S., and is not being made to, nor will an Agreement be accepted from, any person in any jurisdiction in which the offer to sell or its acceptance would not comply with the securities or other laws of such jurisdiction.  The Foundation reserves the right to exclude a potential Purchaser from participation in this sale of Agreements or Tokens to any potential Purchaser for any reason in the Foundation's discretion including if such Purchaser resides in any jurisdiction in which it may be illegal to make the Offering or sell Agreements or Tokens without registration, permits or licenses, or if it would be unreasonably expensive or otherwise burdensome to comply with all applicable securities and other Laws in such jurisdiction or in The U.S.. Furthermore, the Foundation does not intend to deliver the Tokens in satisfaction of the Agreement, until the Foundation is reasonably certain the Tokens will not be deemed securities under applicable law. Therefore, the ultimate delivery of the Tokens in satisfaction of the Agreement may be delayed due to regulatory uncertainty as to the treatment of such Tokens in any jurisdiction or in The U.S..

The Purchaser further acknowledges and agrees that, specifically as a consequence of the Foundation complying with certain exemptions from United States securities laws with respect to the sale of the Agreements and the delivery of the Tokens in accordance with the Agreements:

(i)     certain protections, rights and remedies provided by securities laws, including statutory rights of rescission and certain statutory remedies against an issuer, underwriters, auditors, directors and officers that are available to investors who acquire securities offered by a prospectus, will not be available to the Purchaser;

(ii)     the common law may not provide investors with an adequate remedy in the event that they suffer investment losses in connection with the Agreement or the Tokens acquired in connection with the Agreement;

(iii)     the Purchaser may not receive information that would otherwise be required to be given under United States securities laws; and

(iv)     the Foundation is relieved from certain obligations that would otherwise apply under United States securities laws.

(u)     The Purchaser has not relied on any representations or warranties made by the Foundation outside of this Agreement, including, but not limited to, conversations of any kind, whether through oral or electronic communication.  The Purchaser represents that it has adequate information on which to base its decision to purchase Tokens through this Agreement, notwithstanding the fact that the Token Distribution Documents to be issued by the Foundation at the time of the Token Distribution Event will supersede any and all disclosures, terms and conditions previously provided, made available to or discussed with the Purchaser. Further, the Purchaser acknowledges that the Token Distribution Documents, are subject to change on an ongoing basis in the sole and absolute discretion of the Foundation as and to the extent the Foundation deems necessary or advisable in connection with the use of the Tokens in the Protocol and that they will be binding on the Purchaser regardless of the extent, nature or impact of such changes.

(v)     The Purchaser understands that no Sponsoring Party is registered with the Securities and Exchange Commission or with the securities commission of any country or other jurisdiction or any state as a broker-dealer under the Exchange Act.  The Purchaser will not be afforded the full set of protections provided under the Exchange Act or comparable state law.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

(w)     This Agreement is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

(x)     The Purchaser understands that the Sponsoring Parties believe that the Foundation is not a money transmitter ("**MT**") or a money services business ("**MSB**"). If the Foundation was deemed to be an MT and/or MSB, it would be subject to significant additional regulation. This could lead to significant changes with respect to the Protocol, how the Tokens are structured, how they are purchased and sold, and other issues, and would greatly increase the Foundation's costs in creating and facilitating transactions in the Tokens. It could lead to the termination of the Tokens. Further, a regulator could take action against the Foundation and Sponsoring Parties if it views the Tokens and the Protocol as a violation of existing law. Any of these outcomes would negatively affect the value of the Tokens and/or could cause the Foundation to cease operations.

(y)     The Purchaser understands that the Foundation does not intend to operate in the state of New York or any other state that requires a license to conduct a virtual currency business. The Sponsoring Parties believe the Foundation is not engaged in unlicensed virtual currency business activity in states where such conduct is prohibited. If the Purchaser is a resident of a state that requires a license to conduct a virtual currency business, this Agreement is void and all rights and privileges of the Purchaser hereunder are canceled. If the Purchaser is a resident of a state that requires a license to conduct a virtual currency business, the Foundation will not allow the Purchaser to purchase this Agreement or the Tokens and participate on the Protocol. Currently, only New York has this type of requirement, but other states may adopt similar requirements. Further, any prohibited Agreement or Token transaction inconsistent with this Subsection may be unable to be rescinded.

(z)     The Purchaser understands that if the Foundation and the Sponsoring Parties were deemed to be conducting an unlicensed virtual currency business they would be subject to significant additional regulation and/or regulatory consequences. This could lead to significant changes with respect to the Protocol, how the Tokens are structured, how they are purchased and sold, and other issues, and would greatly increase the Foundation's costs in creating and facilitating transactions in the Tokens. It could lead to the termination of the Tokens. Further, a regulator could take action against the Foundation and the Sponsoring Parties if it views the Tokens and the Protocol as a violation of existing law. Any of these outcomes would negatively affect the value of the Tokens and/or could cause the Foundation to cease operations.

(aa)    The Purchaser understands that it is anticipated that the Tokens will also be sold or resold outside the United States, which could subject the Sponsoring Parties or the Tokens to non-U.S. and United States legal requirements, which could be significant. Non-U.S. and United States regulation could lead to the same types of changes and outcomes described above with respect to U.S. regulation, and any of these outcomes would negatively affect the value of the Tokens and/or cause the Sponsoring Parties to cease operations.

(bb)    The Purchaser's ability to transfer the Agreement or any Tokens delivered thereunder is limited by, among other things, applicable United States securities laws.

(cc)    The Agreement or any Tokens delivered thereunder shall be subject to statutory resale restrictions under the United States securities laws and the Purchaser covenants that it will not resell, assign, pledge, give, transfer or otherwise dispose of the Agreement or any Tokens delivered thereunder or any interest therein, or make any offer or attempt to do any of the foregoing except in compliance with such applicable United States securities laws, and the Purchaser acknowledges that it is solely responsible (and the Foundation is not in any way responsible) for such compliance.

(dd)     The Purchaser acknowledges that no representations or warranties have been made regarding the applicable hold periods and transfer restrictions imposed by United States securities laws or other resale restrictions applicable to the Agreement or any Tokens delivered thereunder that restrict the ability of the Purchaser (or others for whom it is contracting hereunder) to resell the Agreement or any Tokens delivered thereunder, that the Purchaser (or others for whom it is contracting hereunder) is solely responsible to find out what these restrictions are, that the Purchaser is solely responsible (and the Foundation is not in any way responsible) for compliance with applicable resale restrictions and that the Purchaser is aware that it may not be able to resell the Agreement or any Tokens delivered thereunder except in accordance with limited exemptions under United States securities laws and other applicable securities laws.

(ee)     The Purchaser understands that no federal, provincial, or state agency or any other Governmental Authority has passed on or made any recommendation or endorsement of this Agreement or the Tokens or the fairness or suitability of this investment, nor has any Governmental Authority passed upon or endorsed the merits of this sale.

(ff)     The Purchaser acknowledges and is aware that any transfer made in violation of the transfer provisions of this Agreement will be void.

(gg)     The Purchaser acknowledges and is aware that this Agreement may be transferred only in accordance with Section 11 of this Agreement.

(hh)     The Purchaser understands and agrees that in connection with the services provided by the Foundation, its personal data may be transferred and/or stored in various jurisdictions in which the Sponsoring Parties have a presence, including in or to jurisdictions that may not offer a level of personal data protection equivalent to the Purchaser's country of residence. The Purchaser further understands and agrees that, although the Sponsoring Parties will use their reasonable efforts to keep the information provided by the Purchaser strictly confidential, the Sponsoring Parties may present this Agreement and the information provided in it to any parties (e.g., affiliates, attorneys, auditors, administrators, brokers and regulators) as the Sponsoring Parties deem necessary or advisable to facilitate the acceptance and management of the Purchaser entering into this Agreement, including, but not limited to,

(i)     in connection with anti-money laundering and similar laws,

(ii)     if called upon to establish the availability under any applicable law of an exemption from registration of this Agreement or to establish compliance with applicable law generally by the Sponsoring Parties, or

(iii)     if the information is relevant to any issue in any action, suit, or proceeding to which the Sponsoring Parties are a party or by which they are or may be bound. The Purchaser acknowledges that the Sponsoring Parties may also release information about the Purchaser if directed to do so by the Purchaser, if compelled to do so by law or in connection with any government or self-regulatory organization request or investigation.  Any disclosure, use, storage or transfer of information for these purposes shall not be treated as a breach of any restriction upon the disclosure, use, storage or transfer of information imposed on any person by law or otherwise.

(ii)     The Purchaser is not: (i) a citizen or resident of a geographic area in which use of cryptographic tokens is prohibited by applicable law, decree, regulation, treaty, or administrative act; (ii) a citizen or resident of, or located in, a geographic area that is subject to U.S., or other applicable sanctions or embargoes; or (iii) an individual, or an individual employed by or associated with an entity, that is identified on the U.S.

Department of Commerce's Denied Persons or Entity List, the U.S. Department of Treasury's Specially Designated Nationals or Blocked Persons Lists, or the U.S. Department of State's Debarred Parties List. If the Purchaser's country of residence or other circumstances change such that the above representations are no longer accurate, the Purchaser will immediately notify the Purchaser. The Purchaser further represents and warrants that the Purchaser: (x) has conducted thorough due diligence with respect to all of its beneficial owners; (y) has established the identities of all direct and indirect beneficial owners and the source of each beneficial owner's funds; and (z) will retain evidence of those identities, any source of funds and any due diligence.

(jj)      The Purchaser represents, warrants and agrees that no payment or other transfer of value to the Foundation and no payment or other transfer of value to the Purchaser shall cause the Sponsoring Parties to be in violation of applicable U.S. federal or state or non-U.S. laws or regulations, including, without limitation, anti-money laundering, economic sanctions, anti-bribery or anti-boycott laws or regulations, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("**USA Patriot Act**"), the various statutes, regulations and Executive Orders administered by the U.S. Department of the Treasury Office of Foreign Assets Control and the Foreign Corrupt Practices Act.

(kk)      The Purchaser represents, warrants and agrees that no payment or other transfer of value to the Foundation is or will be derived from, pledged for the benefit of, or related in any way to: (i) the government of any country designated by the U.S. Secretary of State as a country supporting international terrorism; (ii) property that is blocked under any laws, orders or regulations administered by OFAC ("**OFAC Regulations**"), or that would be blocked under OFAC Regulations if it were in the custody of a U.S. national; (iii) persons to whom U.S. nationals cannot lawfully export services, or with whom U.S. nationals cannot lawfully engage in transactions, under OFAC Regulations; or (iv) directly or indirectly, any illegal activities.

(ll)      The Purchaser represents, warrants and agrees that all payments or other transfer of value to the Foundation by the Purchaser will be made without an account (or virtual currency public address whose associated balance, either directly or indirectly, has been funded by such an account) located in a jurisdiction that does not appear on the list of boycotted countries published by the U.S. Department of Treasury pursuant to §999(a)(3) of the Code, as in effect at the time of the Purchaser's payment or other transfer of value. In the event that the Purchaser is, receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "**Non-U.S. Bank**") in connection with the Purchaser's purchase of this Agreement, the Non-U.S. Bank: (i) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities; (ii) employs one or more individuals on a full-time basis; (iii) maintains operating records related to its banking activities; (iv) is subject to inspection by the banking authority that licensed it to conduct banking activities; and (v) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate.

(mm)      The Purchaser's entry into this Agreement complies with applicable laws and regulations in the Purchaser's jurisdiction.

(nn)      The Purchaser understands that the Purchaser bears sole responsibility for any taxes as a result of the matters and transactions that are the subject of this Agreement, and any future acquisition, ownership, use, sale or other disposition of Tokens held by the Purchaser. To the extent permitted by law, the Purchaser agrees to indemnify, defend and hold the Foundation or any of its affiliates, employees or agents (including developers, auditors, contractors or founders) harmless for any claim, liability, assessment or penalty with respect to any taxes (other than any net income taxes of the Foundation that result from the delivery of Tokens

to the Purchaser pursuant to Section 2 of this Agreement) associated with or arising from the Purchaser's purchase of Tokens hereunder, or the use or ownership of Tokens.

(oo)     The Purchaser agrees to indemnify the Sponsoring Parties for any and all costs, fees and expenses (including reasonable legal fees and disbursements) in connection with any damages resulting from the assertion of the Purchaser's lack of proper authorization from the Ultimate Owner to enter into this Agreement or perform its obligations under it.

(pp)     The Purchaser understands and acknowledges that (i) the Foundation (or any other Sponsoring Party) may be required to provide the identities, addresses and telephone contact information of the Purchaser's direct and indirect beneficial owners to a governmental entity, and (ii) the Purchaser hereby waives any provision of law and/or regulation of any jurisdiction that would, absent a waiver, prevent the Foundation from compliance with the foregoing and otherwise with applicable law.

(qq)     The Purchaser will not use the Tokens in connection with any activity that violates applicable laws in any relevant jurisdiction, including, but not limited to, use of the Tokens in connection with transactions that violate U.S. federal or state securities or commodity laws; or United States securities laws.

(rr)     The Purchaser will at all times maintain control of the Purchaser's wallet where any Tokens are stored, and the Purchaser will not share or disclose the account credentials associated with such wallet with any other party.  If the Purchaser transfers Tokens into another wallet or vault, the Purchaser will likewise at all times maintain control of such other wallet or vault, and will not share or disclose the account credentials associated with such other wallet or vault with any other party.

(ss)     The representations and warranties of the Purchaser set forth in this Agreement, including those incorporated and restated by reference, shall be deemed repeated and reaffirmed by the Purchaser to the Foundation as of each date the Foundation delivers Tokens to the Purchaser pursuant to this Agreement.  If at any time prior to the termination of this Agreement, the representations and warranties set forth in this Agreement, including those incorporated and restated by reference, cease to be true in any respect, the Purchaser shall promptly notify the Foundation in writing.

**5.     *Payment Instructions.***

**Wire and/or Cryptoasset Transfer Instructions**.  The Foundation's wire and/or property transfer instructions will be provided to the Purchaser after the Foundation has approved the Purchaser's Purchase Amount.  If the payment will be made in any currency or property, including digital currencies, other than U.S. dollars, the exchange rate to be used for the conversion into U.S. Dollars for the payment of the Purchase Amount will be listed on the table above and will have been determined in accordance with the U.S. dollar equivalent of such currency or property as of the date and time this Agreement is executed by the Foundation as published on such exchange or exchanges as shall be determined in the sole discretion of the Foundation. There is no guarantee that the same exchange rate will be used for each Purchaser due to the various timing of different Purchasers' Purchase Amounts.

**6.     *Additional Lock-Ups & Other Features.***

The Purchaser acknowledges that, in addition to the Use Restriction set forth in Section 2(f), it may be necessary or advisable under applicable law for the Foundation to require certain lockups, dribble out rules, or other features to apply to the Tokens upon delivery to the Purchaser.  Any distribution of the Tokens by the Foundation to the Purchaser shall be subject to these additional features and requirements as deemed necessary or advisable in the sole and absolute discretion of the Foundation under then applicable law.

7.      ***PLEASE READ THIS INDEMNIFICATION PROVISION CAREFULLY BECAUSE IT LIMITS A PURCHASER'S ABILITY TO SEEK RELIEF FROM AN INDEMNIFIED PARTY.***

The Purchaser acknowledges that he, she or it understands the meaning and legal consequences of the representations and warranties contained in this Agreement, and except as otherwise agreed to in writing with the Foundation, hereby agrees to indemnify and hold harmless the Sponsoring Parties, and each other person, if any, who controls, is controlled by, or is under common control with any of the foregoing (each, an "**Indemnified Party**") from and against any and all loss, claim, damage, liability or expense whatsoever (including reasonable attorneys' fees and disbursements) due to or arising out of or based upon: (a) any inaccurate representation or warranty made by the Purchaser, or breach or failure by the Purchaser to comply with any covenant or agreement made by the Purchaser in this Agreement or in any other document furnished by the Purchaser in connection with entering into this Agreement; (b) any action for securities, commodities, or money transmission law violations instituted by the Purchaser that is finally resolved by judgment against the Purchaser; or (c) any action instituted by or on behalf of the Purchaser against an Indemnified Party that is finally resolved by judgment against the Purchaser or in favor of an Indemnified Party.

Further, each Indemnified Party is an intended third-party beneficiary of this Agreement.  The remedies provided in this Section 8 shall be cumulative and shall not preclude the assertion by any Indemnified Party of any other rights or the seeking of any other remedies against the Purchaser. Notwithstanding the foregoing, nothing contained in this Agreement shall constitute a waiver by a Purchaser of any of his, her or its legal rights under applicable federal securities and commodities laws or any other laws whose applicability is not permitted to be contractually waived

8.      *Limitation of Liability.*

PLEASE READ THIS SECTION CAREFULLY.  THIS PROVISION LIMITS THE SCOPE OF THE FOUNDATION'S LIABILITY IN CONNECTION WITH ENTERING INTO THIS AGREEMENT.

(a)      To the fullest extent permitted by applicable law: (i) in no event will the Foundation or any of the Sponsoring Parties be liable for any indirect, special, incidental, consequential, or exemplary damages of any kind (including, but not limited to, where related to loss of revenue, income or profits, loss of use or data, or damages for business interruption) arising out of or in any way related to entering into this Agreement or otherwise related to these terms, regardless of the form of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive or imputed), or any other legal or equitable theory (even if the party has been advised of the possibility of such damages and regardless of whether such damages were foreseeable); and (ii) in no event will the aggregate liability of the Foundation and the Sponsoring Parties (jointly), whether in contract, warranty, tort (including negligence, whether active, passive or imputed), or other theory, arising out of or relating to these terms exceed the amount Purchaser pays to the Foundation in connection with this Agreement.

(b)      The limitations set forth in Section 9(a) will not limit or exclude liability for the gross negligence, fraud or intentional, willful or reckless misconduct of the Foundation.

(c)      Some jurisdictions do not allow the limitation or exclusion of liability for incidental or consequential damages.  Accordingly, some of the limitations of Section 9 may not apply to the Purchaser.

PRIVILEGED AND CONFIDENTIAL

**9.** *Conflicts Waiver.*

Each party to this instrument acknowledges that Horizons Law ("**Counsel**"), are counsel to the Foundation, may have in the past represented and may now or in the future represent one or more Purchasers or their affiliates in matters unrelated to the transactions contemplated by this instrument (this "**Transaction**"), including representation of such Purchasers or their affiliates in matters of a similar nature to this Transaction. The applicable rules of professional conduct require that Counsel inform the parties hereunder of this representation and obtain their informed consent. Counsel has served as counsel to the Foundation and has negotiated the terms of this Transaction solely on behalf of the Foundation. The Foundation and each Purchaser hereby: (a) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (b) acknowledge that with respect to this Agreement, Counsel has represented solely the Foundation, and not any Purchaser or any shareholder, director or employee of the Foundation or any Purchaser; and (c) gives its informed consent to Counsel's representation of the Foundation in this Agreement and Transaction or the transactions contemplated hereunder despite any possible representation of the Purchaser(s) in other matters as described above.

**10.** *Assignment*

(a)     Subject to Section 11(c), the Purchaser shall not, by operation of law or otherwise, directly or indirectly (and shall not agree to) assign the benefit of this Agreement (in whole or in part), or sell, transfer, declare a trust of, pledge, or otherwise dispose of in any manner whatsoever, any Tokens or any economic interest in the Tokens (an "**Assignment**") without the prior written consent of the Foundation. Subject to Section 11(b), the Foundation shall not assign this Agreement, nor the rights contained herein, by operation of law or otherwise, without the prior written consent of the Purchaser.

(b)     The Foundation may assign this Agreement in whole, without the consent of the Purchaser, in connection with a reincorporation to change the Foundation's domicile or a transfer by way of continuation of the Foundation to another jurisdiction.

(c)     The Purchaser shall be entitled, without the consent of the Foundation, after having given no less than three (3) Business Days' prior written notice to the Foundation, to assign the benefit of this Agreement (in whole or in part) or transfer any or all its obligations and liabilities under this Agreement to any other entity that directly or indirectly, controls, is controlled by or is under common control with the Purchaser, including, without limitation, any general partner, managing member, officer or director of the Purchaser, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management Foundation with, the Purchaser (an "**Assignee**") provided, however, that the Assignee: (i) undertakes in writing to the Foundation to be bound by the Purchaser's obligations and liabilities under this Agreement; (ii) warrants in writing to the Foundation that each of the Purchaser's representations and warranties set forth in Section 5 and elsewhere in this Agreement is true, accurate and not misleading as at the date of the assignment or transfer with respect to itself (as if each reference to the Purchaser is construed as a reference to the Assignee); and (iii) delivers such other documents to the Foundation relating to this Agreement as the Foundation may reasonably request.

**11.** *Miscellaneous*

(a)     This Agreement is one of a series of Token Purchase Agreements (Series 1) with substantially identical terms (other than with respect to individual Purchase Amounts) being sold by the Foundation from time to time (*collectively*, the "**Token Purchase Agreements (Series 1)**"). Any provision of this Agreement,

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

or the Token Purchase Agreements (Series 1), may be amended, waived or modified only upon the written consent of the Foundation and the holders of a majority in aggregate Purchase Amounts paid to the Foundation with respect to all outstanding Token Purchase Agreements (Series 1) at the time of such amendment, waiver or modification; provided that any such amendment shall be the same across all outstanding Token Purchase Agreements (Series 1).

(b)        This Agreement along with the other materials between the Purchaser and the Foundation sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)        Any notice required or permitted by this Agreement will be deemed sufficient when (i) delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page as subsequently modified by written notice; or (ii) 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the first page of this Agreement, as subsequently modified by written notice.

(d)        The purchase of Token Purchase Agreements and ultimate ownership of Tokens (i) does not provide Purchaser with rights of any form with respect to the Foundation or its revenues or assets, including, but not limited to, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property), or other financial or legal rights in the Foundation; (ii) is not a loan to Foundation; and (iii) does not provide Purchaser with any ownership or other interest in Foundation.

(e)        Neither this Agreement nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; provided, however, that this Agreement and/or the rights contained herein may be assigned without the Foundation's consent by the Purchaser to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Purchaser, including, without limitation, any general partner, managing member, officer or director of the Purchaser, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management Foundation with, the Purchaser; and *provided, further*, that the Foundation may assign this Agreement in whole, without the consent of the Purchaser, in connection with a reincorporation to change the Foundation's domicile.

(f)        In the event any one or more of the provisions of this Agreement is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Agreement operate or would prospectively operate to invalidate this Agreement, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Agreement and the remaining provisions of this Agreement will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(g)        The Purchaser shall, and shall cause its affiliates to, execute and deliver any additional documents, instruments, conveyances and assurances and take any further actions requested by the Foundation to give effect to this Agreement and the transactions contemplated by this Agreement, including, without limitation, to enable the Foundation or the transactions contemplated by this Agreement to comply with applicable laws.

(h)        This Agreement (i) shall be binding upon the Purchaser and the heirs, legal representatives, successors and permitted assigns of the Purchaser and shall inure to the benefit of the Foundation and its successors and assigns; (ii) shall, if the Purchaser consists of more than one person, be the joint and several

obligation of each; and (iii) may be executed in counterparts, all of which when taken together, shall be deemed one original.

(i)     The Foundation shall not be liable or responsible to the Purchaser, nor be or deemed to have defaulted under or breached this Agreement, in each case, for any failure or delay in fulfilling or performing any obligation under this Agreement, including without limitation any failure to deliver or delay in delivery of Tokens, to the extent the failure or delay is caused by or results from acts beyond the Foundation's reasonable control, including, without limitation: (i) acts of God; (ii) flood, fire, earthquake or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (iv) outbreaks of infectious diseases or pandemics, including but not limited to covid-19; (v) the application or change of any Law; (vi) action by any Governmental Authority, (vii) cyber-attacks, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing, spoofing and similar events; or (viii) technological changes (including changes imposed by platforms or Protocols related to the Tokens and the Protocol).

(j)     ALL RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF ZUG, SWITZERLAND WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES, NOTWITHSTANDING THE PLACE WHERE THIS PURCHASE AGREEMENT MAY BE EXECUTED BY ANY PARTY.  To the extent permissible under applicable law, the Purchaser hereby irrevocably agrees that any suit, action or proceeding ("**Action**") with respect to this Agreement may, but need not, be resolved, whether by arbitration or otherwise, within ZUG, SWITZERLAND.  Accordingly, the parties consent and submit to the non-exclusive jurisdiction of the federal and state courts and any applicable arbitral body located within ZUG, SWITZERLAND.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date written below.

**THE FOUNDATION:**

**Hephaestus Foundation AG.**

By: _Daniel Bara_
    C47D3EB3643647A...

Name:  Daniel Bara
Title:    Director

Address: Alpanstrasse 11 .
            6302 Zug
            Switzerland

Email: dbara@hephaestusfoundation.org
Date: 3/11/2021

**THE PURCHASER:**

Jayson Hu

(PRINT NAME)

By: _Jayson Hu_
    7FA757C7A78B491...

Name:  Jayson Hu
Title:

Address:
231 Given TCE

Email: jayson.hu@qq.com
Date: 3/11/2021

*PRIVILEGED & CONFIDENTIAL*

**Exhibit A**

**RISK FACTORS: pOLY TOKEN OFFERING**

**HEPHAESTUS FOUNDATION AG.**
(in formation)

**[January 1ˢᵗ 2021]**

This document (the "**Risk Factors**") is provided as a supplement to the Token Purchase Agreement (the "**TPA**") for the purchase by purchasers ("**Purchasers**") of HEPHAESTUS FOUNDATION AG.'s (the "**Company**") proprietary tokens pOLY or the token that is redeemed into (sOLY, OLY), collectibly (the "**Tokens**"), under the terms described in the upcoming token offering (the "**Offering**"). The Tokens are being designed for use on a new protocol that will be a hub for decentralized finance activity. (the "**Protocol**"). The Protocol will have a regulated monetary policy carried out via market operations where value will be derived from real assets but determined by market forces. The purpose is to introduce a truly viable digital-native currency system for the global economy, allowing for variable policy while retaining scarcity constraints. The Company plans to issue the Tokens during a future Token distribution event (the "**Token Distribution Event**"). If there is a Dissolution Event, as defined below, or the Company otherwise forgoes its plan for issuing the Tokens, Purchasers may not receive a return of some or all of the investment ("**Investment**").

> *Important: The Company does not recommend that any particular Purchaser participate in the Offering. Each Purchaser in the Offering is responsible for determining whether the Tokens they may receive are appropriate expenditures for the Purchaser.*
> ***A purchase of the Tokens involves a high degree of risk. You should carefully consider the risks and uncertainties described below before deciding to purchase the Tokens. The occurrence of any of the following risks could result in you losing all or part of your Investment.***

These Risk Factors focus on the following types of risks related to this Offering:

- Part I: Risks Associated with the Structure of the Offering

- Part II: Risks Associated with the Tokens

- Part III: Risks Related to Management

- Part IV: Risks Related to the Protocol

- Part V: Technology and Cybersecurity Risks

- Part VI: Regulatory and Other Legal Risks

RISKS ASSOCIATED WITH THE STRUCTURE OF THE OFFERING

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

**Is this Offering risky?**

Yes. This Offering is extremely risky and is not appropriate for every Purchaser eligible to participate. The Company does not warrant the Offering's suitability for any particular Purchaser.

The Company is in an intermediate stage of planning and developing its products. Consequently, many details about the Company's products, development strategy and business model are not known, are uncertain, and are subject to change, with or without notice to you. Each Purchaser should review the TPA of the Offering, these Risk Factors, and any other information provided to Purchasers as part of this Offering (*collectively*, the "**Offering Materials**") carefully; however, many details in the Offering Materials may change after the Offering is completed, and in some circumstances, quite significantly. Potential Purchasers should not participate in the Offering unless they are able to bear a total and complete loss. Purchasers should ask the Company questions about the Offering and should not participate in the Offering until they have received answers that are satisfactory to them. Potential Purchaser should seek out independent accounting, financial, legal, and tax advice before participating in the Offering. Until a potential Purchaser has been accepted by the Company, potential Purchasers are under no obligation to participate in the Offering.

**Will Purchasers receive pOLY immediately after completing their participation in the Offering?**

Yes. The Company anticipates delivering pOLY right after receiving the executed TPA and the Purchase Price ("**Token Distribution Event**").

Purchasers will provide a digital wallet address at which they will receive the pOLY at the time of placing an order through the Offering. The Company will then, on the Token Distribution Event, distribute Tokens to the Purchasers' digital wallets.

**Does the Company guarantee it will release OLY?**

No. Many factors could influence the success of the Company in developing OLY and the Protocol, some of which are out of the Company's control, and there can be no guarantee that the Company will ultimately be successful in deploying and delivering OLY.

If the Company is unable to deliver pOLY, Purchasers will be refunded pursuant to the TPA of the Offering. If the Token Distribution Event does not occur or for other reasons the Company does not issue pOLY as planned, Purchasers will not receive some or all of the Tokens.

It is anticipated that pOLY will be generated before the Token Distribution Event, and that certain individuals (such as the founders of the Company) will receive the pOLY that have been generated prior to the Token Distribution Event. Receipt of the Tokens by these, or other, individuals does not constitute a Token Distribution Event and is not a guarantee that Purchasers in this Offering will receive Tokens or that the Token Distribution Event will occur. The Company has sole discretion to determine when the Token Distribution Event occurs and will notify Purchasers of its decision.

**Are the pOLY freely transferable?**

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

No. pOLY are subject to restriction according to various terms and lockup periods, as described in the TPA. pOLY acquired during the first Tranche (Tranche I) will vest at a rate of 2% of the Token supply, while tokens acquired during the second Tranche (Tranche II) will vest at a rate of 1.25%. It is possible that some pOLY (including those issued pursuant to inflation goals or otherwise distributed outside the Offering) may be transferrable under less restricted conditions than Tokens obtained via the Offering.

**Is the valuation of the price per Token in this Offering correct?**

Not necessarily.  There is no guarantee that the Offering price of the Tokens ("**Offering Price**") will reflect the actual value of the Tokens at any time, including without limitation when they are distributed to Purchasers and/or when and if they are freely tradable.  The actual value will be Offering Price may be significantly above or below their market value.

**Are there other methods of distribution that might allow other Token Purchasers to purchase Tokens on better terms than those in this Offering or that might dilute the value of a Purchaser's Tokens?**

Yes.  In addition to this Offering, the Company may also distribute the Tokens through the following mechanisms, each of which could result in both a decrease in the value of the Tokens and in certain recipients or purchasers receiving more advantageous terms:

- *Additional Offering Offerings*.    The Company may engage in additional sales similar to or different from this Offering with terms that may be more advantageous than the terms offered in this Offering.

- *Sales and Giveaways to Other Employees*.  The Company anticipates providing Tokens as a form of bonus or compensation to employees, either for free or for a reduced price, to incentivize activities that support the growth of the Protocol.

- *Incentives to Protocol Users and Developers*.  The Company plans to reserve a certain number of Tokens for users of the Protocol.  It is anticipated that these Tokens will be distributed for free or at a substantial discount.

Some of these sales and distributions have occurred or may occur for free or at a substantial discount to the amount paid by Purchasers in the Offering and/or may result in other terms that are more advantageous to certain Purchasers and recipients.

In addition, the Company may sponsor other types of offerings or distributions of the Tokens in the future.  These methods of distribution may further dilute the value of the Tokens or be offered on more advantageous terms.

**Do Purchasers have any protection if the Company conducts an Offering or another sale of Tokens in the future on different terms than those in this Offering?**

No.  The Company may engage in one or more additional Offerings or other sales in the future. The terms of such future sales may be different than the terms in this Offering and may be more favorable for other purchasers.

**Will Purchasers receive any rights to any of the Company's profits or revenues as either a Purchaser under this Offering or as OLY holder?**

No. Neither the Investment or Tokens will give the Purchasers or subsequent OLY holders the rights to any of the profits or revenues of the Company, any affiliates of the Company, the Protocol or any user of the Protocol.

**Will Purchasers receive any rights to any intellectual property owned by the Company, the Company's affiliates, or any of its employees as either a Purchaser or when a Token holder?**

No. The Tokens will not give holders the rights to any of the intellectual property owned by the Company or any user of the Protocol.

**Do Purchasers have any governance rights in the Company as a Token holder?**

No. Holders of Tokens will not possess any right to control or vote on how the Company is governed. However, OLY holders will likely be able to vote on the governance of the Protocol based on the amount of their Tokens that they have vested and staked. There is no guarantee that any individual OLY holder will be able to influence the outcome of any vote, but rather are decided according to consensus of OLY stakers (the "**Community**"). Decisions may be made that are contrary to a Token holder's preference.

**Will Purchasers definitely receive pOLY if they submit a request or order to participate in the Offering?**

No. Among other things, in order to participate in the Offering through the Offering, a Purchaser must not be a U.S. person or be purchasing pOLY for the account or benefit of a U.S. person or a person who is not otherwise a Non-U.S. person. For purposes of these Risk Factors, "United States" and "U.S. person" are as defined in Rule 902 of Regulation S, and the term "Non-U.S. person" means any person who is not a U.S. person under Regulation S, or is a Non-United States person under the U.S. Commodity Futures Trading Commission ("CFTC") Regulation 4.7(a)(iv), except for any person under CFTC Regulation 4.7(a)(iv)(D) not otherwise qualified as a Non-United States person. The Company reserves the right to reject potential Purchasers for any reason or no reason at all. In addition, a participant must submit a successful order in the Offering in order to receive any Tokens.

**Will Purchasers definitely receive their desired Investment amount?**

No. As mentioned previously, it is possible that OLY will not be distributed at all and only a portion of their Investment amount will be vested and returned, if any. Further, Purchasers must submit correct blockchain addresses for pOLY to be accurately distributed to their accounts, and a Purchaser's failure to do so may result in not receiving a desired Investment amount. The Company assumes no responsibility for a Purchaser's error in submitting the correct, accurate information.

RISKS ASSOCIATED WITH THE TOKENS

**Can Purchasers use their pOLY once they purchase them?**

Yes, subject to the Use Restriction as defined and detailed in the Offering TPA.

**Is there any guarantee that the Company will successfully register the OLY?**

No. The Company does not intend to register the OLY.

**Will a Purchaser's pOLY increase in value?**

Not necessarily. There is no guarantee that the Tokens will hold their value or increase in value, and Purchasers may lose the purchase price of the Tokens in whole or in part.

Cryptoassets such as Tokens are a new and relatively untested product. There is considerable uncertainty about their long-term viability, which could be affected by a variety of factors, including many market-based factors such as economic growth, inflation, and others. In addition, the success of the Tokens and other types of cryptoassets will depend on whether blockchain and other new technologies related to the Tokens turn out to be useful and economically viable. Further, blockchain is only one out of several technology components being used by the Company, and even if blockchain is successful, the other technology components might not be successful. Finally, the value of the Tokens will depend on the successful development of the Protocol, which is not guaranteed to be successful. See the sections below entitled "**Risks Related to Management**," "**Risks Related to the Protocol**" and "**Technology and Cybersecurity Risks**" for additional discussion of this risk. The Company does not control many of these factors, and therefore may not be able to control the long-term success of the Tokens or the ability of the Tokens to maintain their value.

Over the longer term, the Company anticipates that the Tokens can grow in value based on increasing demand resulting from, among other things, increased activity on the Protocol. However, there can be no guarantee that the Tokens will hold their value or increase in value. Many factors will influence this outcome, many of which are beyond the Company's control, only some of which are described in these Risk Factors.

**Can the value of the pOLY decrease after a Purchaser receives the Tokens?**

Yes. After the Token Distribution Event, the value of the pOLY will be tied to the use of OLY on the Protocol and off it (for example, OLY may trade on third-party exchanges). As a result, the value of pOLY may decrease, and may even decrease lower than the purchase price based on the terms of the Offering.

**Can the value of the OLY ever trade below 1 DAI?**

Possibly. The price of OLY and (the Protocol's overall health) require OLY to consistently trade at a price above 1 DAI. It is possible for the Protocol to fail to gain necessary market traction or for other factors that to cause OLY to fail to sustain enough buy pressure to maintain this price. While the Company and Community are making efforts to increase market presence, communicate

the benefits and goings-on with the Protocol, and form partnerships to mitigate this risk, it is possible these efforts will not succeed and the price of OLY falls below 1 DAI.

OLY' price maintenance above 1 DAI also depends on the treasury to maintain a sufficient portfolio of underlying assets. Failure to maintain a proper portfolio allocation may also cause the price of OLY to fall below 1 DAI. The Protocol will undergo active portfolio management both automatically (through the Protocol's smart contract underpinnings) as well as by the Company or the Protocol's DAO (as defined below) to help offset this risk, though (like any other investment portfolio) it is possible for the Protocol's treasury to fail at maintaining a proper portfolio to achieve its goals.

In these or similar scenarios, this failure to keep OLY valued above 1 DAI may snowball into a larger loss of market faith that inhibits or prevents recovery, placing further downward pressure on the price of OLY. Such scenario may also cause OLY to never vest according to the terms of the Protocol (and the consequent lack of supply expansion of the Tokens generally).

**Will the value of the OLY be affected by the success of the Protocol?**

Yes. Because OLY are intended for use on the Protocol, a failure to successfully develop the Protocol would negatively affect the value of OLY. There is no guarantee that the Protocol will develop as planned by the Company or become successful in the marketplace. For additional discussion of some of the factors that may affect the success of the Protocol, refer to the sections below entitled "**Risks Related to Management**," "**Risks Related to the Protocol**" and "**Technology and Cybersecurity Risks**."

**Is there any guarantee or insurance supporting the value of pOLY?**

No. The Company provides no guarantee that pOLY a Purchaser purchases will retain their value, and the Purchaser may lose all or some of that value. The Company does not plan to maintain any type of bond or trust account designed to protect holders of pOLY, and the Company does not intend to secure pOLY with any other assets.

**Will the value of bitcoins, ethers, DAI, or other cryptoassets impact the success of the Offering?**

Perhaps. The Company will use the proceeds from the Offering net of federal and state taxes to develop OLY and the Protocol, to pay salaries and other expenses of the Company, and for all other lawful purposes. Some of the proceeds of the offering may be denominated in cryptoassets and may be converted by the Company into other cryptographic and fiat currencies in its sole discretion. If the value of bitcoins, ethers, DAI, or other cryptoassets fluctuates unfavorably during or after the Offering, and if the Company holds those cryptoassets during these types of events, the Company may not be able to fund development of the Tokens and the Protocol in the manner that it intended.

**Will OLY fluctuate in value relative to other cryptoassets, dollars, or other currency?**

Yes. The volatility and unpredictability of the price of cryptoassets, including OLY, relative to fiat and other currency may result in significant loss over a short period of time. In addition, the value of OLY may be derived from the continued willingness of market participants to exchange

fiat and other currency for OLY, which may result in the potential for permanent and total loss of value of OLY should the market for them disappear.

Prices of cryptoassets are generally considered very volatile and unpredictable, and if there is secondary market activity with respect to OLY, the price of OLY, including any decline in price, may correlate with cryptoasset prices more generally for reasons not directly associated with the Token or Protocol. Alternatively, it is possible that the price of Tokens, including any increase in price, may not correlate in any meaningful way with the prices of other cryptoassets (including well-known cryptoassets such as bitcoins or ethers).

Fluctuations in Token value are anticipated over time. After delivery, the value of OLY may be determined based on current pricing on secondary markets. There is, however, no guarantee that any secondary market(s) will develop. In the absence of such pricing, the price of OLY may be limited to what a buyer is willing to pay in a privately negotiated, arms-length transaction. The Company is under no obligation to provide any Token valuations to Purchasers in the Offering.

**Will cryptoassets, such as OLY, maintain a stable value?**

Not necessarily. OLY are a type of cryptoasset that involves a high degree of risk. Cryptoassets, such as OLY, are relatively new products and technologies that have not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Conversely, a significant portion of the demand for cryptoassets may be generated by speculators and Purchasers seeking to profit from the short- or long-term holding of cryptoassets. The relative lack of acceptance of cryptoassets in the retail and commercial marketplace limits the ability of end-clients to pay for goods and services with OLY. A lack of expansion by cryptoassets into retail and commercial markets, or a contraction of such use, may result in increased volatility.

Prices of the cryptoassets, including those like OLY, have fluctuated widely for a variety of reasons and may continue to experience significant price fluctuations. Several factors may affect the price of OLY, including, without limitation:

- The total number of cryptoassets in existence;

- Global cryptoasset supply and demand;

- Purchasers' expectations with respect to the rate of inflation of fiat currencies;

- Fiat currency and cryptoasset exchange rates;

- Interest rates associated with fiat currencies or interest rates offered by lenders or other financial institutions;

- Withdrawal and deposit policies of both centralized and decentralized cryptoasset exchanges (collectively, "cryptoasset exchanges");

- Trade volume and liquidity on cryptoasset exchanges;

- Interruptions, suspensions, or terminations of one or more cryptoasset exchanges;

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

- Cyber theft of cryptoassets from cryptoasset exchanges, cryptoasset wallet providers, individual cryptoasset wallets or news of such theft from such providers, whether perceived or real;

- Investment and trading activities of hedge funds or other large cryptoasset holders;

- Sovereign monetary policies, trade restrictions and inflation controls imposed by governments or regulators;

- Regulatory measures in one or more jurisdictions that affect the usability of cryptoassets as a form of legal tender, financial instrument, software product, or otherwise restrict or facilitate cryptoasset purchases, sales, or holdings;

- Availability and popularity of businesses that provide cryptoasset-related services;

- Development and maintenance of open-source software protocols for cryptoasset networks, applications, or platforms;

- The forking of the software protocols underlying one or more cryptoasset networks, applications, or platforms;

- Unintended consequences arising from deployed smart contracts (e.g., software bugs or exploits in the smart contract code, or misuse of administrative privileges by a smart contract administrator);

- The use of exploitative or opportunistic strategies by persons transacting in cryptoassets or interacting with smart contracts on certain cryptoasset protocols, including through the use of swaps, other derivative instruments, margin, leverage, or financing (including lending, borrowing, flash loans or other types of financing);

- Fluctuations in the popularity of substitute assets, financial or investment instruments, or technologies; and

- Domestic and foreign political, economic, financial, and public health events or uncertainty.

If cryptoasset markets continue to be subject to high volatility, Purchasers may experience losses based on their purchases of OLY. Even if Purchasers are able to hold OLY for long, potentially indefinite periods, OLY may never generate a profit. Additionally, Purchasers should be aware that there is no assurance that OLY will maintain their long-term value.

**Do cryptoassets like the Tokens have long-term viability?**

It is unclear. Cryptoassets, including those like the Tokens, and others like it, are new and relatively untested products. There is considerable uncertainty about their long-term viability, which could be affected by a variety of factors, including many market-based factors such as economic growth, inflation, and others. In addition, the success of cryptoassets (including the Tokens) will depend on the long-term utility and economic viability of blockchain and other new

technologies related to cryptoassets.  Due in part to these uncertainties, the prices of cryptoassets are volatile and the Tokens may be hard to sell.  The Company does not control any of these factors, and therefore may not be able to control the ability of the Tokens to maintain their value over time.

**Could innovations in the cryptoasset industry cause pOLY I have purchased to lose value?**

Yes.  The development and acceptance of the cryptographic and algorithmic protocols governing the issuance of and transactions in cryptoassets is subject to a variety of factors that are difficult to evaluate and predict.  The use of cryptoassets to, among other things, buy and sell goods and services is part of a new and rapidly evolving commercial practice that employs digital assets based on a computer-generated mathematical and/or cryptographic protocol.  The growth of this commercial practice in general, and the use of cryptoassets in particular, is subject to a high degree of uncertainty.  Factors affecting further development of the cryptoasset industry include, among other things, the continued worldwide adoption of cryptoassets; governmental and quasi-governmental regulation of cryptoassets and/or cryptoasset exchanges; changing consumer demographics, tastes and preferences; sustained development and maintenance of open-source software protocols; the popularity and availability of alternative and/or new payment services; and general economic conditions.  If these factors negatively affect or impede the development of the cryptoasset industry, the value of a Purchaser's Token purchase in the Offering or holding of Tokens may also be negatively affected.

**Are Tokens legal tender?  Are deposits of the Tokens protected by Federal Deposit Insurance Corporation and/or Securities Purchaser Protection Corporation protections?**

No.  Tokens are not legal tender in any jurisdiction and are not backed by the government of any jurisdiction.  Accounts and value balances for the Tokens are not subject to Federal Deposit Insurance Corporation or Securities Purchaser Protection Corporation protections, or any other similar protections given in some jurisdictions to purchasers, consumers, or investors.

**What are the tax consequences of owning the Tokens?**

The tax characterization of the Tokens is uncertain, and each Purchaser must seek its own tax advice in connection with the purchase of Tokens. The purchase of Tokens may result in adverse tax consequences to Purchasers, including withholding taxes, income taxes, and tax reporting requirements.  Additionally, subsequent transactions in cryptoassets such as the Tokens may cause Purchasers to incur tax liabilities.  Further, any reward received in the form of, or through the use of, Tokens (such as any staking or bonding reward, 'forked' cryptoasset, 'airdropped' cryptoasset or other economic benefit that may arise) may result in additional tax liability.  Each Purchaser should consult with and must rely upon the advice of its own professional tax advisors.

**Will the Company ever increase the supply of pOLY?  If so, what will happen to the value of Purchaser's Tokens?**

The Company intends to initially limit the total number of pOLY across the Protocol to One Billion (1,000,000,000).

Following the Token Distribution Event, a decentralized distributed Protocol will control the Token supply and will be able to change any of the parameters of Token supply. There is no guarantee that the Protocol will not adjust the expected total supply of Tokens or otherwise adjust Token issuance rules, each of which may affect a Purchaser's Tokens' value. The distribution of additional Tokens may negatively affect the value of Tokens a Purchaser receives in the Offering.

**Will the supply OLY ever decrease?**

Potentially. Some users may lose access to their OLY by losing their private keys or by accidentally or purposefully sending their OLY to "black hole" addresses from where they cannot be recovered. These, or other activities that result in a reduction in OLY, can reduce the effective supply of OLY and potentially the effectiveness of the Protocol.

Further, while it is unanticipated, it is possible that the Community will collectively decide to decrease the supply of OLY for an unforeseen reason. The conditions of such a reduction are unknown and may involve a Purchaser losing Tokens held in their account (possibly proportionately or disproportionately to other accounts). While it is generally believed that decentralized governance tends to rule towards fairness and equity, it cannot be guaranteed that it will always do so in the future.

**Can anyone else affect the supply or characteristics of OLY?**

Yes. Third-party groups or individuals involved in the Protocol could at any time "fork" the software that creates OLY (that is, use the software to create a new version of OLY) in a way that changes the rules associated with OLY. Although hard forks that change OLY distributions are rare and require a majority support from Token holders, there is a possibility the changes made to OLY could, among other things, alter the economics of OLY. A person who forks OLY could subsequently garner support from the Protocol for the changes made. If this occurs, it could negatively affect the value of pOLY purchased in this Offering.

**Is it guaranteed that Purchasers will be able to sell their pOLY or exchange pOLY for other currencies?**

No. No exchange is currently listing the Tokens in the United States, or elsewhere. Although some are expected to develop, these exchanges may be relatively new, making them more susceptible to business disruptions and/or fraud or manipulation. Holders of the Tokens should be prepared to hold onto their Tokens if necessary, for an indefinite period.

**If Purchasers can sell or trade their pOLY, will they be able to get their Investment back?**

Not necessarily. Even if Purchasers can sell or exchange their pOLY, there is no guarantee that they will receive as much as they paid for them.

**Will Purchasers be able to cast a vote or otherwise have a say in how the Tokens are administered or governed?**

Yes. The Community is expected to control OLY supply and will be able to change any of the parameters of OLY supply. OLY holders are likely to be able to vote on these issues by staking

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

OLY.  However, there is no guarantee that the votes from the decentralized distributed Protocol as a whole will agree with the preferences of any individual Purchaser.

**Could the Company create another cryptoasset similar to the Tokens?**

Potentially.   The Company has the right to create additional cryptoassets and blockchain technology.  These other cryptoassets may share certain characteristics with the Tokens and the Protocol, and they may compete directly or indirectly with the Tokens.  As a result, such cryptoassets could negatively affect the value of the Tokens.  They could also potentially replace some or all of then-current usage of the Tokens, which would affect the Tokens' value.

RISKS RELATED TO MANAGEMENT

**Will the members of the Company's management team (the "Management") have broad discretion to use the net proceeds from this Offering?**

Yes.  Management expects to use the net proceeds from this Offering to advance development of OLY and the Protocol, and for working capital and other general corporate purposes. Management may also use a portion of the net proceeds to acquire, license and invest in complementary products, technologies, or businesses; however, the Company currently has no agreements or commitments to complete any such transaction.  However, Management will have broad discretion over the use of proceeds from this Offering, and could spend the proceeds from this Offering in ways with which Purchasers may not agree with or that do not yield a favorable return, if at all.  If Management does not invest or apply the proceeds of this offering in ways that benefit the Protocol, the future value and utility of Purchasers' Tokens may be adversely affected.

**Does the Company's Management have experience successfully operating other businesses utilizing cryptoassets and distributed ledger technology?**

The Company has little to no experience working in the blockchain sector, this would be Management's first venture into this space.

**Can a Purchaser rely on the Company's operating history in making a decision about whether to purchase pOLY?**

No.  The Company is newly formed and therefore has no operating history on which prospective Purchasers may base an evaluation of likely performance.  To the extent that the Company's Management is responsible for the results of any previous business ventures, those results are, in any event, past results and are not necessarily indicative of future results of the Company's business.  Management's previous businesses may have benefited from opportunities and general market conditions that may not repeat themselves.  In addition, Management is new to the particular type of business that the Company is pursuing, i.e., developing a Protocol supported by blockchain infrastructure.  The Company may not be able to achieve the same results or profitable business operations as quickly as any of its prior efforts or of the prior businesses of Management, and favorable market conditions may not arise.

**Are there risks associated with the intended Decentralized Autonomous Organization ("DAO") structure to manage the Protocol's continued development and functioning?**

Yes, many. The Company intends to decentralize management of the Protocol into a DAO structure, whereby Token-holders participate in the Protocol's governance proportionate to their portion of Tokens (possibly requiring fulfillment of some conditions to participate). DAO-structures are known for many inherent risks on their own, such as 51-attacks, a majority of Token-holders guiding the Protocol against the interests of a minority, or technical failures in the smart contract or other programmatic underpinnings of the DAO features (for additional information regarding this risk, see the section titled "Risks Related to the Protocol" below). In the Protocol's case, while unlikely, the DAO (at the control of a majority of Token-holders) may take the Protocol in a different direction than is currently planned, such as electing to removing the Token redemption smart contracts altogether and causing the Tokens to become virtually worthless.

*PRIVILEGED & CONFIDENTIAL*

Tokens are intentionally disbursed among a wide portion of varying, independent individuals and parties to help ensure incentives are aligned away from this possibility. Nonetheless, these risks associated with the Protocol's DAO (and with all DAO's, to some degree) remain and, consequently, so do their potential effects on the value of the Tokens.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

RISKS RELATED TO THE PROTOCOL

**Is the Protocol's success dependent on technical development?**

Yes.  The Company is designing a technology that is expected to have fundamentally different technical operation compared to other, more field-tested blockchain applications.  Specifically, the protocol will depend on market and oracle integrations to operate as well as a set of no less than 7 smart contracts that will provide Treasury Management, Purchase and Sales, Staking, Bonding, Profit Distributions and others. The success of the Protocol depend on the Company's ability to convert its logical proof of concept into actual code that achieves its goal to introduce a truly viable digital-native currency system for the global economy, allowing for variable policy while retaining scarcity constraints.  If the Company is unable to develop a truly viable digital-native currency system for the global economy as it expects to achieve, the Protocol may not be successful.

**Does the success of the Protocol rely on participation and adoption by users or Purchasers?**

Yes.  The size of the Protocol's user base and the level of developer adoption of the Protocol are critical to its success.  The performance of the Protocol will be significantly determined by the success of the Company in adding, retaining, and engaging active users on the Protocol.  Even if the Company achieves higher market penetration rates, the active user growth rate may decline over time as the size of the Protocol's active user base increases.  In this case, the Company may have to determine new ways of increasing user engagement with the Protocol, but there can be no guarantee that the Company will be able to do so.

If U.S. and non-U.S. persons do not perceive the Protocol as useful, reliable, and trustworthy, the Protocol will not attract or retain users or otherwise maintain or increase the frequency and duration of their engagement.

One or more of the following factors could potentially negatively affect user retention, growth, and engagement levels, including:

- Developers increasingly engage with competing blockchains;

- The Company fails to introduce new and improved versions of the Tokens or the Protocol or other new functionalities;

- The Company's  new and improved versions of the Protocol or other new products or services are not favorably received;

- Users' perception of the Protocol's or the Company's new products' quality or usefulness;

- Users' concerns relating to the privacy, sharing, safety and security of information contained or user activities on the Protocol;

- Changes in legislation, rules, and regulations, including potential regulatory actions or proceedings taken against the operators of the Protocol;

- Delays in allowing users to access the Protocol in a rapid and reliable manner or other technical disruptions or adverse changes in the Protocol that adversely affect user experience;

- The privacy policies or procedures for the Protocol are altered so that the user base or the general public perceive the changes negatively; or

- The Company, the Protocol, or other companies in the crypto industry are the subject of adverse media reports or other negative publicity.

Users may not accept the Protocol, its incentive structure, or its use of the Tokens as a replacement for or in addition to existing protocol blockchains available in the marketplace. If the market stops developing, develops more slowly than expected, or becomes saturated with competitors, or if the Protocol does not achieve or sustain acceptance by the marketplace, the value of the Tokens would be materially adversely affected.

**Does the Protocol face significant competition?**

Yes. [The Protocol is fundamentally a new blockchain for smart contracts. Other blockchains, such as the Ethereum blockchain, have been in existence for a longer period than the Company's blockchain and have achieved substantial adoption in the crypto community. If the Company is not able to convince the crypto community to use its blockchain over existing opportunities, then the value of the Tokens may suffer.

Additionally, many other companies are attempting to develop blockchains that improve upon existing blockchain technology. To the extent that any of these blockchains develop a product that is superior to the Protocol, then the value of the Tokens may suffer.]

**Does the Company own all of the technology that it is developing?**

No. The technology that the Company is developing is an open-source technology. Therefore, no one will not have exclusive rights to this technology. The technology that the Company is developing could be copied at any time or used in another system. Consequently, the Company may have limited abilities to protect the intellectual property that it develops.

**What happens if a competitor offers the same or similar service as the Protocol?**

It is possible that alternative Protocols and blockchains could be established that utilize the same or similar technology, either directly or indirectly through reverse engineering, and attempt to facilitate materially similar services as the Company or the Protocol. The Protocol may compete with these alternative Protocols, which could lead to decreased demand for the Protocol, leading to a lower value of the Tokens.

**Can technological advances negatively impact the value of the Tokens?**

Yes. Advances in cryptography or technical advances such as the development of quantum computing could present risks to the viability of cryptoassets and the Protocol by undermining or vitiating its cryptographic consensus mechanism.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

**Is Protocol susceptible to [Validator/base layer] attacks?**

Yes. The Protocol is an application that exists on top of the ETHEREUM blockchain (the "**Base Layer Blockchain**"). Any failure or disruption to the Base Layer Blockchain may affect the Protocol's functionality or the value of OLY. This includes, without limitation, 51% Attacks, systemic node failure, bugs flaws or vulnerabilities in the Base Layer Blockchain's client software, severe network congestion, or many other events that can harm the Base Layer Blockchain.

**Is the Protocol susceptible to smart contract or other programmatic failures?**

Perhaps. The Protocol's functionality (including its DAO management system) depends on of a series of smart contracts that run immutably once they are launched. Any flaws, errors, vulnerabilities, or other aspect that causes the code underlying these smart contracts or other programmatic bases of the Protocol to incorrectly perform may cause the entire Protocol to perform differently than intended. This may result in (without limitation) failures for the code to run at all, vulnerabilities attackers may exploit to steal funds or otherwise maliciously manipulate the system, number overflow errors, unnecessarily expensive transactions, unintended creation of Tokens, failed or unintended functionalities, or many other types of foreseeable and unforeseeable consequences. While the Company is seeking audits from two independent sources of the code that it launches to the blockchain, there is no perfect way to remove all of this risk. Any errors in the Protocol's underlying smart contracts or programmatic underpinnings may result in damage to the Protocol or affect the price of OLY.

**Is the Protocol vulnerable to cyber-attacks?**

The Protocol may be interrupted in the event of a cyber-attack attack or other malicious activity. Because attackers can use a variety of hardware and software that may interface with the Protocol, there is risk that the Protocol may become unavailable or interrupted based on a failure of interoperability or an inability to integrate these third-party systems and devices that the Company does not control. The risk that the Protocol may face interruptions and the Protocol may face additional security vulnerabilities could adversely affect the Protocol and therefore the future value and utility of the Tokens.

For additional information regarding this risk, see the section titled "**Technology and Cybersecurity Risks**" below.

**Is the Protocol subject to government interference?**

Potentially. Governments may directly or indirectly restrict access to the Protocol in their countries, which could substantially harm the Protocol. It is possible that governments of one or more countries may seek to censor applications developed using the Protocol in their country, restrict access to those applications from their country entirely, or impose other restrictions that may affect the accessibility of the application in their country for an extended period of time or indefinitely. Governments in other countries may seek to restrict access to the Protocol if they consider the Company or the Offering to be in violation of their laws. In the event that access to the Protocol is restricted, in whole or in part, in one or more countries or our competitors are able

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

to successfully penetrate geographic markets that the Company cannot access, its ability to retain or increase its user base may be adversely affected, the Company may not be able to maintain or grow the Protocol as anticipated, and the value of the Tokens could be adversely affected.

**Could geopolitical events affect the value of the Tokens or the Protocol?**

Potentially. The impact of geopolitical events on the supply and demand for cryptoassets like the Tokens is uncertain. It is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of cryptoassets globally and/or locally. Large-scale sales of the Tokens may result in a reduction in the value of the Tokens and adversely affect a Purchaser's purchase of Tokens.

TECHNOLOGY AND CYBERSECURITY RISKS

**By purchasing Tokens, are Purchasers vulnerable to social engineering, phishing emails, man-in-the-middle, phone hijacking, sim-swapping, ransomware, denial of service, hacking and other cyberattacks?**

Yes. The nature of cryptoassets, such as OLY, may lead to an increased risk of fraud or cyberattack. Hackers or other malicious groups or organizations may attempt to interfere with the purchase OLY using virtual currency in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing, spoofing, social engineering, phishing emails, man-in-the-middle, phone hijacking, sim-swapping, and ransomware. If Purchasers own significant sums of cryptoassets (such as OLY), they may also be targets for "kidnapping" of the cryptoassets for ransom.

Furthermore, because the Protocol is based on open-source software, there is a risk that a third-party, the Company, the Community, or an affiliate may intentionally or unintentionally introduce weaknesses into the core infrastructure of the Protocol, which could negatively affect OLY and the Protocol. Recently, other services that sponsor and engage in transactions in cryptoassets have been the subject of cyberattacks that have resulted in a loss of cryptoassets. Among other things, a Purchaser could lose her, his or its Investment of virtual currency due to these types of threats, or the Company could experience a loss of virtual currency in its own wallet, which would undermine core components of the Protocol and put the Company at financial risk.

Potential Purchasers are responsible for educating themselves on protecting their personally identifiable information and on cybersecurity best practices. While the Company will take all steps that are commercially reasonable and customary to prevent or mitigate the impact of cyberattacks, there can be no guarantee that the Company will be successful in preventing all cyberattacks on its systems.

**Is the Protocol vulnerable to risks, both foreseen and unforeseen, arising from the new and untested nature of cryptoasset technology?**

Yes. The Company currently anticipates that the Protocol will rely on a blockchain the Company is developing as the foundation for OLY. Cryptoasset technology is a relatively new, untested, and evolving technology that in fact represents a novel combination of several concepts, which may be present or absent in varying degrees across differing cryptoassets. For example, cryptoassets use new methods of authenticating transactions using cryptography across distributed blockchain nodes, which eliminate the need for a central clearing-house and use differing methods of incentivizing this validation by the use of "mining," staking, bonding, validating, or transaction fees. As such, the further development and future viability of cryptoassets in general or the Tokens in particular are generally uncertain, and practical and ideological challenges, both known and unknown, may prevent their wider adoption. For example, the Protocol may be subjected to a variety of potential cyber-attacks, including smart contract exploits, consensus-based attacks, replay attacks, Sybil attacks, fifty-one percent (51%) attacks, selfish-validator attacks, *de facto* bribe attacks and other forms of cyber-attacks to which blockchains are susceptible now or in the future. Whether these risks are the same or amplified given the novel complexity of the Protocol

compared to other blockchain projects or technologies is also unknown, and it is possible such novelty will be the source of the previous mentioned vulnerabilities in ways that cannot occur in older, more-tested systems.

In the event the existing technology of the Tokens proves inadequate to the demands of its Token holder/user base, solutions may be difficult to implement as they may require the majority consent of existing users, for example, if they are implemented via a fork. Such consent may be difficult to obtain for several reasons: users may be unable to agree on the technical merits of a solution, or debates over these trade-offs may turn on and expose ideological differences regarding the relative importance of the various features of the Tokens. Such debates may therefore be difficult or impossible to resolve by consensus, which may ultimately result in the abandonment of the Tokens or a split in the user base that limits the Protocol's broad adoption. It is also possible that changes or forks in the base layer blockchain will intentionally or unintentionally cause the Protocol to become incompatible, unusable, interrupted, or obsolete. There is therefore no guarantee that effective solutions to the challenges facing the Tokens will be found and adopted, and the failure to do so could adversely affect the future value and utility of cryptoasset technology in general and a Purchaser's Tokens in particular.

**Are the Tokens securely held?**

Not necessarily. The Protocol, the Company, the DAO, and the Tokens are each subject to various significant cybersecurity risks. The nature of cryptoassets may lead to an increased risk of fraud or cyberattack. Hackers or other malicious groups or organizations may attempt to interfere with the Tokens, the Protocol, or the Company in a variety of ways, including, but not limited to, viruses, malware attacks, denial-of-service attacks, consensus-based attacks, Sybil attacks, smurfing, spoofing, social engineering, phishing emails, man-in-the-middle, phone hijacking, and ransomware.

Because the Protocol is an open-source software, there is a risk that a third-party, the Protocol, the Company, or an affiliate may intentionally or unintentionally introduce weaknesses into the core infrastructure of the Protocol, which could negatively affect a Purchaser's Investment. Recently, other platforms that sponsor and engage in transactions in cryptoassets have been the subject of cyberattacks that have resulted in a loss of cryptoassets.

Although it is difficult to determine what, if any, harm may directly result from any specific interruption or attack, any failure to maintain performance, reliability, security, and availability of the Company and the Protocol's technical infrastructure may harm the Company's, the Protocol's, or the Tokens' reputations, its ability to retain existing Purchasers and attract new clients, and its results of operations.

**Is there a risk of losing access to the Tokens?**

When issued, the Tokens received by you may be held in a digital wallet, which requires a private key or a combination of private keys for access. Accordingly, loss of the private key(s) associated with your digital wallet storing the Tokens will result in the loss of such Tokens. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet or vault service you might use, may be able to misappropriate your Tokens. The Company, the Community, nor any other affiliate are not responsible for any such losses.

DocuSign Envelope ID: 2A53EBB2-4635-4433-A2AB-D2A5A696884E

In addition, any errors or malfunctions caused by or otherwise related to the digital wallet you choose to receive and store Tokens, including your own failure to properly maintain or use such digital wallet, may also result in the loss of your Tokens. Additionally, your failure to follow precisely the procedures set forth for this Offering and receiving Tokens in the Token Distribution Event, may also result in the loss of your Tokens.

**Could the Protocol or the Tokens contain undetected errors, bugs, or vulnerabilities?**

Yes. The internal systems of the Company, the Protocol, and the Tokens generally rely on and incorporate software that is highly technical and complex, and the Company's and the Protocol's internal systems depend on the ability of such software to store, retrieve, process, and manage immense amounts of data. This software has and may now or in the future contain undetected errors, bugs, or vulnerabilities. It is possible the Company or the Community will not detect errors in the Protocol or the underlying blockchain technology until after code has been released for external or internal use. Any errors, bugs, vulnerabilities, or other design defects discovered in the Protocol's code after release may result in a negative experience for Purchasers who use the Protocol and the Tokens. Any errors, bugs, or defects discovered in the Protocol or the Company's software could result in damage to the Company's or the Protocol's reputation, or cause liability in the Company or the Community for damages, any of which could result in significant declines in the value of the Tokens.

**What happens if a Purchaser loses her, his or its private keys?**

Once the Tokens are distributed, a Purchaser's Token balance is associated with her, his, or its public key address, which is in turn associated with her, his or its private key address. Purchasers are responsible for knowing their private key address and keeping it a secret. Because a private key, or a combination of private keys, is necessary to control and dispose of the Tokens stored in the Purchaser's digital wallet or vault, the loss of one or more of a Purchaser's private keys associated with her, his or its digital wallet or vault storing the Tokens will result in the loss of the Purchaser's Tokens. Moreover, any third-party that gains access to one or more of a Purchaser's private keys, including by gaining access to login credentials of a hosted wallet service a Purchaser uses, may be able to misappropriate a Purchaser's Tokens. The Company and its affiliates will never ask a Purchaser for her, his or its private key address and a Purchaser should never share them with someone the Purchaser does not know and trust.

**What happens if a Purchaser accidentally spends virtual currency or is misled into spending virtual currency when purchasing the Tokens? What happens if a Purchaser accidentally spends the Tokens or is misled into spending the Tokens?**

Transactions in virtual currency or in the Tokens may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may be irrecoverable. Once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer or a theft of cryptoassets, such as the Tokens, generally will not be reversible. If a party is able to hack a Purchaser's account and initiate a transaction, the Purchaser may not be capable of receiving compensation for any such transfer or theft. If there is an error and a transaction occurs with the wrong account, to the extent that the Company and the Community are unable to seek a corrective transaction with such third-party or is incapable of identifying the third-party which has received the Tokens through error or theft, the Company and the Community will be unable to revert or

otherwise recover incorrectly transferred Tokens. To the extent that the Company or the Community are unable to seek redress for such error or theft, such loss could adversely affect a Purchaser's purchase of Tokens.

The Purchaser is solely responsible for providing the Company with accurate information with respect to its digital wallet for the receipt of the Tokens. If information provided by a Purchaser proves incorrect, and as a result, the Tokens are not delivered to the Purchaser, the Company will not have any liability to the Purchaser for the Company's good faith reliance on such misinformation.

**Will the Company or the Protocol ever experience a disruption that could impact the value of the Tokens?**

Perhaps. The digital nature of the Protocol and Tokens means that any technological difficulties experienced by the Company or the Protocol could negatively impact the usability of the Protocol or the Tokens. While the Company will take all steps that are reasonable and customary to prevent or mitigate the impact of disruptions to the Protocol, there can be no guarantee that the Company will be successful in preventing all such disruptions.

**PRIVILEGED & CONFIDENTIAL**

REGULATORY AND OTHER LEGAL RISKS

**Could regulatory changes affect a Purchaser's Investment?**

Yes. Regulation of cryptoassets in the United States and in foreign jurisdictions is in its early stages of development and is subject to unpredictable changes which may have an adverse impact on the Protocol and the Tokens. The regulatory status of cryptoassets remains unclear or unsettled in many jurisdictions. Legislative and regulatory changes or actions at the local, state, federal, foreign, or international level may adversely affect the use, transfer, exchange, and value of cryptoassets. These legislative and regulatory changes or actions are difficult to predict and may adversely impact the Tokens, the blockchain technology underlying the Tokens, the Company, and the Protocol.

As cryptoassets have grown in popularity and market size, legislators and regulators have begun to develop laws and regulations and have, at times, released interpretive guidance governing the cryptoasset industry. Both legislators and regulators have expressed concerns that cryptoassets can be used by criminals to evade taxes and launder money. To the extent that future actions by legislators and/or regulators impose restrictions or limitations on the asset market, the demand for the Tokens is likely to be reduced. In addition, such actions may limit the ability of Purchasers to convert Tokens into fiat currency, which is likely to result in a reduction of demand and, in turn, a decline in the value of the Tokens.

Additional or changing regulations could also limit the use of cryptoassets on various cryptoasset platforms. Such reductions in use could decrease or remove the value of the functionality achieved on those platforms and cause a substantial decrease the value of those cryptoassets and demand for Tokens and the Company's blockchain technology.

Various jurisdictions may adopt laws, regulations, or directives that address the cryptoasset market and participants in such market. Any such laws, regulations, or directives may (i) conflict with those of other jurisdictions, (ii) negatively impact the acceptance of cryptoassets inside and outside such jurisdictions, (iii) impede the growth or sustainability of the cryptoasset market in other jurisdictions, and/or (iv) otherwise negatively affect the value of cryptoassets such as the Tokens. These changes or new laws, regulations, or directives, if any, are impossible to predict, but any such change could be substantial and adverse to the value of a Purchaser's Tokens.

**Is there a risk that banks and other financial institutions may refuse to process transactions for or maintain accounts for entities or individuals transacting in cryptoassets?**

Yes. Banks in some jurisdictions may refuse to provide bank accounts and other banking services to cryptoasset-related companies or companies that accept cryptoassets for reasons that include regulatory requirements or ambiguities and perceived compliance risks or costs. This has caused some providers of cryptoasset-related services to have difficulty finding financial institutions willing to provide accounts and services to them. Continuation of such difficulties in the future could decrease the utility and adoption of cryptoassets as a means of payment, harm public perception of cryptoassets, and/or could limit the utility and potential applications of cryptoassets. These events could materially and adversely affect the Company as well as the adoption of the Tokens and the Protocol.

**Are the Tokens registered with any U.S. state or federal securities or commodities regulators?**

No.  In an abundance of caution and without admitting or acknowledging that the Token may qualify as a "security" under any applicable Laws, we are intending to comply with the requirements of certain exemptions from U.S. securities Laws with respect to the sale and delivery of the Tokens.  Accordingly, Tokens are only being offered and sold to certain qualified buyers outside the U.S. and are not being offered or sold to any Person in any jurisdiction in which the offer to sell or its acceptance would not comply with the securities or other laws of such jurisdiction.  We reserve the right to exclude a Person from participation in the Offering for any reason in our discretion including if such Person resides in any jurisdiction in which it may be illegal to offer or sell Tokens without registration, permits or licenses, or if it would be unreasonably expensive or otherwise burdensome to comply with all applicable securities and other Laws.

As mentioned, the Company intends to distribute the Tokens to Non-U.S. Persons only. However, the internet-based nature of the Protocol and the broad, principles-based approach of U.S. securities laws means that such laws can be deemed to apply on an extra-territorial basis in certain circumstances, and so the risk that the Offering, Token Distribution Event, or any subsequent transactions in Tokens, are not in compliance with Reg S or other potentially applicable U.S. securities laws is a risk that adheres to the Investment, purchase, and subsequent Tokens. This risk may be heightened because persons or entities associated with the Company are subject to U.S. jurisdiction.

**Are the exchanges or alternative trading systems that the Tokens can be bought and sold on registered with the SEC?**

Currently there are no exchanges where the Tokens are listed and/or traded.  While the Company anticipates exchanges for cryptoassets in the United States and elsewhere will list the Tokens in the future, the Company cannot and does not guarantee that such exchanges will ever list and trade the Tokens.  As such, the Company cannot guarantee that any exchanges that may list the Tokens are registered with the SEC or are otherwise compliant with all applicable rules and regulations.

**Could changes in international, national, regional, or local laws impact the value of the Tokens and/or the Company's ability to develop the Protocol and Tokens?**

Yes.  Legislative and regulatory changes or actions at the national, regional, or international level (including actions by US or Swiss regulators) may adversely affect the use, transfer, exchange, and value of the Tokens.  Potential Purchasers should be aware that, in addition to the regulatory uncertainty of the Tokens, the regulatory status of the Tokens and similar cryptoassets is unclear or unsettled in many jurisdictions.  It is difficult to predict how or whether regulatory agencies may apply existing or new regulation with respect to such technology and its applications, including the Tokens and the Protocol.  Further, it is difficult to predict how or whether legislatures or regulatory agencies may implement changes to law and regulation affecting distributed ledger technology and its applications.  Regulatory actions could negatively impact the Tokens, and the Protocol in various ways, including, for example, through a determination that the Tokens are regulated financial instruments required to be registered with the appropriate regulatory agency.  Any of these outcomes could affect the value and utility of the Tokens and the Protocol.

Changes in the law by legislatures and regulatory agencies could negatively impact the Tokens and the Protocol. In addition, self-regulatory bodies may be established that set guidelines regarding cryptoassets, the Tokens, and the Protocol, which we may commit to comply with, or which our failure to comply with may result in negative publicity, government investigation, government or private litigation, or investigation by these self-regulatory bodies or other accountability groups. The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal or commercially undesirable to operate in such jurisdiction.

Currently, the Company is aware of the following (non-exhaustive) regulatory risks associated with cryptoassets in certain selected major jurisdictions:

Central government regulators within the People's Republic of China maintain a ban on 'initial coin offerings' and financial institutions and third-party payment providers operating in China are banned from accepting, using, or selling almost all forms of cryptoassets.

Certain Indian parliamentary committees are considering draft legislation that would ban almost all forms of cryptoassets.

The member states of the European Union have adopted different approaches to the regulation of cryptoassets within the existing European Union regulatory framework, which in some cases may require issuers or exchangers of cryptoassets to register with regulatory authorities (e.g., France, Germany).

The U.S. regulatory environment presents a risk that many cryptoassets could be deemed to be 'investment contracts' and regulated as securities in the U.S. U.S. persons may only receive securities pursuant to an exemption from the U.S. Securities Act, U.S. Exchange Act or other applicable securities laws and such cryptoassets would therefore only be available for purchase and sale on a registered securities exchange or alternative trading system that has accepted the tokens for trading or quotation (currently, no such exchange or ATS exists).

Any changes to regulatory regimes potentially applicable to cryptoassets could materially and adversely affect the Token, the Protocol, or the Company. Such changes could have an effect directly or could cause any eventual secondary markets for Tokens to be unavailable in those major jurisdictions thereby affecting the subsequent value of the Token following distribution.

**Does the Company control the conduct of users of the Protocol?**

No. There can be no guarantee that Token holders or other users of the Protocol will not engage in misconduct. Such behavior could negatively impact the Tokens and the Protocol, both on a short-term and long-term basis. Purchasers should not rely on the Company exercising control over the Protocol after Tokens are distributed.

**Will the Company be able to completely eliminate the use or attempted use of the Tokens in connection with criminal activity in the U.S. or elsewhere?**

No. Cryptoassets have in the past been, and in the future likely will be, used by bad actors for black-market transactions, to commit fraud, launder funds, evade taxes or economic sanctions, finance terrorism, and other illegal activities. The Company's policies and procedures for the

detection and prevention of money laundering and terrorism-funding activities may not completely eliminate misuse or attempted use of the Tokens to facilitate money laundering or other illegal or improper activities. The occurrence of such activities may adversely affect the value and utility of the Tokens.

**Is there a risk that Purchasers of the Tokens can manipulate trading in the Tokens or affect the price of the Tokens by "dumping" them on the market?**

Yes. If a significant number of Tokens are sold once the Tokens become freely transferable, this trading could negatively affect the price of the Tokens. In addition, it is possible that Token holders could deliberately, and improperly, influence the price of the Tokens by trading based on information they may receive about the Protocol and timing sales of the Tokens based on that information. The Company will not have control over or responsibility for these activities.

**Is the Company registered as a money transmitter or money services business?**

No. The Company believes that it is not a money transmitter ("**MT**") or a money services business ("**MSB**"). If the Company were deemed to be a MT and/or MSB, it would be subject to significant additional regulation. This could lead to significant changes with respect to the Protocol, how the Tokens are structured, how they are purchased and sold, and other issues, and would greatly increase the Company's costs in creating and facilitating transactions in the Tokens. It could lead to the termination of the Tokens. Further, a regulator could take action against the Company if it views the Tokens and the Protocol as a violation of existing law. Any of these outcomes would negatively affect the value of the Tokens and/or could cause the Company to cease operations.

**Could the Company be deemed an unlicensed virtual currency business despite current guidance stating the opposite?**

Yes. Though highly unlikely, the Company could be deemed to be conducting an unlicensed virtual currency business and would be subject to significant additional regulation and/or regulatory consequences. This could lead to significant changes with respect to the Protocol, how the Tokens are structured, how they are purchased and sold, and other issues, and would greatly increase the Company's costs in creating and facilitating transactions in the Tokens. It could reasonably lead to the termination of the Tokens. Further, a regulator could take action against the Company if it views the Tokens and the Protocol as a violation of existing law. Any of these outcomes would negatively affect the value of the Tokens and/or could cause the Company to cease operations.

**Would Capital Controls Apply to Tokens?**

They may. Many jurisdictions impose strict controls on the cross-border flow of capital. Purchasers or other holders of the Tokens may be subject to these regulations.

**Do regulations or embargoes concerning Countering the Financing of Terrorism ("CFT"), Anti-Money Laundering ("AML"), or political sanctions apply to Tokens?**

Yes. The extent to which cryptoassets are used to fund criminal or terrorist enterprises or launder the proceeds of illegal activities or are subject to sanctions or embargoes imposed by governments or regulatory authorities could materially impact the success of the Token.

The potential, or perceived potential, for anonymity in transfers of bitcoins and similar cryptoassets, as well as the decentralized nature of blockchain systems, has led some terrorist groups and other criminals to solicit bitcoins and other cryptoassets for capital raising purposes. As cryptoassets have grown in both popularity and market size, many jurisdictions have started examining the operations of cryptoassets, their users and exchanges, concerning the use of cryptoassets for the purpose of laundering the proceeds of illegal activities or funding criminal or terrorist enterprises.

In addition to the current market, new blockchain systems or similar technologies may be developed to provide more anonymity and less traceability. There is also the potential that cryptoasset exchanges may court such illicit activity by not adhering to know-your customer and anti-money laundering practices.

Illegal activity occurring through the use of the Token may be unpreventable. The Company may be unable to detect the unauthorized use of a Purchaser's digital wallet or compromise of the Purchaser's private key(s) prior to Token distribution.

The use of cryptoassets for illegal purposes, or the perception of such use, could result in significant legal and financial exposure, reputational damage to the Company or the Protocol, or damage to the reputation of cryptoassets in general. The failure to meet KYC/AML requirements could result in regulatory penalties on the Company, which could have a materially adverse effect on the value of a purchase or subsequently distributed Token.

The United Kingdom, European Union member states and other major financial jurisdictions have issued regulations to combat terrorist financing and money- laundering activities.  Many other countries, including the United States, have enacted similar legislation to control the flow of capital for such illicit activities and the financial action task force of the G7 group of countries has issued recommendations for national CFT and AML legislation. In the event that licenses, registrations, or other authorizations are required under applicable CFT and/or AML regulations to distribute Tokens, receive or hold the Tokens or operate as a Protocol node, there is no guarantee that the Company or other persons will be able to successfully obtain such licenses, registrations, or authorizations.  In addition, any illicit use of the Tokens by bad actors could breach such regulations and seriously impact the global reputation of the Token or the Protocol.  In such event, it is conceivable that this could trigger scrutiny by CFT and AML regulators and potentially cause significant disruption to the distribution and any subsequent transfers of the Tokens.

Further, the European Union, United States and the governments of certain other countries currently impose, and may impose in the future, economic sanctions on transactions with certain identified persons or persons residing in sanctioned regions. These sanctions may apply to transactions involving the Tokens, including the Offering, distributions of Tokens or later transactions of the Tokens on the Protocol. The Company, Token holders or Protocol participants may be subject to fines or penalties under applicable law governing such sanctions or embargoes.

**Am I represented by the Company's legal counsel?**

No.  Horizons Law & Consulting Group and AMS Attorney ([*collectively*], "**Counsel**") currently represents the Company and Management in connection with the Offering.  Counsel does not represent any current or prospective Purchasers with respect to a purchasing the Tokens.  No

separate counsel has been engaged by Management or the Company to represent any current or prospective Purchasers with respect to purchasing the Tokens.  Counsel may be removed as counsel by Management or the Company at any time without the consent of, or notice to, Purchasers.  In addition, Counsel does not undertake on behalf of or for the benefit of Purchasers to monitor the compliance of the Company with (i) the Investment program, Investment strategies, Investment restrictions and other guidelines and terms set forth in these governing documents of the foregoing or (ii) applicable laws.  In addition, Counsel may invest directly or indirectly in the Offering without notice to other Purchasers in the Offering.

**Are there additional risks associated with the Tokens?**

Yes.  This discussion of Risk Factors is not complete, and it may not describe all of the risks and conflicts of interests relating to purchasing the Tokens.  Potential Purchasers should consult with their own legal and financial advisors before purchasing the Tokens.

**PRIVILEGED & CONFIDENTIAL**

**Exhibit B**

**Token Economics**

| | pOLY | Distribution |
|---|---|---|
| Team and Founders | 350,000,000 | 35.0% |
| Advisors | 50,000,000 | 5.0% |
| Private Sale 1 | 50,000,000 | 5.0% |
| Private Sale 2 | 25,000,000 | 2.5% |
| Public Sale | 50,000,000 | 5.0% |
| DAO | 475,000,000 | 47.5% |
| **Total** | **1,000,000,000** | **100.0%** |



**PRIVILEGED & CONFIDENTIAL**

**Exhibit C**

**<u>Form W9 or 8BEN</u>**