# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| HU CHUN LIANG,<br><br>       Plaintiff,<br><br>   v.<br><br>DANIEL BARA, HEPHAESTUS FOUNDATION AG, OLYMPUS DAO, AND JOHN DOE DEFENDANTS 1-5,<br><br>       Defendants. | Case No. 3:22-cv-00541-JCH<br><br>Hon. Janet C. Hall<br><br>June 3, 2022 |

## DEFENDANTS' MEMORANDUM OF LAW ISO MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Tracey Salmon-Smith (ct 29372)
Faegre Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932
Tel.: (973) 549-7038
Fax: (973) 360-9831
tracey.salmonsmith@faegredrinker.com

Antonio M. Pozos (PHV forthcoming)
Victoria L. Andrews (PHV forthcoming)
Henry Grabbe (PHV forthcoming)
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Tel.: (215) 988-3327
Fax: (215) 988-2757
antonio.pozos@faegredrinker.com
victoria.andrews@faegredrinker.com
henry.grabbe@faegredrinker.com

*Counsel for Defendant Daniel Bara*

Jonathan Freiman (ct 24248)
Wiggin and Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510
Tel.: (203) 498-4584
Fax: (203) 782 2889
jfreiman@wiggin.com

Daniel B. Ravicher (PHV forthcoming)
Aaron M. Zeisler (ct 29317)
Meghan H. Sullivan (PHV forthcoming)
Sumana Wolf (PHV forthcoming)
ZEISLER PLLC
45 Rockefeller Plaza, 20th Floor
New York, NY 10111
Tel.: (212) 671-1921
Fax: (888) 229-1921
dan@zeisler-law.com
aaron@zeisler-law.com
meghan@zeisler-law.com
sumana@zeisler-law.com

*Counsel for Defendants Hephaestus Foundation AG and Olympus DAO*

<strong>TABLE OF CONTENTS</strong>

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

    A.    Plaintiff Purchases pOLY Tokens from Hephaestus AG Pursuant to the TPA ...... 2

    B.    The TPA Placed a Use Restriction on Plaintiff's Tokens ...................................... 3

    C.    The TPA Contains Two Limitation of Liability Clauses ....................................... 4

    D.    The TPA Contains a Swiss Choice of Law and Dispute Resolution Clause .......... 5

    E.    Mr. Liang Repeatedly Breaches the TPA by Exchanging and Selling Tokens ...... 5

    F.    Plaintiff Performs Promotional Services ............................................................. 7

ARGUMENT .................................................................................................................. 8

I.    THERE IS NO SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFF AND
DEFENDANTS ARE ALL FOREIGN CITIZENS ......................................................... 8

    A.    Given that Defendant Bara is Not a Citizen of the United States, He and the
Allegedly Unincorporated Hephaestus AG and Olympus DAO Are All Aliens .... 9

    B.    Plaintiff Himself Defeats Diversity Jurisdiction by Virtue of His Alleged
Membership in Defendants Hephaestus AG and Olympus DAO ......................... 11

II.    NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW ..................................... 14

III.    COUNTS I-III SHOULD BE DISMISSED BECAUSE PLAINTIFF CANNOT PLEAD
INJURY FROM BEING UNABLE TO EXCHANGE TOKENS DURING THE USE
RESTRICTION PERIOD ............................................................................................. 16

IV.    COUNTS I-III SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFF HAS
ALREADY RECOVERED MORE THAN THE LIMITATIONS OF LIABILITY IN
THE TPA PERMIT ..................................................................................................... 20

V.    COUNTS IV-IV SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO
SUFFICIENTLY PLEAD FRAUD BY DEFENDANTS ................................................. 24

VI.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF
FORUM NON CONVENIENS IN FAVOR OF SWITZERLAND ................................. 28

    A.    Relevant Law ..................................................................................................... 29

    B.    Plaintiff's Choice of the District of Connecticut is Not Entitled to Deference .... 30

i

1.       Plaintiff's Residence is Not Convenient to the Chosen Forum ................ 31

2.       Key Witnesses are Unavailable in the Chosen Forum ............................. 31

3.       Defendants' Amenability to Process is Not Dispositive ........................... 32

4.       Plaintiff Has Obtained Adequate Legal Assistance in the Alternative Forum ............................................................................................................. 32

C.     Switzerland is an Adequate Alternative Forum ...................................................... 32

D.     The Public and Private Interests Factors All Favor Dismissing Plaintiff's Complaint in Favor of Switzerland ........................................................................ 34

CONCLUSION .................................................................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

*Acosta v. JP Morgan Chase & Co.*,
219 F. App'x 83 (2d Cir. 2007) .................................................................... 30, 31

*Aenergy, S.A. v. Republic of Angola*, -- F.4th --,
2022 WL 1099445 (2d Cir. Apr. 13, 2022) ...................................... passim

*Aguinda v. Texaco, Inc.*,
303 F.3d 470 (2d Cir. 2002) ......................................................................... 34

*Allstate Ins. Co. v. Adv. Health Pros., P.C.*,
256 F.R.D. 49 (D. Conn. 2008) .................................................................... 26

*Alpha Beta Capital Partners, L.P. v. Pursuit Inv. Mgmt., LLC*,
219 A.3d 801 (Conn. App. Ct. 2019) ......................................................... 18

*Americold Realty Tr. v. Conagra Foods, Inc.*,
577 U.S. 378 (2016) ............................................................................... 11, 12

*ARMOUR Capital Management LP v. SS&C Technologies, Inc.*,
407 F. Supp. 3d 98 (D. Conn. 2019) ..................................................... 21, 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 17

*Aurecchione v. Schoolman Transp. Sys., Inc.*,
426 F.3d 635 (2d Cir. 2005) .......................................................................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... 17

*Bigio v. Coca-Cola Co.*,
448 F.3d 176 (2d Cir. 2006) ......................................................................... 34

*Breiter v. Breiter*,
80 Conn. App. 332 (2005) ............................................................................ 17

*Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*,
655 F. Appx. 9 (2d Cir. 2016) ................................................................ 15, 16

*Brooklyn Ctr. for Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co.*,
955 F.3d 305 (2d Cir. 2020) ......................................................................... 16

*Camofi Master LDC v. College P'ship, Inc.*,
452 F. Supp. 2d 462 (S.D.N.Y. 2006) .......................................................... 22

*Cantonbury Heights Condo., Inc. v. Local Land Dev. LLC*,
    273 Conn. 724 (2005) ............................................................. 17

*Carden v. Arkoma Assocs.*,
    494 U.S. 185 (1990) ......................................................... 11, 13

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016) ....................................................... 8

*Chirag v. MT Marida Marguerite Schiffahrts*,
    983 F. Supp. 2d 188 (D. Conn. 2013) ........................................ 30, 31, 32

*Conn. Gen. Life Ins. Co. v. BioHealth Laboratories, Inc.*,
    No. 3:19-CV-01324, 2021 WL 5447142 (D. Conn. Nov. 22, 2021) ...................... 24

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
    629 F.2d 786 (2d Cir. 1980) .................................................. 9, 13

*Deming v. Nationwide Mut. Ins. Co.*,
    905 A.2d 623 (Conn. 2006) ................................................... 18, 19

*DynCorp v. GTE Corp.*,
    215 F. Supp. 2d 308 (S.D.N.Y. 2002) ............................................. 22

*Elgar v. Elgar*,
    679 A.2d 937 (Conn. 1996) ................................................... 14, 15

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
    665 F.3d 384 (2d Cir. 2011) .................................................. 29, 33

*Fosen v. United Techs. Corp.*,
    484 F. Supp. 490 (S.D.N.Y.), *aff'd*, 633 F.2d 203 (2d Cir. 1980) .................... 9

*Freedman v. Value Health, Inc.*,
    No. 3:95-cv-2038, 2000 WL 630916 (D. Conn. Mar. 24, 2000) ........................ 26

*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*,
    748 F.2d 729 (2d Cir. 1984) ..................................................... 21

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ............................................................ 34

*Halebian v. Berv*,
    644 F.3d 122 (2d Cir. 2011) ..................................................... 25

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ...................................................... 17

*IM Partners v. Debit Direct Ltd.*,
394 F. Supp. 2d 503 (D. Conn. 2005)................................................................ 26

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000).............................................................................. 8

*McNally Wellman Co. v. New York State Elec. & Gas Co.*,
63 F.3d 1188 (2d Cir. 1995).............................................................................. 22

*Melgares v. Sikorsky Aircraft Corp.*,
613 F. Supp. 2d 231 (D. Conn. 2009)............................................ 29, 30, 32, 33

*Meyers v. Livingston*,
311 Conn. 282 (2014)........................................................................................ 17

*Michel v. Yale Univ.*,
547 F. Supp. 3d 179 (D. Conn. 2021)................................................................ 17

*Negrete v. Citibank, N.A.*,
237 F. Supp. 2d 112 (S.D.N.Y. 2017)................................................................ 21

*Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*,
123 F. Supp. 3d 343 (D. Conn 2015)................................................................. 14

*Omni Corp. v. Sonitrol Corp.*,
476 F. Supp. 125 (D. Conn. 2007), *aff'd* 303 F. App'x 908 (2d Cir. 2008) ...... 21, 22

*One World, LLC v. Onoufriadis*,
2021 WL 184400 (S.D.N.Y. Jan. 19, 2021) ...................................................... 10

*Peters v. UBS AG*,
588 F. App'x 57 (2d Cir. 2014) ......................................................................... 33

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
329 F.3d 64 (2d Cir. 2003)........................................................................... 30, 33

*Rationis Enters. Inc. of Panama v. Hyundi Mipo Dockyard Co., Ltd.*,
426 F.3d 580 (2d Cir. 2005)............................................................................... 15

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)............................................................................... 24

*Seales v. Panamanian Aviation Co.*,
356 F. App'x 461 (2d Cir. 2009) ................................................................... 30, 31

*Stanley Works Israel Ltd. v. 500 Grp., Inc.*,
332 F. Supp. 3d 488 (D. Conn. 2018)........................................................... 18, 19

*Tagger v. Strauss Grp. Ltd.*,
   951 F.3d 124 (2d Cir. 2020) ................................................................ 10, 11

*Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*,
   No. 3:15-CV-14, 2017 WL 4765646 (D. Conn. Oct. 20, 2017) ............................................. 17

*Trefoil Park, LLC v. Key Holdings, LLC*,
   No. 2015 WL 1138542 (D. Conn. Mar. 13, 2015) .................................................. 26

*Turedi v. Coca-Cola Co.*,
   343 F. App'x 623 (2d Cir. 2009) ................................................................ 30

*Universal Licensing Corp. v. Paola del Lungo S.p.A.*,
   293 F.3d 579 (2d Cir. 2002) .................................................. 8, 9, 11, 13

*Zhang v. Han*,
   2022 WL 62154 (S.D.N.Y. Jan. 5, 2022) .......................................................... 10

## RULES

Fed. R. Civ. P. 9(b) ................................................................................ 24

Fed. R. Civ. P.12(b)(1) .............................................................................. 8, 16

Fed. R. Civ. P.12(b)(6) ............................................................................. 16, 17

Fed. R. Civ. P. 44.1 ................................................................................ 15, 16

## STATUTES

28 U.S.C. § 1332 ................................................................................... 8, 9

Conn. Gen. Stat. §§ 42a-2-719 .................................................................... 21, 22

## TREATISES AND OTHER AUTHORITIES

Caitlin Reilly, U.S. Losing Out of Crypto to Singapore, Switzerland, Davidson Says,
   2020 WL 4686258 (Jan. 30, 2020) ............................................................... 33

Khandelwal, Rachana (2019) "Taxation of Cryptocurrency Hard Forks," The
   Contemporary Tax Journal: Vol. 8: Iss. 1, Art. 5 ................................................. 27

Restatement (Second) of Conflict of Laws § 187 ..................................................... 14

Uniform Commercial Code, Comment to Subsection (3) ............................................................ 22

# **INTRODUCTION**

Roughly a year ago, Plaintiff purchased 2,000,000 pOLY tokens for $50,000 pursuant to a Token Purchase Agreement ("TPA") that prohibited any exchange or sale of those tokens for at least a year, and then not until a defined milestone was reached. After just two months, however, Plaintiff exchanged some of his pOLY tokens for OHM tokens in clear violation of the TPA, which he then sold for a profit of over $300,000. When confronted over his breach, Plaintiff unwound the sale, but did it again a few days later and again a few months later. Importantly, Plaintiff still holds all of the pOLY tokens he purchased (less the ones he illicitly sold), and they will be exchangeable for OHM tokens when the contractual milestone is reached. Despite this and the fact he already made several times his money, Plaintiff asks the Court to award him between $20 million and $2.2 billion in damages on his $50,000 purchase of tokens.

Plaintiff's Complaint should be dismissed for several reasons. First, there is no subject matter jurisdiction because Plaintiff and at least one defendant are aliens. In fact, all defendants are aliens, so no diversity jurisdiction exists between Plaintiff and any of them. Second, because Plaintiff's tokens are subject to a use restriction set forth in the TPA barring their exchange or sale, Plaintiff cannot plead breach of contract for being technologically prevented from exchanging or selling them. Third, the TPA contains limitation of liability clauses that preclude recovery beyond what he has already recovered from selling a small portion of his tokens. Fourth, Plaintiff's fraudulent inducement claims are deficient because, in some instances, he fails to plead them with requisite specificity, and in others, the alleged fraudulent statements that induced Plaintiff either occurred *after* Plaintiff purchased the pOLY tokens or are flatly contradicted by the clear language of the TPA. Finally, because Plaintiff is an alien, the TPA counterparty is a Swiss business, and the TPA contains both a Swiss choice of law and dispute resolution clause, this Court is an inconvenient forum. For these reasons, the Complaint should be dismissed.

# BACKGROUND[1]

## A.    Plaintiff Purchases pOLY Tokens from Hephaestus AG Pursuant to the TPA

Plaintiff Hu Chun "Jayson" Liang is an Australian resident. Compl., ¶ 13. He is also an Australian citizen. Exhibit 1 (images of Plaintiff's passport and selfie with passport indicating his nationality is Australian). On March 11, 2021, Plaintiff entered into a Token Purchase Agreement ("TPA," Compl., Exhibit A) with "Hephaestus Foundation AG (in formation)" ("Hephaestus AG") pursuant to which he purchased 2,000,000 pOLY tokens for 50,000 DAI tokens. Compl., ¶ 143; TPA at 1, 21. DAI tokens are stablecoins pegged to the U.S. dollar. Compl., ¶¶ 4, 26. As such, Plaintiff effectively paid $50,000 for his 2,000,000 pOLY tokens.

Defendant Hephaestus AG is the TPA counterparty that sold pOLY tokens to Plaintiff. Compl., ¶ 46, TPA at 20. The address for Hephaestus AG provided in the TPA is in Zug, Switzerland. Compl., ¶¶ 144, TPA at 20. Hephaestus AG was not yet formed at the time the TPA was entered, a fact disclosed in the TPA, which twice states Hephaestus AG is "in formation." Compl., ¶ 143, TPA at 1, 21. The formation process for the Hephaestus AG has since been completed as Hephaestus F. AG of Zug, Switzerland. Exhibit 2 (Commercial register for Canton Zug).[2]

Neither Defendant Daniel Bara nor defendant Olympus DAO ("DAO") are parties to the TPA. Defendant Bara signed the TPA on behalf of Hephaestus AG, while the DAO "launched the cryptocurrency OHM," for which pOLY can be exchanged. Compl., ¶¶ 16, 50. The Complaint alleges no action taken by Defendant Bara except on behalf of Hephaestus AG, or any action taken

---

[1] For the purposes of this Motion only, Defendants cite the allegations in Plaintiff's Complaint without conceding the veracity thereof.

[2] Should Defendants' Motion to Dismiss be denied, they intend to move the Court to substitute Hephaestus F. AG for the Defendants under Rule 25(c), as Plaintiff consented to such by entering into the TPA that twice identified Hephaestus AG as "in formation."

by the DAO relating to the TPA or pOLY tokens. Instead, the Complaint conflates all three defendants, and collectively calls them "Olympus."

**B.     The TPA Placed a Use Restriction on Plaintiff's Tokens**

When Plaintiff purchased his pOLY tokens, he accepted the terms of the TPA, which the Complaint alleges "was enforceable and supported by valid consideration." Compl., ¶¶ 46, 177. The TPA sets forth several material limitations on the tokens, including a "Lockup" with both vesting conditions[3] and a Use Restriction. TPA, § 1(c). Plaintiff fails to address the Use Restriction in the Complaint, but as the TPA states, "all tokens, whether provisionally released or subject to the vesting provisions herein *shall remain subject* to the Use Restriction until the achievement of the Decentralization Milestone." TPA, § 1(c) (emphasis added).

The "Use Restriction" states, "During the Use Restriction Period, the Purchaser *will not be able to* [] sell [or] exchange, [] directly or indirectly, the Tokens." TPA, 4, § 1(d)(ii) (emphasis added). The "Use Restriction Period" is "the period commencing on the Effective Date and ending on *the later of*: (a) one-year plus one day anniversary of the Effective Date; or (b) the achievement of the Decentralization Milestone." TPA, 3 (emphasis added). The "Decentralization Milestone" is "the moment in time that the Foundation determines that at least thirty-three percent (33%) of the staked Tokens are not owned or controlled by the Foundation or any of its Affiliates or their directors, officers, employees or consultants." TPA, 2. Nowhere in the Complaint does Plaintiff

---

[3] Plaintiff alleges his tokens vest at the rate of 2% of the total supply of OHM tokens, but the TPA says the tokens have "*a maximum* vested quantity of 2% of the total [OHM] supply," and the "Risk Factors" exhibit attached to the TPA states that, for all Purchasers, "pOLY acquired during the first Tranche (Tranche I) will vest at a rate of 2% of the Token supply." TPA, 21. Thus, each individual purchaser's pOLY does not vest at 2%; rather, it is all of the pOLY sold during the first tranche that vests at a total of 2%. *See also* TPA § 11(a) ("This Agreement is one of a series of Token Purchase Agreements (Series 1) with substantially identical terms (other than with respect to individual Purchase Amounts) being sold by the Foundation from time to time"). Plaintiff's interpretation that every purchaser's pOLY vests at 2% would mean that, if there were more than 50 purchasers, the total vesting would be greater than 100% of supply, which is impossible.

allege the Decentralization Milestone has been met. Thus, Plaintiff's pOLY tokens remain subject to the Use Restriction prohibiting sale or exchange still to this day.

### C. The TPA Contains Two Limitation of Liability Clauses

The TPA contains other provisions of particular relevance to Defendants' motion to dismiss. First, there are two limitation of liability clauses that limit the amount that can be recovered by Plaintiff to only the amount he paid for the pOLY tokens:

> § 4(h): THE AGGREGATE LIABILITY OF FOUNDATION AND ITS AFFILIATES AND ITS AND THEIR RESPECTIVE MANAGERS, SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS, LEGAL COUNSEL, CONTROL PERSONS AND REPRESENTATIVES, ARISING OUT OF, OR RELATED TO THE TOKENS WHETHER FOR BREACH OF CONTRACT, TORT OR OTHERWISE, _SHALL NOT EXCEED YOUR PURCHASE AMOUNT ACTUALLY RECEIVED BY THE FOUNDATION._
>
> § 8(a): _[I]n no event_ will the aggregate liability of the Foundation and the Sponsoring Parties (jointly), whether in contract, warranty, tort (including negligence, whether active, passive, or imputed), or other theory, arising out of or relating to these terms _exceed the amount the Purchaser pays to the Foundation in connection with this Agreement_.

TPA §§ 4(h) and 8 (emphasis added). These provisions also preclude recovery of, inter alia, consequential damages, diminution in value, or lost profits, saying specifically:

> § 4(h): NONE OF THE FOUNDATION, ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE MANAGERS, SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS, LEGAL COUNSEL, CONTROL PERSONS AND REPRESENTATIVES, SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF BEING ADVISED OF THE POSSIBILITY OF THE SAME OR ANY SPECIAL CIRCUMSTANCES.
>
> § 8(a)(i): in no event will the Foundation or any of the Sponsoring Parties be liable for any indirect, special, incidental, consequential, or exemplary damages of any kind (including, but not limited to, where related to loss of revenue, income or profits, loss of use or data, or damages for business interruption) arising out of or in any way related to entering into this Agreement or otherwise related to these terms, regardless of the form of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive or imputed), or any

other legal or equitable theory (even if the party has been advised of the possibility of such damages and regardless of whether such damages were foreseeable)…

*Id*. Through these Limitation of Liability clauses, Plaintiff voluntarily agreed to waive any right to seek consequential, indirect, or lost profit damages, or to recover more than 50,000 DAI.

### D. The TPA Contains a Swiss Choice of Law and Dispute Resolution Clause

Also relevant to the instant motion is Section 11(j) of the TPA, which states:

(j) ALL RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF ZUG, SWITZERLAND WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES, NOTWITHSTANDING THE PLACE WHERE THIS PURCHASE AGREEMENT MAY BE EXECUTED BY ANY PARTY. To the extent permissible under applicable law, the Purchaser hereby irrevocably agrees that any suit, action or proceeding ("Action") with respect to this Agreement may, but need not, be resolved, whether by arbitration or otherwise, within ZUG, SWITZERLAND. Accordingly, the parties consent and submit to the non-exclusive jurisdiction of the federal and state courts and any applicable arbitral body located within ZUG, SWITZERLAND.

Plaintiff agreed that Swiss substantive law would apply in resolving disputes relating to the TPA, and that any such disputes could be resolved in Zug, Switzerland.

### E. Plaintiff Repeatedly Breaches the TPA by Exchanging and Selling Tokens

Plaintiff admits he began exchanging his pOLY tokens, which he misleadingly calls pOHM in the Complaint, for OHM tokens just two weeks after entering into the TPA. Compl., ¶ 70.

On March 25, 2021, Mr. Liang was able to begin using the original smart contract … to exchange pOHM to OHM. That day, he posted 82.42 pOHM and 82.42 DAI and received 82.42 OHM from the Original pOHM Smart Contract. Mr. Liang was able to continue to use the Original pOHM Smart Contract several additional times on April 4, 8, 11 and 12, to convert pOHM to OHM.

*Id*. (footnote omitted). Plaintiff incorrectly suggests that his being "able" to exchange pOLY tokens for OHM tokens means he was legally permitted to make those exchanges under the TPA, but he is incorrect, because the minimum-one-year Use Restriction on his pOLY tokens had not expired.

*Compare* Compl. ¶ 70 *with* TPA, 4, § 1(d)(ii), TPA 3 (defining Use Restriction Period).

To make matters worse, just two months after entering into the TPA, Plaintiff sold several hundred OHM tokens he received in exchange for his pOLY tokens. Compl., ¶ 72 ("On May 12, 2021, Mr. Liang sold 702.925 OHM … and received 363,076 DAI."). Given that Plaintiff's transaction was in clear violation of the terms of the TPA, Defendant Bara immediately contacted Plaintiff and advised him to undo his sale, which he eventually did. Compl., ¶¶ 73-74. That Plaintiff lost some OHM as a result of his own breach of the TPA is his fault, not Defendants'. *Id.*

Evidently, Plaintiff did not get the point, as he sold OHM tokens just four days later using a different wallet to try and hide his breach. Compl., ¶ 75. Defendant Bara was indeed outraged that Plaintiff was "dumping the market," because that is precisely what the TPA forbade. Compl., ¶¶ 75-76. Plaintiff in his Complaint accuses Defendant Bara of fraud and manipulation, saying:

> Bara's pressure tactics were an obvious attempt to inflate artificially the price of OHM. Bara and Olympus were attempting to manipulate the market by indicating that investors were holding and not selling OHM. By pressuring Mr. Liang to not sell and to use the proceeds of prior sales to buy more OHM, Bara ensured that the price of OHM would not be negatively affected by Mr. Liang's sales.

Compl., ¶ 77. To the contrary, all Defendant Bara did was insist Plaintiff stop breaching the Use Restriction in the TPA. There is nothing untoward about trying to get Plaintiff to abide by the TPA.

Soon thereafter, with advance notice given to Plaintiff and all other pOLY holders, the ability of pOLY tokens to be exchanged for OHM tokens was disabled. Compl., ¶ 78 ("[O]n or around June 2021, without warning, Olympus withdrew the Original pOHM Smart Contract, which made it impossible for Mr. Liang to redeem pOHM for OHM."). This change affected all purchasers of pOLY tokens, not just Plaintiff. Compl., ¶ 81 ("the Original pOHM Smart Contract has not been used by anyone to mint[4] OHM since April 13, 2021"). This action is permitted by the express language in the TPA that says, "During the Use Restriction Period, the Purchaser *will not*

---

[4] To "mint" a token means to create one in exchange for another token or combination of tokens. To "mint" an OHM requires providing one pOLY token and one DAI token.

*be able to* [] sell [or] exchange, [] directly or indirectly, the Tokens." TPA, 4, §1(d)(ii) (emphasis added).

Unfortunately, Plaintiff still did not get the message, because in July 2021 when he was technologically able to exchange pOLY tokens for OHM tokens again, Mr. Liang immediately did so and sold the resulting OHM. Compl., ¶¶ 84-85. Again, he was notified immediately that this was not permitted. *Id.*, ¶ 85.

To stop Plaintiff's wanton and continual breach of the TPA, the ability of pOLY to be exchanged for OHM was disabled again so that no holder of any pOLY tokens can exchange them for OHM. *Id.*, ¶ 100 ("Not only did the Third pOHM Smart Contract not work for Mr. Liang, but publicly available blockchain records show that the Third pOHM Smart Contract has never been used to mint OHM by anyone."). This is, again, expressly permitted by the TPA. TPA, 4, §1(d)(ii) ("During the Use Restriction Period, the Purchaser *will not be able to* [] sell [or] exchange, [] directly or indirectly, the Tokens.") (emphasis added).

## F.   Plaintiff Performs Promotional Services

The Complaint alleges Plaintiff was an early supporter of and participant in the OLY/OHM project. Compl., ¶ 2 (describing Plaintiff as a "seed investor," who "took a chance by providing much-needed startup capital"). The Complaint further alleges Plaintiff received 2,000,000 additional pOLY tokens in exchange for agreeing to promote the Olympus project. *Id.*, ¶ 3. The Complaint alleges, "Mr. Liang performed under the Consulting Agreement by issuing multiple social media posts on various mediums concerning Olympus and coordinating interviews with Zeus." *Id.*, ¶ 5. The 2,000,000 pOLY tokens the Complaint alleges were compensation for performance of promotional services were transferred at the same time and to the same wallet as the 2,000,000 pOLY tokens purchased by Plaintiff. *Id.*, ¶ 49 ("On March 14, 2021, Mr. Liang

transferred 50,000 DAI to the digital address provided by Olympus. Olympus transferred the 4,000,000 pOHM to Mr. Liang's digital wallet.")

<u>**ARGUMENT**</u>

## I.     THERE IS NO SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFF AND DEFENDANTS ARE ALL FOREIGN CITIZENS

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of proving the existence of subject matter jurisdiction. *Makarova*, 201 F.3d at 113. To determine whether the plaintiff has met its burden, the court must accept all factual allegations in a complaint as true and draw all reasonable inferences in plaintiff's favor. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). The court may also rely on evidence outside the complaint in deciding a Rule 12(b)(1) motion. *Makarova*, 201 F.3d at 113.

In this case, Plaintiff only alleges diversity subject matter jurisdiction under 28 U.S.C. § 1332. "In an action in which jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced," and "the party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction." *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002) (citations omitted). Here, Plaintiff misguidedly asserts the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because "Mr. Liang and the Defendants are completely diverse in citizenship and the amount in controversy exceeds $75,000." Compl., ¶ 18. Plaintiff's assertion of diversity, however, is contradicted by Plaintiff's own factual allegations, in which he states that he is a resident of Paddington, Queensland, Australia. *Id*. at ¶ 13. As is demonstrated herein, he also fails to inform

the Court that he is a citizen of Australia and not a citizen of the United States. As a result of Plaintiff's citizenship, no diversity jurisdiction exists if *any* of the Defendants are also a foreign citizen, and here, *every* Defendant is a foreign citizen. Defendant Bara is not a citizen of the United States, and both he and Plaintiff, as members of the allegedly unincorporated Hephaestus AG and Olympus DAO, render them foreign citizens, too. Without jurisdiction, the Complaint is to be dismissed.

### A. Given that Defendant Bara is Not a Citizen of the United States, He and the Allegedly Unincorporated Hephaestus AG and Olympus DAO Are All Aliens

Diversity is present "when the action is between citizens of a State and citizens or subjects of a foreign state…or between citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. §§ 1332(a)(2)-(3); *Universal Licensing Corp.*, 293 F.3d at 580-81 (internal quotations omitted). There is no subject matter jurisdiction under 28 U.S.C. § 1332 when plaintiff is an alien and defendants include both aliens and citizens of the United States. *Universal Licensing*, 293 F.3d at 581 ("[D]iversity is lacking within the meaning of [28 U.S.C. §§ 1332(a)(2)-(3)] where the only parties are foreign entities, *or where on one side there are citizens and aliens and on the opposite side there are only aliens*") (emphasis supplied); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980) ("[T]he fact that alien parties were present on both sides would destroy complete diversity"); *Fosen v. United Techs. Corp.*, 484 F. Supp. 490, 495 (S.D.N.Y.), *aff'd*, 633 F.2d 203 (2d Cir. 1980) ("The plaintiffs are Norwegian, the defendant ANA is Japanese; the fact that other defendants in this suit are citizens of a state does not cure this jurisdictional defect. … Therefore, contrary to what the parties evidently presumed, this Court does not have diversity jurisdiction to entertain the plaintiffs' claims against ANA").

Here, while he conspicuously fails to acknowledge this fact in the Complaint, Plaintiff is a citizen of Australia, not the United States, and thus he is an alien for the purposes of diversity jurisdiction. *See* Ex. 1 (Images of Plaintiff's passport and selfie with passport). In light of Plaintiff's foreign domicile, if there is any foreign defendant, there is no jurisdiction. *Universal Licensing*, 293 F.3d at 581.

Regarding Defendant Bara, Plaintiff alleges he is both a resident and "citizen" of Connecticut. Compl., ¶¶ 14, 19. The latter is false. Defendant Bara is not a citizen of the United States. Exhibit 3 (Declaration of Daniel Bara, ¶ 2). As a non-citizen, even if he is a resident, he is still considered an alien for the purposes of diversity jurisdiction. *See, e.g.*, *Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124, 126-127 (2d Cir. 2020); *Zhang v. Han*, 2022 WL 62154, *2-3 (S.D.N.Y. Jan. 5, 2022) ("A foreign citizen who is a permanent resident of the United States is an alien for the purposes of diversity jurisdiction") (internal quotations omitted); *One World, LLC v. Onoufriadis*, 2021 WL 184400, *13 (S.D.N.Y. Jan. 19, 2021) ("A lawful permanent resident domiciled in a state is not a citizen of that state – he is an alien for purposes of diversity jurisdiction"). Because Plaintiff and Defendant Bara are both aliens, there is no diversity jurisdiction.

*Tagger* is particularly instructive here. In that case, a lawful permanent resident alien, who was a citizen of Israel and domiciled in New York, brought an action against an Israeli corporation. 951 F.3d at 125-26. In affirming the district court's dismissal of the action for lack of subject matter jurisdiction, the Second Circuit held that the lawful permanent resident alien was not a citizen of New York for the purpose of conferring diversity jurisdiction. *Id*. at 126. The Court reasoned that while the 1988 amendments to Section 1332 made domicile determinative of a permanent resident alien's citizenship for the purposes of diversity, the 2011 amendments to Section 1332 clarified that lawful permanent residents were not, in fact, U.S. citizens for

jurisdictional purposes. *Id*. at 126-127 ("The House Report accompanying the 2011 bill stated that the amendment was intended to ensure that permanent resident aliens 'would no longer be deemed to be U.S. citizens for purposes of diversity jurisdiction, thereby avoiding the possibly anomalous results' with respect to the 1988 language."). Because the *Tagger* plaintiff and defendant were both aliens, and federal courts do not have diversity jurisdiction between two foreign parties, the Court concluded that diversity jurisdiction did not exist. *Id*. at 127.

Regarding Hephaestus AG and Olympus DAO, Plaintiff alleges that they are unincorporated entities that, "have no independent citizenship and instead take on the citizenship of each of their members." Compl., ¶ 19; *see also Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990); *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 379 (2016) ("While humans and corporations can assert their own citizenship, other entities take the citizenship of their members"). The Complaint also alleges that Defendant Bara is a member of both Hephaestus AG and Olympus DAO and that they therefore take on his citizenship. According to the allegations in the Complaint, because Bara is an alien, both Hephaestus AG and Olympus DAO are aliens, too. Given that plaintiff and *at least one* defendant are aliens, there is no jurisdiction and the Complaint is to be dismissed. *Tagger*, 951 F.3d at 127; *Universal Licensing Corp.*, 293 F.3d at 581.

### B.      Plaintiff Himself Defeats Diversity Jurisdiction by Virtue of His Alleged Membership in Defendants Hephaestus AG and Olympus DAO

Diversity jurisdiction also does not exist here because Plaintiff himself defeats it, as he, too, is a member of the allegedly unincorporated entities, which therefore take on his foreign citizenship as well. While the Supreme Court has never expressly defined the term "members" as it relates to citizenship in diversity jurisdiction actions, it has "equated an association's members with its owners or '***the several persons composing such association***," identifying "the members of a joint-stock company as its shareholders, the members of a partnership as its partners, the

members of a union as the workers affiliated with it, and so on." *Americold Realty Trust*, 577 U.S. at 381 (emphasis supplied). The Supreme Court reasoned that "beneficial owners" or persons who "have ownership interests" and "appear to be in the same position as the shareholders of a joint-stock company or the partners of a limited partnership – both of whom we viewed as members of their relevant entities" could be considered members of an unincorporated entity. *Id*. at 382 (noting that in an "unincorporated business trust or association in which property is held and managed for the benefit and profit of any person who may become a shareholder," shareholders have "ownership interests and votes in the trust by virtue of their shares of beneficial interest").

Here, Plaintiff entered into a TPA with Hephaestus AG to invest 50,000 DAI "to fund the creation of Olympus and its Protocol." Compl., ¶¶ 43-44. In exchange for his investment, Plaintiff received 2,000,000 pOLY. *Id*., ¶ 47. Plaintiff's ownership of pOLY entitled him to receive voting rights in Olympus DAO upon conversion into OHM, just like a shareholder in a trust. *Id.*, ¶ 57. Moreover, Plaintiff provided seed capital to launch Hephaestus AG, making him a key figure "composing" it akin to an investor or partner in a limited partnership who contributes start-up capital with the intention of maximizing a return on that investment when the company succeeds. Indeed, as Plaintiff acknowledges in his Complaint, the goal of the presale in which Plaintiff participated was "to build[] a solid protocol by bringing in funds and ***individuals [they] believe[d] [could] be pivotal to the success of the protocol***." *Id.*, ¶ 39 (emphasis supplied). Thus, under the Court's reasoning in *Americold Realty Trust*, Plaintiff was a beneficial owner of pOLY, and in turn a member of both Hephaestus AG and Olympus DAO.

It is also worth noting that in his Complaint, Plaintiff describes Hephaestus AG as an entity "used by Bara and John Doe Defendants," who he deems to be members of the entity. *Id.*, ¶¶ 15, 19. Plaintiff then defines "John Doe Defendants" as "the entities, founders, ***promoters***, executives,

and others responsible for the management of Olympus" including but not limited to "those who conducted the various interviews and 'Ask Me Anything' (commonly referred to as 'AMAs') purportedly being performed by Zeus." *Id.*, ¶ 17 (emphasis supplied). In March 2021, Plaintiff also alleges he entered into a Consulting Agreement with Hephaestus AG whereby Plaintiff would provide Olympus with promotional/marketing services, including sharing "updates about Olympus with [Plaintiff's] relatively large social media following and otherwise market[ing] Olympus." *Id.*, ¶¶ 5, 48. Plaintiff further alleges he "performed under the Consulting Agreement by issuing multiple social media posts on various mediums concerning Olympus and coordinating interviews with Zeus." *Id.* Indeed, Plaintiff alleges he, "created a WeChat group with hundreds of potential Chinese investors advertising Olympus" and "advertised Olympus to this investor group," promoted Olympus DAO and OHM through his Twitter handle (which has over 21,000 Twitter followers), helped to create a WeChat profile, and "attempted to set up 'Ask Me Anything (AMA) sessions at which Zeus, Apollo (Defendant Bara) and others at Olympus would speak directly with potential investors." *Id.*, ¶¶ 59-65. Plaintiff's promotional/marketing efforts are the very same services he claims the John Doe Defendants provided. For this reason, if Plaintiff deems the John Doe Defendants to be members of Hephaestus AG and Olympus DAO, then he, too, is a member pursuant to his own allegations.

Because his own allegations make Plaintiff a member of Hephaestus AG and Olympus DAO, they take on Plaintiff's Australian citizenship as well. *Carden v. Arkoma Assocs.*, 494 U.S. 185. Thus, alien parties are again present on both sides, destroying diversity. *See Corporacion Venezolana de Fomento*, 629 F.2d at 790; *Universal Licensing Corp.*, 293 F.3d at 581. In sum, even if Defendant Bara were a citizen of the United States, which he is not, Plaintiff's Complaint must be dismissed for lack of diversity jurisdiction based on Plaintiff's own allegations.

## II.    NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW

Pursuant to Rule 44.1, Defendants hereby give notice of their intention to raise issues of Swiss law in this action. As noted, *supra*, the TPA contains a Swiss choice of law clause which provides, in relevant part: "ALL RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF ZUG, SWITZERLAND WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES." TPA, § 11(j).

"A federal court sitting in diversity must apply the choice of law provisions of the forum state to determine which state's law to apply." *Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 350 (D. Conn 2015). Under Connecticut law, "parties to a contract generally are allowed to select the law that will govern their contract," subject only to the limited restrictions set forth in the Restatement (Second) of Conflict of Laws. *See Elgar v. Elgar*, 679 A.2d 937, 942 (Conn. 1996); *see also Odyssey*, 123 F. Supp. 3d at 350 (Connecticut follows the Restatement (Second) of Conflict of Laws).

Under this approach, Connecticut law "enforces choice of law provisions unless (i) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (ii) application of that state's law would contradict a fundamental policy of a state that has a materially greater interest in the action and whose law would otherwise apply had it not been for the parties' choice." *Odyssey*, 123 F. Supp. 3d at 350. These exceptions are construed narrowly. Indeed, while "[t]he forum will not apply the chosen law . . . if the parties had no reasonable basis for choosing this law . . . [s]ituations of this sort do not arise in practice. Contracts are entered into for serious purposes and rarely, if ever, will parties choose a law without good reason for doing so." Restatement (Second) of Conflict of Laws § 187 cmt. f. Nor do courts following the Restatement "refrain from applying the chosen law merely

because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law." *Id.* at cmt. g.

This analysis does not change in cases, like this one, where plaintiff generally alleges fraud — but does not plead that the alleged fraud specifically affected his decision to agree to the choice-of-law clause at issue. *See Elgar*, 679 A.2d at 942 ("The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean that a choice-of-law provision contained therein will be denied effect. This will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision.").

While Plaintiff's Complaint references the forum selection clause of Section 11(j) of the TPA, it entirely fails to reference the Swiss choice of law clause in that same section or provide the requisite notice of foreign law pursuant to Fed. R. Civ. P. 44.1. *See* Compl., ¶ 19, n.4. Defendants, therefore, respectfully provide this notice of intent to raise issues of Swiss law at the appropriate junctures in this litigation – including on summary judgment. *See Rationis Enters. Inc. of Panama v. Hyundi Mipo Dockyard Co., Ltd.*, 426 F.3d 580, 585-86 (2d Cir. 2005).

At the current juncture, however, Defendants are mindful of the distinction between the notice requirements of Rule 44.1, and argument. "It is important to acknowledge that notice under Rule 44.1 differs from argument – notice merely called attention to the fact that the issue will be raised, whereas argument lays out, inter alia, the provisions of foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Id.*; *see also Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 655 F. Appx. 9, 12 (2d Cir. 2016) ("Writ large, Rule 44.1 promulgates a notice requirement, not an argument requirement.").

Argument regarding choice of law is, of course, not necessary for the Court's resolution of

the question of subject matter jurisdiction under Rule 12(b)(1). *See* Section I, *supra*.

Nor is resolution of the parties' disagreement regarding the applicable law necessary to conclude that Plaintiff has failed to state a cause of action under Rule 12(b)(6) because Plaintiff's claims fail to state a cause of action even under his preferred rubric of domestic law. Defendants reserve their rights to argue that Mr. Liang's claims are barred by Swiss law if the case proceeds past the instant motions. However, even assuming arguendo that domestic law were to govern Plaintiff's claims, this Court should grant the instant motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) for the reasons set forth in Sections III - V.[5]

Finally, choice of law is relevant to the Court's analysis of whether this matter should be dismissed under the doctrine of forum non conveniens, as set forth in Section VI. The implications of these choice of law issues will be discussed accordingly.

## III. COUNTS I-III SHOULD BE DISMISSED BECAUSE PLAINTIFF CANNOT PLEAD INJURY FROM BEING UNABLE TO EXCHANGE TOKENS DURING THE USE RESTRICTION PERIOD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." *Brooklyn Ctr. for Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co.*, 955 F.3d 305, 310 (2d Cir. 2020) (citing *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009)); Fed. R. Civ. P.12(b)(6). To determine whether a

---

[5] Defendants would be remiss if they did not note that the Second Circuit has found that dismissing cases in which parties seeking to avert dismissal by providing notice of intent to raise issues of foreign law under Rule 44.1 is premature. *See Bristol-Myers Squibb Co.*, 655 F. App'x at 12-13 (collecting cases). In this case, however, Plaintiff has not provided notice under Rule 44.1 of his intent to do so, and indeed the Complaint only asserts claims under Connecticut law. Accordingly, while the Court may not foreclose arguments pertaining to foreign law at the pleading stage in the face of a party's notice of intent to raise foreign law, Defendants are unaware of any authority that would prevent dismissal of Mr. Liang's claims where, as here, he has not provided notice under Rule 44.1. If Plaintiff wishes to assert claims under Swiss law, he must file a new Complaint doing so (although it would still be due to be dismissed for the reasons set forth herein), as the current Complaint fails to even mention Swiss law governs the TPA and all "rights and obligations" thereunder. TPA, § 11(j).

plaintiff has adequately stated "a claim upon which relief can be granted," courts look to the allegations put forth in the complaint and consider their "legal sufficiency." *Id*.

A plaintiff's claim for relief must also be supported by "sufficient factual matter, accepted as true" so as to be "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the nonmovant's favor. *See La Liberte v. Reid*, 966 F.3d 79, 85 (2d Cir. 2020). However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678.

Plaintiff's claims for Breach of Contract (Counts I-II) and Conversion (Count III) fail to fail to state a claim under these standards. In Connecticut, "'[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.'" *Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 188-189 (D. Conn. 2021) (quoting *Meyers v. Livingston*, 311 Conn. 282, 291 (2014)). "Where the language of [a] contract is clear and unambiguous, the contract should be given effect according to its terms." *Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, No. 3:15-CV-14, 2017 WL 4765646, at *2 (D. Conn. Oct. 20, 2017) (citing *Breiter v. Breiter*, 80 Conn. App. 332, 336 (2005)). "A contract is" considered to be "unambiguous when its language is clear and conveys a definite and precise intent." *Id*. (citing *Cantonbury Heights Condo., Inc. v. Local Land Dev. LLC*, 273 Conn. 724, 735 (2005)).

Conversion occurs "when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." *Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623, 639 (Conn. 2006). Duplicative conversion claims should also be dismissed where they "rest[] on the same set of facts that underlie Plaintiff's claims for breach of contract" and the plaintiff would be "fully compensated" if it prevailed on its breach of contract claim. *Stanley Works Israel Ltd. v. 500 Grp., Inc.*, 332 F. Supp. 3d 488, 514 (D. Conn. 2018); *see also Alpha Beta Capital Partners, L.P. v. Pursuit Inv. Mgmt., LLC*, 219 A.3d 801, 825 (Conn. App. Ct. 2019) (dismissing plaintiff's conversion claim as "merely a recasting of its breach of contract claim," evidenced by the fact that both claims sought the same damages, based on the same conduct).

The Complaint alleges Plaintiff was authorized to convert his pOLY tokens to OHM tokens and to then sell the OHM tokens. Compl., ¶ 166. These allegations are implausible given the plain language of the TPA itself, which subjected Plaintiff's pOLY tokens to a Use Restriction that prohibited any exchange or sale of the tokens until, "the later of: (1) one-year plus one day anniversary of the Effective Date; or (b) the achievement of the Decentralization Milestone." TPA § 1(d); TPA at 2 ("Use Restriction Period"). While Plaintiff may argue that some of his pOLY tokens have vested, the TPA unequivocally states, "For purposes of clarity, all tokens, whether provisionally released or subject to the vesting provisions herein shall remain subject to the Use Restriction until the achievement of the Decentralization Milestone." TPA § 1(c).

Thus, whether any of his pOLY tokens have vested or not, they were still subject to the Use Restriction preventing their exchange or sale until at least March 2022, and then only if the "Decentralization Milestone" (as defined at TPA at 2) was achieved. Nowhere in the Complaint does Plaintiff allege the Decentralization Milestone has been met. Thus, to this day, he is still not

permitted to exchange or sell any of his pOLY tokens. Moreover, he was not permitted under the TPA to make the exchanges of pOLY for OHM that he made in 2021, or to sell the OHM. Disabling the ability to exchange pOLY for OHM was not a violation of the TPA, which expressly permits such action. TPA, 4, §1(d)(ii) ("During the Use Restriction Period, the Purchaser _will not be able to_ [] sell [or] exchange, [] directly or indirectly, the Tokens.") (emphasis added).

The TPA defines "Tokens" to include all pOLY tokens, not just the pOLY tokens sold under the TPA. TPA, 1. The tokens provided to Plaintiff as part of the alleged Consulting Agreement were transferred to the same wallet as the tokens he purchased, and thus subject to the same restrictions. Compl., ¶ 49 ("On March 14, 2021, Mr. Liang transferred 50,000 DAI to the digital address provided by Olympus. Olympus transferred the 4,000,000 pOHM to Mr. Liang's digital wallet.") Therefore, the pOLY provided as compensation for the services performed by Plaintiff were subject to the same Use Restriction as the pOLY tokens he purchased.

Nor may Mr. Liang evade the fact that he was not authorized to sell the tokens by recasting his failed breach of contract claims as claims for conversion.  Mr. Liang cannot plausibly plead that Defendants acted "without authorization" because the Defendants were acting within their rights under the TPA, and Mr. Liang may not rely upon duplicative pleading that "rests on the same set of facts that underlie Plaintiff's claims for breach of contract" to evade this result. _Deming_, 905 A.2d at 639; _Stanley Works Israel Ltd._, 332 F. Supp. 3d at 514.

Because the 4,000,000 pOLY tokens transferred to Plaintiff on March 14, 2021, are all subject to the Use Restriction barring their exchange or sale, and because the Complaint fails to allege the Decentralization Milestone has been met in order to lift the Use Restriction, the Complaint fails to state a claim under Count I Breach of Contract – TPA, Count II Breach of Contract – Consulting Agreement, and Count III Conversion. They should each be dismissed.

**IV.    COUNTS I-III SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFF HAS ALREADY RECOVERED MORE THAN THE LIMITATIONS OF LIABILITY IN THE TPA PERMIT**

Plaintiff's breach of contract claims also fail because the TPA's limitation on liability clauses expressly prohibits the damages he claims. Specifically, the TPA expressly provides:

> §4(h): THE AGGREGATE LIABILITY OF FOUNDATION AND ITS AFFILIATES AND ITS AND THEIR RESPECTIVE MANAGERS, SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS, LEGAL COUNSEL, CONTROL PERSONS AND REPRESENTATIVES, ARISING OUT OF, OR RELATED TO THE TOKENS WHETHER FOR BREACH OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED YOUR PURCHASE AMOUNT ACTUALLY RECEIVED BY THE FOUNDATION. NONE OF THE FOUNDATION, ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE MANAGERS, SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS, LEGAL COUNSEL, CONTROL PERSONS AND REPRESENTATIVES SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF BEING ADVISED OF THE POSSIBILITY OR THE SAME OR ANY SPECIAL CIRCUMSTANCES.

> § 8: To the fullest extent permitted by applicable law: (i) in no event will the Foundation or any of the Sponsoring Parties be liable for any indirect, special, incidental, consequential, or exemplary damages of any kind (including, but not limited to, where related to loss of revenue, income or profits, loss of use or data, or damages for business interruption) arising out of or in any way related to entering into this Agreement or otherwise related to these terms, regardless of the form of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive or imputed), or any other legal or equitable theory (even if the party has been advised of the possibility of such damages and regardless of whether such damages were foreseeable); and (ii) in no event will the aggregate liability of the Foundation and the Sponsoring Parties (jointly), whether in contract, warranty, tort (including negligence, whether active, passive or imputed), or other theory, arising out of or relating to these terms exceed the amount Purchaser pays to the Foundation in connection with this Agreement.

TPA, 8 (§4(h)) and 15 (§8(a)). These clauses preclude Liang's recovery on his breach of contract claim for two reasons.

First, by claiming wholly unsupported damages for breach of contract "within a range, as of April 13, 2022, of $10,166,594 and $1,135,717,994" (Compl. ¶ 192), Plaintiff asks this Court

to award exactly the type of "consequential, indirect, . . . lost profits or revenues" damages these clauses in the TPA expressly prohibit. Courts in the Second Circuit and elsewhere routinely uphold the enforceability of contractual prohibitions on consequential damages and lost profits or revenues.[6] *See, e.g.*, *ARMOUR Capital Management LP v. SS&C Technologies, Inc.*, 407 F. Supp. 3d 98, 109-110 (D. Conn. 2019) (granting summary judgment of claim for lost employee time on the ground that such "reliance damages," like "lost profits," were consequential damages under Connecticut law, and therefore barred by contractual limitation of liability); *Omni Corp. v. Sonitrol Corp.*, 476 F. Supp. 125, 127 (D. Conn. 2007), *aff'd* 303 F. App'x 908 (2d Cir. 2008) (affirming limitation of liability in fire-alarm contract); *see also* Conn. Gen. Stat. §§ 42a-2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.").

The case of *Negrete v. Citibank, N.A.*, 237 F. Supp. 2d 112 (S.D.N.Y. 2017), is instructive here. In that case, the court granted the defendant's motion to dismiss a breach of contract claim involving a financial institution's alleged markup of, and its failure to execute, certain foreign exchange trades. *Id.* at 126-128. Noting that the operative contract "limited damages by stating that '[n]o party shall be required to pay or be liable to the other party for any consequential, indirect or punitive damages, opportunity costs or lost profits," (*id.* at 128) the court held that the plaintiff's breach of contract claim must be dismissed where the plaintiff's claimed damages were expressly prohibited by this language. As the court explained,

---

[6] Plaintiff has not and cannot credibly allege that he was unaware of these provisions limiting Defendants' liability, as he alleges in the Complaint that the TPA "was enforceable and supported by valid consideration." Compl., ¶ 177. Indeed, the only situations in which courts in the Second Circuit have declined to enforce these contractual limitations on liability are where the party relying on such provisions "is entirely unaware of the existence of the disclaimer—for example, where the disclaimer is inserted surreptitiously into the final draft of the contract." *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737 (2d Cir. 1984).

Even if the markup claims stated a valid theory of breach, they would still fail because they do not claim valid damages. . .. [A]ny damages measured as the difference between the contract price and the markup price would be a form of lost profits, which are expressly prohibited under the [contract]. Similarly, this limitation of liability provision in the [contract] applies to some of the alleged damages for the unexecuted and partially executed trades. Any claims for lost profits from markups or lost opportunities to profit from unexecuted or partially executed trades are dismissed. Damage from Plaintiffs having taken on unknown risk is not compensable under the [contracts], as it is a form of indirect damage to the Plaintiff.

*Id.* at 128 (internal citations omitted).

So, too, here: Plaintiff's claims for amounts that grossly exceed his $50,000 investment are unquestionably claims for lost profits, which are expressly prohibited under the TPA. While Plaintiff may wish to rewrite the arm's-length bargain he made when executing the TPA, courts in this jurisdiction routinely dismiss claims based on the kind of *post hac* revision of contractual terms that Liang now suggests. *See, e.g., ARMOUR Capital Management LP*, 407 F. Supp. 3d at 109-110; *Omni Corp. v. Sonitrol Corp.*, 476 F. Supp. at 127; Conn. Gen. Stat. §§ 42a-2-719, Uniform Commercial Code Comment to Subsection (3) (exculpatory clauses excluding consequential damages "are merely an allocation of unknown and undeterminable risks..."); *see also Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) ("The parties may later regret their assumption of risks of nonperformance in this manner, but courts let them lie on the bed they made, unless the provision is the result of unconscionable conduct or unequal bargaining power between the parties." (internal quotations and citations omitted)); *McNally Wellman Co. v. New York State Elec. & Gas Co.*, 63 F.3d 1188, 1195 (2d Cir. 1995) ("It is axiomatic that parties to a contract [are] free to allocate risks and shield themselves from liability."); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) ("I may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their

liabilities and rights of recovery."). This Court should decline Plaintiff's invitation to turn a blind eye to the TPA's clear and unambiguous language.

Second, the allegations demonstrating that Plaintiff's purchase of pOLY has already netted him a profit that significantly exceeds Hephaestus AG's contractual liability for the claims alleged in the Complaint warrant dismissal of all the contract claims. By Plaintiff's own admission, his purchase of pOLY totaled 50,000 DAI. *Id.* ¶ 44. After converting some of the pOLY he purchased to OHM, Plaintiff sold the OHM for 363,076 DAI. *Id.* ¶ 72. In other words, just two months after his purchase, Mr. Liang made over $300,000. Under the facts alleged, Plaintiff has not suffered any cognizable damages whatsoever. On the contrary, he alleges that, to date, he has profited more than $300,000, which is far more than the $50,000 "purchase amount actually received by [Hephaestus AG]" that is the maximum the clear terms of the TPA permit Liang to recover. TPA ¶¶ 4(h), 8(a).

As discussed above, the TPA defines "Tokens" to include all pOLY tokens, not just those pOLY tokens sold under the TPA. The tokens provided to Mr. Liang as part of the alleged Consulting Agreement were transferred to the same wallet as the tokens he purchased, and thus intended to be subject to the same conditions, including the Limitation of Liability clauses contained in the TPA. Compl., ¶ 49 ("On March 14, 2021, Mr. Liang transferred 50,000 DAI to the digital address provided by Olympus. Olympus transferred the 4,000,000 pOHM to Mr. Liang's digital wallet."). The Limitation of Liability clauses themselves also apply to any liability (i) "arising out of, or related to the tokens whether for breach of contract, tort or otherwise," § 4(h), or (ii) "arising out of or in any way related to entering into this Agreement or otherwise related to these terms, regardless of the form of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive or imputed), or any other legal or equitable

theory," §8(a). Therefore, the pOLY tokens provided as compensation for the services allegedly performed by Plaintiff were subject to the same Limitation of Liability clauses as the pOLY tokens he purchased.

Thus, because the 4,000,000 pOLY tokens transferred to Plaintiff on March 14, 2021, are all subject to the Limitation of Liability clauses barring recovery of any damages, and because Plaintiff has already recovered more than he paid for the pOLY tokens under the TPA, the Complaint fails to state a claim under Count I Breach of Contract – TPA, Count II Breach of Contract – Consulting Agreement, and Count III Conversion. They should each be dismissed.

## V. COUNTS IV-IV SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO SUFFICIENTLY PLEAD FRAUD BY DEFENDANTS[7]

Rule 9(b) requires that, in alleging fraud, a party must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Under the heightened pleading standard of Rule 9(b), "[a] complaint alleging fraud must ordinarily: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Conn. Gen. Life Ins. Co. v. BioHealth Laboratories, Inc.*, No. 3:19-CV-01324, 2021 WL 5447142, at *9 (D. Conn. Nov. 22, 2021) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). When alleging fraud against multiple defendants, plaintiffs must "make specific and separate allegations against each defendant." *Id*. at *10 (internal quotations and citations omitted).

Plaintiff alleges Defendants made several misrepresentations that induced him to enter into the TPA. Critically, however, the facts asserted in the Complaint and the plain language of the TPA show no fraudulent statements were made by Defendants at any time. The first alleged

---

[7] Mr. Liang's Complaint appears to contain a typographical error identifying both his fourth claim – common law fraud – and fifth claim – civil conspiracy – as "Count IV."

misrepresentation occurred via a blog post on March 11, 2021 (Compl., ¶¶ 105-106), the same day Plaintiff signed the TPA. Yet there is no allegation Plaintiff read the blog post prior to signing the TPA. Regardless, the allegation that Defendants falsely claimed to be "decentralized," which was allegedly "important to Mr. Liang," and in fact, "a core reasons why Mr. Liang felt comfortable investing in this early-stage company on the other side of the world" (*id.*, ¶¶ 122-123), fails because a careful review of Plaintiff's allegations reveals that he is improperly attempting to use statements of future intention, rather than statements of existing fact, to support his claims. More importantly, his claims are directly contradicted by both the underlying document referenced in his Complaint and the TPA.

As a threshold matter, the alleged statements regarding decentralization in the March 11th blog post with which Mr. Liang takes issue are self-evidently non-actionable, forward-looking statements. *See*, *e.g.*, Compl., ¶¶ 107 ("[a]ll decisions *will be* made via snapshot ….") (emphasis added). Indeed, the majority of the referenced passages from the blog post are included under the heading: "Here's how it'll work" – again looking to the future, rather than the present. *Compare* Compl., ¶¶ 107-108, *with* Olympus DAO, The Genesis DAO (Mar. 11, 2021), https://olympusdao.medium.com/the-genesis-dao-70f0ee6b5b8.[8] Further, Mr. Liang's allegation that "Olympus stated that it retained 'a few non-critical powers,'" this quotation is misleading and must be disregarded because the actual passage reads, prospectively, that "[t]he team *will* retain a few non-critical powers . . . ." *Compare* Compl., ¶ 109; *with* The Genesis DAO, *supra* (emphasis

---

[8] The Court, when considering a motion to dismiss for failure to state a claim, may consider "documents attached to the complaint as exhibits and documents incorporated by reference in the complaint," as well as "matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011). While not attached as an exhibit, the blog post is clearly incorporated by reference. *See* Compl., ¶¶ 107-109, fn. 35-38 (citing the blog post).

added). Statements of opinion and future intention that do not come to fruition cannot support a claim for fraud. *See, e.g.*, *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 515-516 (D. Conn. 2005) (granting motion to dismiss securities fraud claims based on projections of future success, noting "[t]here are many representations that can be made about the prospects for a proposed business that, even if the business turns out not to be successful, are not fraudulent."); *Freedman v. Value Health, Inc.*, No. 3:95-cv-2038, 2000 WL 630916, at *2-3 (D. Conn. Mar. 24, 2000) (granting motion to dismiss, noting that "excessively optimistic" projections were not actionable because "the statement was not alleged to have been untrue when made"). *Trefoil Park, LLC v. Key Holdings, LLC*, No. 2015 WL 1138542, at *8 (D. Conn. Mar. 13, 2015) ("the general rule is that a misrepresentation must relate to an existing or past fact," and "Connecticut courts have long interpreted 'statement of fact' to exclude statements of opinion and promises to act in the future unless the promisor had a present intention not to fulfill that promise.") (internal citations omitted); *Allstate Ins. Co. v. Adv. Health Pros., P.C.*, 256 F.R.D. 49, 61 (D. Conn. 2008) ("a conclusion that a representation is fraudulent requires . . .that the representation be false – which, in turn, requires the existence of a fact with which the representation is inconsistent . . .").

Turning to the TPA, the Risk Factors similarly speak to future intent: "The Tokens are being designed for use on a new protocol that *will be* a hub for decentralized finance activity." Again, such statements are not ones of existing fact that would support a claim for fraud. *See, e.g.*, *IM Partners*, 394 F. Supp. 2d at 515-516; *Freedman*, 2000 WL 630916, at *2-3; *Trefoil Park, LLC*, No. 2015 WL 1138542, at *8.[9]

---

[9] And, as noted *supra*, while the Court need not determine the relationship between the term "decentralization" as used in Plaintiff's Complaint and the "Decentralization Milestone" referenced in the TPA, repeated references to a future Decentralization Milestone also weigh against finding that Plaintiff has plausibly pleaded a violation based on alleged statements regarding decentralization.

The second alleged source of misrepresentations was published March 13, 2021 (*id.*, ¶ 114), two days *after* Plaintiff entered into the TPA. Thus, nothing contained in that source could have induced Mr. Liang to enter the TPA two days before it was published.

The third set of alleged misrepresentations are contradicted by the TPA itself. *Id.*, ¶ 116. Namely, Plaintiff alleges that the statements on pages 28 and 29 of the TPA (contained in the Risk Factors exhibit) that (i) "hard forks that change [OHM] distributions are rare and require a majority support from Token holders" and (ii) "solutions may be difficult to implement as they may require the majority consent of existing users" are false and misleading.

The first statement regarding "hard forks" is not actionable because merely changing the ability of pOLY to be exchanged for OHM to ensure Plaintiff ceases violating the terms of the TPA is not a "hard fork"[10] in that it does not "create[] a separate blockchain with a new cryptocurrency." *See* Khandelwal, Rachana (2019) "Taxation of Cryptocurrency Hard Forks," The Contemporary Tax Journal: Vol. 8: Iss. 1, Art. 5. Regarding the second alleged misrepresentation in the TPA's Risk Factors, it clearly states majority consent "may" be required, not that it always or ever is required.

Further, in the same Risk Factors in which Plaintiff alleges these misrepresentations exist, there is the statement that, "pOLY are subject to restriction according to various terms and lockup periods, as described in the TPA." TPA at 23. In addition, the Risk Factors clearly address governance rights:

---

[10] "[A] hard fork (also known as a chain split) occurs when a blockchain network protocol is permanently upgraded by implementing major changes to the existing protocol, *thereby creating a separate blockchain with a new cryptocurrency*." *See* Khandelwal, Rachana (2019) "Taxation of Cryptocurrency Hard Forks," The Contemporary Tax Journal: Vol. 8: Iss. 1, Article 5 (emphasis added). "Bitcoin has undergone several hard forks such as Bitcoin XT (December 2014), Bitcoin Classic (February 2016), and Bitcoin Cash (August 2017)." *Id.* "In 2016, Ethereum went into a hard fork in Ethereum Classic (old) and Ethereum (new)." *Id.*

> OLY holders will likely be able to vote on the governance of the Protocol based on the amount of their Tokens that they have vested and staked. There is no guarantee that any individual OLY holder will be able to influence the outcome of any vote, but rather are decided according to consensus of OLY stakers (the "Community"). Decisions may be made that are contrary to a Token holder's preference.

*Id.* at 24. Thus, the right to participate in making decisions regarding the pOLY tokens and their ability to be exchanged for OHM was not guaranteed, and voting was expected to be based on whether one was holding vested and staked tokens. Plaintiff's allegations of misrepresentations regarding control and governance are disproven by the language of the TPA itself.

Finally, Plaintiff alleges fraud regarding Hephaestus AG's legal status, but as discussed above, the TPA in two separate places identified the TPA as "in formation." TPA at 1, 21. Thus, Plaintiff cannot allege being misled into thinking Hephaestus AG was fully formed as of the time of signing the TPA.

For these reasons, Count IV – Fraud and Count IV – Civil Conspiracy of the Complaint should be dismissed.

## VI. PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF FORUM NON CONVENIENS IN FAVOR OF SWITZERLAND

Connecticut bears no relationship to this dispute beyond the fact that Mr. Bara resides here. Rather, this case involves a dispute between an Australian citizen who claims to reside in Australia (Plaintiff), a Swiss entity (the Hephaestus F. AG, successor to Hephaestus Foundation AG (in formation) (collectively defined above as "Hephaestus AG"), Olympus DAO (an unincorporated entity), an Argentine citizen residing in Connecticut (Defendant Bara), and several John Doe defendants. The negotiation, execution, and performance of the contracts underlying Plaintiff's complaint occurred virtually and Plaintiff himself contends he did not know the identities, much less residencies, of the individuals with whom he claims to have negotiated, i.e., "Apollo" and "Zeus." Compl., ¶ 1.

Conversely, Switzerland has numerous material ties to this matter. The parties to the TPA agreed to submit to jurisdiction in Switzerland, and that Swiss law would apply to any disputes. Compl., § 11(j). Hephaestus AG, Plaintiff's counterparty under the TPA, was in the process of formation in Switzerland at the time the TPA was executed, has since been formally organized under the laws of Switzerland. *See* Exhibit 2. The known defendants are amenable to process in Switzerland, and to making any documents and records located in the United States available for use in Swiss proceedings. And necessary witnesses, who are not otherwise subject to compulsion in this District, are available to testify in Switzerland. Accordingly, even if this Court had jurisdiction over the parties and subject matter of the Complaint[11]—which it does not, *supra*, the Complaint should be dismissed under the doctrine of forum non conveniens because this matter can be more conveniently and justly resolved in Switzerland. *See Melgares v. Sikorsky Aircraft Corp.*, 613 F. Supp. 2d 231, 235 (D. Conn. 2009) (Hall, J.).

### A.    Relevant Law

The forum non conveniens analysis calls on the Court to: "(1) determine the degree of deference properly accorded the plaintiff's choice of forum; (2) consider whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) balance the private and public interests implicated in the choice of forum." *Aenergy, S.A. v. Republic of Angola*, -- F.4th --, 2022 WL 1099445, at *2 (2d Cir. Apr. 13, 2022). All three queries weigh in favor of dismissal here.

---

[11] "Although courts are normally obliged to consider issues of subject matter jurisdiction prior to other issues," the Court may "exercis[e] discretion to consider [a forum non conveniens] dismissal without first adjudicating issues of subject matter jurisdiction." *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 390 (2d Cir. 2011).

### B.        Plaintiff's Choice of the District of Connecticut is Not Entitled to Deference

"[W]hen a plaintiff sues in his home forum, that choice is generally entitled to great deference because it is presumed to be convenient." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003). The presumption of convenience is not present where, as here, "a foreign plaintiff sues in a United States forum." *Id*. That choice is afforded "less deference" because it "provides a much less reliable proxy for convenience" and more so "suggests the possibility that plaintiff's choice was made for reasons of trial strategy." *Id.* at 74.

Courts in the Second Circuit and District of Connecticut have readily granted forum non conveniens dismissals when a foreign plaintiff sues in an American court, especially when the alleged conduct is not physically tied to the forum. *See, e.g.*, *Seales v. Panamanian Aviation Co.*, 356 F. App'x 461, 463 (2d Cir. 2009); *Turedi v. Coca-Cola Co.*, 343 F. App'x 623, 625 (2d Cir. 2009); *Aenergy S.A.*, -- F.4th --, 2022 WL 1099445, at *1; *Acosta v. JP Morgan Chase & Co.*, 219 F. App'x 83, 85 (2d Cir. 2007); *Pollux Holding Ltd.*, 329 F.3d at 71; *Chirag v. MT Marida Marguerite Schiffahrts*, 983 F. Supp. 2d 188, 195 (D. Conn. 2013); *Melgares*, 613 F. Supp. 2d at 235.

As an Australian citizen residing in Australia, Plaintiff's choice of the District of Connecticut is not entitled to deference. Further, the choice of a defendant's home forum is only entitled to deference "to the extent that the plaintiff and the case possess bona fide connections to, and convenience factors favor, that forum." *Pollux*, 329 F.3d at 74; *see also Melgares*, 613 F. Supp. 2d at 245 (giving less deference to a foreign plaintiff's choice of venue—even though one of the defendants was a Connecticut entity—because although "the case [had] some connection to the United States . . . the plaintiffs [did] not."). The factors a court should use to assess whether an action has a bona fide connection to the chosen forum are:

(1) the convenience of the plaintiff's residence in relation to the chosen forum, (2) the availability of witnesses or evidence to the forum district, (3) the defendant's amenability to suit in the forum district, (4) the availability of appropriate legal assistance, and (5) other reasons relating to convenience or expense.

*Chirag*, 983 F. Supp. 2d at 195. Applied here, Plaintiff's claims bear no bona fide connection to the District of Connecticut.

### 1.    Plaintiff's Residence is Not Convenient to the Chosen Forum

Plaintiff resides in Australia, which is plainly inconvenient to Connecticut.[12]

### 2.    Key Witnesses are Unavailable in the Chosen Forum

Important prospective witnesses in this matter are unavailable to testify in the District of Connecticut because they live beyond the Court's subpoena power. *See Aenergy S.A.*, -- F.4th --, 2022 WL 1099445, at *8 (granting dismissal for forum non conveniens in part because it was "far from certain . . . whether a U.S. subpoena could be served upon or enforced against" certain witnesses). Specifically, one of the core allegations in this case is that the Defendants falsely represented that Hephaestus AG was organized, or in the process of being organized, in Switzerland, and that other allegedly false information about Hephaestus AG, including its address, was included in the TPA.  Compl., ¶¶ 15, 142-146, 186-190 & 225-227. To rebut these allegations, Defendants propose to seek the testimony of: (1) Annina Furrer, Esq., Hephaestus AG's Swiss transactional counsel; (2) Richard Nägeli, a Swiss notary involved in the initial efforts to organize Hephaestus AG; (3) Patrick Narboni, a Swiss citizen serving as a director of Hephaestus AG. It is "far from certain" that any of these witnesses could be made to testify in the

---

[12] On a motion to dismiss for forum non conveniens, the Court is empowered to "make findings of fact" based on affidavits of the parties. *Acosta*, 219 F. App'x at 85 (affirming dismissal where the plaintiffs were foreign nationals). The Court may, therefore, make determinations about plaintiff's residency that would otherwise be premature in the pre-discovery motion phase. *See Seales*, 356 F. App'x at 463 ("On this record, we identify no error, much less clear error signaling an abuse of discretion, in the district court's factual finding that plaintiff did not reside in the United States and that, therefore, his choice of forum was entitled to less deference.").

District of Connecticut. *See Chirag*, 983 F. Supp. 2d at 195 (dismissing the complaint where plaintiffs were "nationals and residents of India," "a critical defendant in [the] case . . . [was] not amenable to process in [the] forum," and "the bulk of the witnesses and evidence in [the] case [were] likely to be found outside of the United States").

### 3. Defendants' Amenability to Process is Not Dispositive

While some Defendants may be amenable to process in the District of Connecticut, this factor is not dispositive where the other factors in this analysis weigh in favor of dismissal. *Melgares*, 613 F. Supp. 2d at 244 (granting forum non conveniens motion in favor of Spain where defendant corporations were located in Connecticut).

### 4. Plaintiff Has Obtained Adequate Legal Assistance in the Alternative Forum

Perhaps aware that this dispute should be litigated in Switzerland, Plaintiff has already retained Swiss counsel, Reto Marghitola, in connection with this dispute. In fact, Mr. Marghitola has corresponded with counsel for defendant Hephaestus on Plaintiff's behalf. *See* Exhibit 4. Thus, adequate legal assistance is not just "available" to Plaintiff, but has already been established in the alternative forum.

### C. Switzerland is an Adequate Alternative Forum

With respect to the second prong of the forum non conveniens analysis—adequacy of the forum—the Second Circuit has stated that "an alternative forum is adequate (1) if the defendants are amenable to service of process there, and (2) if it permits litigation of the subject matter of the dispute." *Aenergy S.A.*, -- F.4th --, 2022 WL 1099445, at *5. Again, each of the factors support

dismissal because all the known defendants are amenable to process in Switzerland,[13] and Plaintiff can litigate this dispute in a Swiss court.

The bar for analyzing whether an alternative forum "permits litigation of the subject matter of the dispute" is not high, and does not require that the chosen forum parallel the law in this District. *See Aenergy S.A.*, -- F.4th --, 2022 WL 1099445, at *5. In *Aenergy*, the Second Circuit found that Angola was an adequate alternative to the Southern District of New York, noting that "the availability of an adequate alternative forum does not depend on the existence of the identical cause of action" or "identical remedies," and that "the prospect of lesser recovery" does not render an alternative forum inadequate. *Id.* at *6; *see also Figueiredo Ferraz E Engenharia de Projeto Ltda.*, 665 F.3d at 390 ("It is no doubt true that only a United States court may attach a defendant's particular assets located here, but that circumstance cannot render a foreign forum inadequate.").

Plaintiff's claims can be resolved in Switzerland, a country that is highly advanced in the very field from which this dispute arose. *See* Caitlin Reilly, U.S. Losing Out of Crypto to Singapore, Switzerland, Davidson Says, 2020 WL 4686258 (Jan. 30, 2020) (recounting Congressman Warren Davidson's statement that uncertainty in the field of cryptocurrency is driving some people to places like Switzerland "not to avoid our regulations, but to find legislative clarity"). Swiss law provides redress for financial and breach of contract disputes, and indeed, in *Peters v. UBS AG*, 588 F. App'x 57 (2d Cir. 2014), the Second Circuit summarily held that a plaintiff was collaterally estopped from reraising a claim in federal court that was dismissed from state court "on the grounds of forum non conveniens, identifying Switzerland as an adequate alternative forum."

---

[13] Courts in this circuit have routinely granted dismissal on forum non conveniens grounds on the condition that defendants make themselves amenable to process in the alternative forum. *See, e.g.*, *Pollux*, 329 F.3d at 75-76; *Melgares*, 613 F. Supp. 2d at 246.

### D. The Public and Private Interests Factors All Favor Dismissing Plaintiff's Complaint in Favor of Switzerland

Finally, this Court is "genuinely inconvenient" within the meaning of the forum non conveniens analysis, and the proposed forum is "significantly preferable." *Aenergy S.A.*, -- F.4th --, 2022 WL 1099445, at *7 (quoting *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 179 (2d Cir. 2006)).

> To assess this issue, we consider private and public interest factors. With respect to the private interest factors, we assess 'the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; the possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.' With respect to public interest factors, we consider 'administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law.'

*Id.* (first quoting *Irgorri*, 274 F.3d at 73-74, then quoting *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002)); *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (creating the public/private interests factors relevant to a forum non conveniens analysis). All the "*Gilbert*" factors that bear on this matter indicate that Switzerland is a more convenient and just forum.

Switzerland has the same access to evidence as the District of Connecticut or any other forum because there is no physical evidence in this case beyond some electronically stored documents. Other than Mr. Bara, Switzerland, and not the District of Connecticut, has access to the potential witnesses and compulsory process is available there. A Swiss court judgment would be enforceable against the defendants, who are making themselves amenable to process in Switzerland. Switzerland has an interest not shared by the District of Connecticut in addressing alleged wrongdoing by Hephaestus AG. And the District of Connecticut would face a high burden in assembling a federal jury to judge a complex cryptocurrency dispute between foreign individuals and entities. In comparison, according to the latest Court of Appeal Accountability Report for the Canton of Zug, in 2021, civil proceedings in which the court acted as a court of first

instance were generally concluded in less than one year. *See* Exhibit 5, at pp. 12.

Additionally, if this case were to proceed beyond the instant motions, the Court would have to navigate Swiss law because the TPA states:

> ALL RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF ZUG, SWITZERLAND WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES.

TPA, § 11(j). This enforceable choice of law provision, *see* Section II, *supra*, provides an important justification for the Court to dismiss the complaint on the ground of forum non conveniens. *See Aenergy S.A.*, -- F.4th --, 2022 WL 1099445, at *8-9 (finding that not dismissing case would require the court to confront "difficult problems in conflict of laws and the application of foreign law" because "the contracts at issue [were] subject to Angolan law").

For these reasons, this Court should dismiss Plaintiff's Complaint in favor of resolution of this matter in the courts of Switzerland.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's Complaint should be dismissed with prejudice.[14]

---

[14] After the Complaint is dismissed, Defendants intend to move for attorney's fees and costs pursuant to Section 7 of the TPA that provides, "Purchaser ... agrees to indemnify and hold harmless the Sponsoring Parties, and each other person, if any, who controls, is controlled by, or is under common control with any of the foregoing (each, an "Indemnified Party") from and against any and all loss, claim, damage, liability or expense whatsoever (including reasonable attorneys' fees and disbursements) due to or arising out of or based upon: ... (c) any action instituted by or on behalf of the Purchaser against an Indemnified Party that is finally resolved by judgment against the Purchaser or in favor of an Indemnified Party."

Respectfully submitted,

*/s/ Jonathan Freiman*

Tracey Salmon-Smith (ct 29372)
Faegre Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932
Tel.: (973) 549-7038
Fax: (973) 360-9831
tracey.salmonsmith@faegredrinker.com

Antonio M. Pozos (PHV forthcoming)
Victoria L. Andrews (PHV forthcoming)
Henry Grabbe (PHV forthcoming)
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Tel.: (215) 988-3327
Fax: (215) 988-2757
antonio.pozos@faegredrinker.com
victoria.andrews@faegredrinker.com
henry.grabbe@faegredrinker.com

*Counsel for Defendant Daniel Bara*

June 3, 2022
31594\1\4891-3519-9779.v1

Jonathan Freiman (ct 24248)
Wiggin and Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510
Tel.: (203) 498-4584
Fax: (203) 782 2889
jfreiman@wiggin.com

Daniel B. Ravicher (PHV forthcoming)
Aaron M. Zeisler (ct 29317)
Meghan H. Sullivan (PHV forthcoming)
Sumana Wolf (PHV forthcoming)
ZEISLER PLLC
45 Rockefeller Plaza, 20th Floor
New York, NY 10111
Tel.: (212) 671-1921
Fax: (888) 229-1921
dan@zeisler-law.com
aaron@zeisler-law.com
meghan@zeisler-law.com
sumana@zeisler-law.com

*Counsel for Defendants Hephaestus
Foundation AG and Olympus DAO*